UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 MAY 21  PM 12: 27

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA          )
                                  )
          v.                      )
                                  )          Criminal No.   5:19-cr - 76 - 1-4
ARIEL QUIROS,                     )
WILLIAM KELLY,                    )
JONG WEON CHOI, aka Alex Choi, and )
WILLIAM STENGER,                  )
          Defendants              )

## INDICTMENT

The Grand Jury charges:

### COUNT ONE

At all times relevant to this indictment:

#### The Defendants

1.        Defendant ARIEL QUIROS, from Florida, purchased the Jay Peak Resort in Jay,

Vermont in 2008. QUIROS had long-term business relationships with WILLIAM KELLY and

JONG WEON CHOI, aka Alex Choi.

2.        Defendant WILLIAM KELLY, from Florida, had long acted as an advisor for

QUIROS and participated in various business ventures with QUIROS. In 2011, QUIROS made

KELLY Chief Operating Officer of the Jay Peak Resort.

3.        Defendant JONG WEON CHOI, aka Alex Choi, from South Korea, ran AnC

Korea. In or about 2007, CHOI oversaw the construction of a biotechnology facility in Korea for

AnC Korea. In early 2013, CHOI was detained as part of a criminal investigation in Korea

relating to his operation of AnC Korea. He was released for a period during the second half of

2013 and detained again for most of 2014. In 2016, he was convicted of multiple financial frauds in Korea associated with his management of AnC Korea.

4.      Defendant WILLIAM STENGER, from Vermont, managed the Jay Peak Resort before QUIROS purchased it. STENGER knew QUIROS before the purchase and assisted QUIROS with the purchase. After the purchase, QUIROS continued to employ STENGER as the President and manager of the resort.

## The Businesses

5.      Jay Peak, Inc., a Vermont corporation, operated Jay Peak Resort, in Jay, Vermont.

6.      Jay Peak Biomedical Research Park L.P. was a Vermont limited partnership associated with the AnC Vermont EB-5 project, a plan to operate a biotechnology facility in Newport, Vermont. The limited partnership was supposed to construct and own the biotechnology facility, purchase distribution rights for certain products from AnC Korea, and then participate in the operations at the AnC Vermont facility. The project was never completed.

7.      AnC Bio Vermont GP Services, LLC, was a Vermont limited liability company that acted as general partner for the AnC Vermont project. Its managing members were QUIROS and STENGER.

8.      AnC Bio VT LLC was a Vermont limited liability company that developed and sponsored the AnC Vermont project. Its managing members were originally QUIROS, STENGER, and QUIROS's son. In or about early 2015, QUIROS took over his son's interest in AnC Bio VT LLC.

9.      AnC Bio, Inc., a Korean corporation, began operations in approximately 2009 as the successor corporation to Bioheart Manufacturing, the corporation that owned the Korean biotechnology facility. In or about 2009, AnC Bio, Inc. became a subsidiary of AnC Bio

2

Holdings, Inc., a Korean publicly traded company. In or about 2013, after CHOI was detained in

Korea, he created AnC Biopharm, Inc., to appear as a separate business from AnC Bio, Inc.

CHOI controlled each of these corporations, which are here referred to collectively as AnC

Korea.

10.     Jay Construction Management, Inc. (JCM), a Vermont corporation with offices in

Miami, Florida, was created by the defendants in 2011. CHOI was listed as the Director and

President of JCM, but QUIROS controlled JCM. In 2014, QUIROS took formal ownership of

JCM.

11.     GSI of Dade County, Inc. (GSI), a Florida corporation, served as a corporate shell

for QUIROS's personal business. QUIROS paid personal expenses through GSI bank accounts.

12.     Q Resorts, Inc., a Delaware corporation, was organized in 2008 by QUIROS to

own Jay Peak, Inc. QUIROS was the sole owner, officer and director of Q Resorts.

13.     North East Contract Services, LLC (NECS), a Florida limited liability company

owned by KELLY, was started in or about 2012 by KELLY with QUIROS's approval to provide

construction supervision services for EB-5 projects.

EB-5 Foreign Investments

14.     The EB-5 Immigrant Investor Program was created by Congress in 1990 to boost

the United States economy through job creation. EB-5 immigrant investors have the opportunity

to become lawful permanent residents of the United States by investing in job-creating

enterprises in the United States. The particulars of the EB-5 program vary by project and

location, but relevant to this indictment an immigrant investor could qualify for permanent

resident status (commonly known as a green card) by investing $500,000 in a commercial

enterprise approved by the Vermont EB-5 Regional Center and by U.S. Citizenship and

3

Immigration Services (CIS). CIS made an initial assessment for approval of a project based on whether an investor's I-526 application showed that the commercial enterprise would create within the near future ten jobs for each investment. CIS considered a number of factors in approving a commercial enterprise, including the credibility and financial viability of the project business plan. If approved, the investor could obtain a conditional green card. Two years after receiving the conditional green card, the investor had to demonstrate to CIS in an I-829 application that ten jobs had been, or would soon be, created to receive a permanent green card.

15.     The State of Vermont ran a federally designated EB-5 regional center. CIS approved the Vermont Regional Center (VRC) and granted it authority to approve and monitor EB-5 projects in Vermont. VRC, in its capacity as a federally-approved and designated regional center, in turn entered into memoranda of understanding with EB-5 project sponsors. In this regard, VRC assisted CIS in the regulation and administration of the EB-5 investment program. VRC was part of the Vermont Agency of Commerce and Community Development (ACCD) until late 2014, when the Vermont Department of Financial Regulation (DFR) joined ACCD as a partner in VRC.

The Jay Peak EB-5 Offerings

16.     The Jay Peak resort began a plan to use funds from EB-5 immigrant investors to support construction at the resort in 2006, before QUIROS bought the resort. Between 2006 and 2012, over $250 million in investor funds were raised to build facilities at Jay Peak as part of six different EB-5 projects. The EB-5 projects were marketed in a variety of ways, including through its website, immigration attorneys, and overseas and domestic meetings and seminars with prospective investors.

4

17.     Each EB-5 investor became a limited partner in a limited partnership associated with a specific project. Each investor signed a limited partnership agreement with the general partner, which gave the general partner certain control over the use of partnership funds. At the same time, according to the limited partnership agreement for the AnC Vermont project, the general partner had certain obligations to the limited partners, including a duty not to borrow or commingle investor funds or acquire property with investor funds that did not belong to the limited partnership without consent, and a duty to inform limited partners of any investigation or event that could have a material adverse impact on the partnership. Each AnC Vermont investor was also required to pay an administrative fee for the sponsor for the EB-5 project. The offering materials for the AnC Vermont project stated that the administrative fees were to be used for expenses associated with the project.

18.     At around the time he bought the resort in 2008, QUIROS took control over the Jay Peak-related EB-5 investor funds through bank accounts at Raymond James. QUIROS also set up a series of loan accounts at Raymond James with EB-5 investor funds as collateral for the loans. In February 2012, QUIROS set up a loan account in the name of Jay Peak, Inc., which relied on collateral from a variety of Raymond James accounts containing EB-5 investor funds. QUIROS used the loan proceeds for a variety of purposes, including personal expenditures and EB-5 project costs. For example, in May 2012, QUIROS used approximately $7 million in loan proceeds to purchase Burke Mountain ski area, where he set up an approximately $100 million EB-5 project in 2013 to construct a hotel and other facilities. By 2013, QUIROS was using AnC Vermont investor funds as collateral for the loan.

19.     By 2011, the defendants knew that Jay Peak's EB-5 projects faced financial problems resulting from the use of EB-5 funds raised for a particular project for purposes

unrelated to that project, including costs associated with other EB-5 projects, financial challenges at Jay Peak resort, and QUIROS's personal expenses. In 2011, the defendants agreed to use JCM as a vehicle to commingle EB-5 investor funds from different projects.

The Scheme

20.     Between in or about the fall of 2011 and in or about April 2016, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER knowingly and willfully conspired to devise a scheme to defraud investors in the AnC Vermont EB-5 project and to obtain money from these investors by materially false and fraudulent pretenses, representations, and promises and to execute that scheme by means of interstate and foreign wire communications, in violation of 18 U.S.C. § 1343. Moreover, during that period, the defendants in fact executed the scheme through interstate and foreign wire communications, including some to and from Vermont.

21.     From the beginning, each of the defendants had certain responsibilities in connection with the AnC Vermont scheme. QUIROS acted as the ultimate decision maker on many project matters and controlled the money raised from investors. KELLY was QUIROS's key advisor and assistant in executing QUIROS's decisions. CHOI was a hidden partner in the project. He formulated the foundation of the business plan for AnC Vermont. CHOI's company, AnC Korea, was supposed to design the Vermont facility, provide the technology for AnC Vermont's operations, and use part of the completed facility. STENGER's primary jobs were to recruit investors and to use his personal connections and reputation to garner support from local, state, and federal politicians. STENGER presented a variety of false and fraudulent statements about the status of the AnC Vermont project to investors, VRC, and CIS. In marketing the projects, STENGER and others highlighted VRC's approval and monitoring of the project.

6

STENGER also assumed the role of the general partner who authorized the expenditure of investor funds to JCM, an entity used to commingle investor funds.

22.    The defendants misrepresented the true business relationship between QUIROS and CHOI. QUIROS and CHOI were financial partners in control of the project. The transaction with AnC Korea involved self-dealing.

23.    In 2009, the defendants had begun formulating a plan for a $50 million project to build a biomedical facility in Vermont. Then in September 2011, QUIROS and CHOI discussed doubling the price of the AnC Vermont project from $50 million to $100 million.

24.    In mid-2012, KELLY took the lead in developing the details for the fraudulent business plan, which would be included in the materials provided to potential investors. Immigrants who decided to invest in the project would, in turn, provide the business plan to CIS as part of their EB-5 submissions. The fraudulent business plan described the planned business operation, business projections, and the use of investor funds. KELLY and STENGER received and used information from CHOI as the principal source for the business plan. QUIROS reviewed and approved KELLY's work. The plan was fraudulent in various ways, including two major deceits: 1) secret embezzlement of investor funds; and 2) deceptions about the number of jobs to be created by the project within several years and the project's ability to generate revenue.

25.    In October 2012, QUIROS and STENGER entered into a memorandum of understanding with VRC for the AnC Vermont project. In the memorandum, among other things, VRC described its responsibility and duty to monitor the project, and QUIROS and STENGER agreed to promote the project honestly and fairly.

26.     The AnC Vermont project was supposed to raise and spend $110 million from 220 EB-5 investors, and to use $8 million from the project sponsor, AnC Bio VT LLC. Between November 2012 and April 2016, the defendants convinced approximately 169 investors to invest in the AnC Vermont EB-5 offering. Those investors each contributed a $500,000 capital investment, for a total of approximately $85 million, plus an "administrative fee" of between approximately $20,000 and $50,000, for a total of approximately $8 million. The AnC Vermont facility, however, was never constructed. In late 2012, the defendants planned to use the building plans for the AnC Korea facility to build the facility in Vermont. Almost immediately, the defendants discovered that the Vermont facility could not be constructed without a new design. Final designs for the AnC Vermont facility were never completed.

27.     To maintain their scheme, the defendants responded to inquiries from different entities that monitored and regulated the AnC Vermont project. During the course of CIS review of the project, CIS submitted two rounds of Requests for Evidence (RFEs) about the project plans. The defendants answered the questions about the project on behalf of the investors. CIS approved the first AnC Vermont I-526 submissions in June 2014.

28.     By mid-2013, the Securities and Exchange Commission (SEC) was investigating whether QUIROS and STENGER had violated federal securities laws in connection with their marketing of EB-5 projects and their use of EB-5 investor funds. In April 2016, the SEC sued QUIROS and STENGER and successfully petitioned a federal court to appoint a receiver to take responsibility for Jay Peak, Burke Mountain, and the EB-5 projects. The defendants lost control of the AnC Vermont project at that time.

29.     In late 2013, as part of its responsibility to monitor the EB-5 projects in Vermont for CIS, VRC began asking QUIROS and STENGER detailed questions about the AnC Vermont

project, including questions about AnC Korea, about QUIROS's business relationships, and about AnC Vermont's business plan. In June 2014, VRC directed that the defendants suspend offering and marketing of the AnC Vermont project. VRC demanded, among other things, that QUIROS, KELLY, and STENGER prepare more detailed offering materials and provide a third-party assessment of the financial projections in the business plan. The project was permitted to go back into the investor market in or about April 2015 with several restrictions imposed by VRC.

Secret Embezzlement

30.     In or about the fall of 2012, QUIROS, KELLY, and CHOI created a chart of the purported use of the AnC Vermont project funds for inclusion in the project offering materials. The use-of-funds chart contained a number of fraudulent statements designed to hide money that they planned to be siphoned to QUIROS and CHOI. For example, the chart listed a $40 million cost for "construction fit out and equipment," referred to here as equipment costs, when in fact QUIROS, KELLY, and CHOI planned to spend approximately $28 million on equipment with the remaining $12 million going to QUIROS and CHOI. The chart listed $10 million to be paid by investors to AnC Korea for distribution rights for the AnC Korea "products," when in fact the defendants knew that this value was inflated and decided by self-dealing. The chart listed working capital of $16 million, when in fact QUIROS, KELLY, and CHOI planned that $6 million would be used for working capital and the remaining $10 million would be shared by QUIROS and CHOI.

31.     The defendants used JCM as the vehicle for controlling the secret embezzlement from the investors. JCM was designated as a pass-through corporation for approximately $52 million that was supposedly to be paid to AnC Korea. Specifically, JCM contracted to act as the

9

pass-through for the $40 million in equipment costs and $10 million in distribution rights described above, as well as $2.1 million in design fees. The JCM pass-through allowed QUIROS and CHOI to secretly skim off millions of dollars of investor funds for their own purposes.

32.     In November 2012, the defendants met in Korea to finalize details about the project. During this visit, QUIROS and CHOI documented their plan to split $34 million. They also documented that KELLY was to receive $4 million and STENGER was to receive $1 million in connection with the "management fee," which was to be paid through NECS.

33.     Between March 2013 and October 2014, QUIROS, KELLY, and STENGER paid over $47 million in AnC Vermont investor money to JCM, which were documented by eighteen monthly invoices of $2.6 million each. Each monthly invoice listed monies due for "architectural, engineering fees, and deposits for equipment." QUIROS controlled the investor money sent to JCM, and he could and did use those funds for a variety of purposes unrelated to the AnC Vermont project. During this period, QUIROS forwarded less than $6 million from JCM to AnC Korea.

34.     QUIROS, KELLY, and STENGER made the first payment of AnC Vermont investor money to JCM in March 2013, in the amount of $2.6 million. Then in June 2013, QUIROS, KELLY, and STENGER arranged for $10.4 million in investor money to be sent to JCM to pay four $2.6 million invoices. No other AnC Vermont investor money was transferred to JCM between June 2013 and late February 2014.

35.     In late 2013, QUIROS learned that he had to pay down the Raymond James loan, which stood at over $21 million. He used money from JCM to make monthly loan payments of $500,000 from October 2013 to February 2014. In or about February 2014, QUIROS learned that he had to pay off the entire loan balance. In early March 2014, QUIROS used AnC Vermont

investor money to pay off the approximately $19 million loan balance. To do this, in late February, QUIROS, KELLY, and STENGER arranged for $18.2 million in AnC Vermont investor money to be sent to JCM to pay seven $2.6 million invoices. When JCM received those funds, QUIROS used the money to pay off the Raymond James loan.

36.      In May 2014, QUIROS was confronted about the Raymond James loan payoff with AnC Vermont investor funds during sworn testimony with the SEC. At that time, QUIROS claimed that the funds represented his profits from EB-5 projects. After the testimony, QUIROS and KELLY convinced AnC Korea representatives to sign declarations representing that AnC Korea directed the use of $21 million to be paid from JCM to Jay Peak Inc., the entity used for the Raymond James loan. The declarations also represented that AnC Korea would provide the equipment, distribution rights, and architectural and engineering services to AnC Vermont investors for $21 million less than their previous contract. The declarations were submitted to the SEC, but they were concealed from investors, from VRC, and from CIS.

37.      Between late March 2014 and October 2014, QUIROS, KELLY, and STENGER arranged for another $15.6 million in investor funds to be sent to JCM to pay six $2.6 million invoices.

38.      QUIROS, KELLY, and STENGER concealed from VRC, CIS, and investors QUIROS's misuse of investor funds that had been sent to JCM. Moreover, QUIROS, KELLY, and STENGER made false and misleading statements to the SEC about the AnC Vermont project to attempt to convince the SEC to end its investigation.

39.      In late 2014, VRC began asking questions about how AnC Vermont investor money had been used. In late 2014 and early 2015, QUIROS and KELLY provided false and misleading information to VRC about payments of investor funds to AnC Korea. For example, in

February 2015, QUIROS and KELLY caused the representation that AnC Korea had been paid the money that had in fact been used to pay off the Raymond James loan.

40.     In or about April 2015, VRC allowed QUIROS, KELLY, and STENGER to again accept investor funds for AnC Vermont, subject to spending restrictions. The defendants were not prepared to move forward with construction. The defendants concealed from past and potential investors, from VRC, and from CIS that they lacked the money to construct and begin operations at the AnC Vermont facility, even if they got approval to use the new, restricted investor funds.

41.     At the same time that QUIROS, KELLY, and STENGER requested to continue fundraising for the AnC Vermont project, QUIROS furthered his plan to misuse previously raised investor funds. After QUIROS paid off his Raymond James loan in 2014, he looked for a new financial institution that would loan him money. In early 2015, QUIROS established a banking relationship with Citibank, which agreed to loan him money. QUIROS arranged a Citibank loan account secured by $15 million in a JCM account at Citibank, most of which was from AnC Vermont investors. QUIROS then borrowed almost $15 million through this loan account, spending the money on matters unrelated to AnC Vermont, including a $6 million payment to the Internal Revenue Service for QUIROS's personal tax obligations in April 2015. Because the $15 million JCM account was acting as collateral for QUIROS's borrowing, it was not available for AnC Vermont project expenses. In June 2015, less than a million dollars was still available at JCM for project expenses from the approximately $47 million that JCM was paid from AnC Vermont investor funds. Almost all of the AnC Vermont money sent to JCM had been used for purposes unrelated to the project.

42.     In November 2015, QUIROS secretly embezzled another $980,000 in AnC Vermont investor funds. At that time, QUIROS had control of approximately $3 million of AnC Vermont investor funds in an account at Citibank. QUIROS transferred $980,000 in investor funds from the Citibank AnC Vermont investor account to his Citibank GSI account. Months later, QUIROS submitted bogus documentation for the books of the AnC Vermont partnership to authorize the payment. In early 2016, KELLY and STENGER participated in the fraudulent authorization of this payment as a legitimate AnC Vermont expense.

43.     The defendants also misused administrative fees paid by AnC Vermont investors. Contrary to the representations in the offering materials, the defendants used these funds for purposes unrelated to the AnC Vermont project. For example, in June 2013, STENGER, QUIROS, and KELLY used $250,000 of these funds as an initial payment for the purchase of a property known as the "Spates Block" in Newport, Vermont, where the defendants planned to construct a future EB-5 project.

Jobs and Revenue Deceit

44.     The defendants created a fraudulent "party line" about jobs and revenues that they presented to investors, VRC, and CIS. The defendants based this party line on inflated revenues and the job numbers they needed to achieve for CIS approval, ignoring the considerations necessary for a realistic business plan. The defendants also understood that CIS approval and business revenues were both important to investors. STENGER routinely stated to potential investors that he believed they would see returns on their investment through AnC Vermont operations as soon as it opened, and that the investors would be paid back their principal investment from operations in four to five years.

45.     In 2012, the defendants knew that they had to demonstrate a plan to create at least 2,200 jobs for CIS approval of the AnC Vermont project. To gain CIS approval, the defendants presented a jobs report prepared by a third-party economist hired by the defendants. The economist's analysis was based directly on inflated hiring and financial projections formulated by the defendants to achieve the required number for EB-5 approval. The jobs report presented a calculation of jobs that would be created during the construction of the facility and during the first few years of operation of the facility.  The construction-phase jobs were based on the amounts the defendants claimed would be spent on construction, equipment, and infrastructure. The operations-phase jobs were based on the number of people the defendants claimed would be hired for the business, and the amounts of money the defendants claimed would be spent on supplies or items used during operations. All of the operational jobs numbers depended on the amount of business that would be conducted by AnC Vermont in the first few years. The defendants created deceptions about both construction jobs and operational jobs.

46.     The defendants maintained the party line from 2012 until 2016, even as their fraudulent business plan became increasingly unrealistic. For example, in April and May of 2014, in response to an RFE from CIS, the defendants made only minor modifications to the business plan, such as delaying the planned commencement of the project and increasing the projected revenues.

47.     The defendants inflated projected jobs from the construction phase.  First, as discussed above, millions of dollars in equipment costs to be paid to AnC Korea were in fact hidden embezzlement to benefit QUIROS and CHOI, which would not create jobs. Second, over $12 million allocated to construction supervision and expenses were in fact project profit to the defendants to be paid through NECS instead of money that would be used to create jobs. Third,

the defendants falsely represented that AnC Bio VT LLC planned to contribute $8 million to the project for infrastructure. Without these fraudulent additions, the projected jobs during the construction phase would have been far fewer.

48.     The defendants also inflated projected jobs and supplies expenses from the operations of the business. The party line described three lines of business: clean room rentals, sales of stem cell products, and sales of artificial organs. The party line was deceptive about all three.

49.     In 2012, when the defendants devised the fraudulent party line, they created inflated projections related to clean room rentals. CHOI's financial projections, the only financial projections considered by the defendants, provided a basis for fewer jobs from clean room rentals than would be necessary for CIS approval. For example, CHOI's business plan contemplated that there would be only ten clean rooms. STENGER and KELLY ignored these figures and inflated the numbers without planning for commercial viability. To ensure that the project appeared to create the necessary number of jobs, STENGER and KELLY told the economist that the facility would have fifty clean rooms with several AnC Vermont employees working in each room beginning as soon as construction was complete.

50.     The defendants made no serious inquiry into the market for rental of clean rooms but falsely represented that there was a significant market for clean room rental. The 2012 business plan represented that clean room revenues would come from AnC Korea and from contract researchers using the facility. In fact, CHOI and QUIROS did not plan on AnC Korea paying money to AnC Vermont to use the facility, and AnC Korea was in financial distress. With regard to contract research, the defendants represented that discussions with potential clients were already underway, when in fact they had not identified any contract research clients.

51.     The defendants maintained the fraudulent clean room rental figures until 2016, no matter what contrary information they received. For example, clean room rental revenues actually depended on creating a successful contract manufacturing operation, namely AnC Vermont being hired by cell therapy companies to manufacture large volumes of cells. It would take substantial investments and time to develop contract manufacturing revenue, including approval by the U.S. Food and Drug Administration (FDA) and business development within the cell therapy industry. The defendants made no plan to develop a contract manufacturing operation, lacked personnel to develop a contract manufacturing operation, and had no financial resources to develop a contract manufacturing operation. In short, a contract manufacturing operation, even if successfully developed, would not be commercially viable within the time restrictions of the party line.

52.     In 2012, when the defendants devised the fraudulent party line, they created inflated projections related to stem cell therapy products. The defendants misrepresented their ability to market a heart regeneration stem cell therapy product. The product was not commercially viable and the defendants had no rights to such a product. Indeed, the fraudulent revenue projections reflected sales of two stem cell products less than two years after construction started. In fact, the defendants had no stem cell products, were conducting no research about stem cell products, and made no efforts to find a stem cell product from a third-party source. The defendants fraudulently maintained the stem cell product party line and the accuracy of fraudulent revenue from stem cell products until they lost control of the project in April 2016.

53.     In 2012, when the defendants devised the fraudulent party line, they created inflated projections related to artificial organs. The defendants represented that AnC Vermont

would manufacture and sell three different artificial organs: an artificial heart-lung known as the T-PLS, an artificial kidney known as the C-PAK, and an artificial liver known as the E-Liver. Artificial organ marketing and sales depended on both development of the products and approval of the products by the FDA. The T-PLS had no commercial market and needed to be redesigned, and the C-PAK and E-Liver had not been developed. AnC Korea had not developed and could not develop the products. The project budget included no resources for development, CHOI had no resources for development, and QUIROS made no effort to spend money on development. FDA approval would take time and money. The defendants made no effort to seriously investigate how much time and money was necessary for FDA approval for the products. In short, these artificial organs, even if successfully developed and approved by the FDA, would not be commercially viable within the time restrictions of the party line. The defendants fraudulently maintained the artificial organs party line and the accuracy of revenue from artificial organs until they lost control of the project in April 2016.

(18 U.S.C. § 1349)

## Count Two

54.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

55.     On or about February 28, 2014, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line "Jay Peak Biomedical Research Park LP General Partner's Authorizations for Payment," for the purpose of executing the scheme in connection with the use of AnC Vermont investor funds to pay off the Raymond James loan.

(18 U.S.C. §§ 1343, 2)

## Count Three

56.    The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

57.    On or about April 23, 2014, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line "What should be the final workbook attached" for the purpose of executing the scheme in connection with CIS questions in the second RFE regarding the job and revenue projections for the AnC Vermont project.

(18 U.S.C. §§ 1343, 2)

<u>Count Four</u>

58.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

59.     On or about January 2, 2015, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line "FW: ACCD Ltr to Kelly," for the purpose of executing the scheme in connection with responding to VRC questions including about the AnC Vermont projections and FDA timeline.

(18 U.S.C. §§ 1343, 2)

## Count Five

60.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

61.     On or about February 20, 2015, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line "FW: Revised Spreadsheet," for the purpose of executing the scheme in connection with responding to VRC questions about the use of AnC Vermont investor funds.

(18 U.S.C. §§ 1343, 2)

Count Six

62.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

63.     On or about August 14, 2015, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line "Letter to the Malek Brothers," for the purpose of executing the scheme in connection with responding to a potential investor's questions including about the SEC investigation and the AnC Vermont project party line.

(18 U.S.C. §§ 1343, 2)

Count Seven

64.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

65.     On or about January 22, 2016, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER, having devised the scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce an email with subject line that begins "FW: $980,000 wire transfer from $ Citibank," for the purpose of executing the scheme in connection with QUIROS's secret embezzlement of $980,000 in AnC Vermont investor funds.

(18 U.S.C. §§ 1343, 2)

## Count Eight

66.     The allegations in paragraphs 54 through 65 of Counts Two through Seven are incorporated here.

67.     In or about April 2015, in the District of Vermont and elsewhere, defendant ARIEL QUIROS knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely a $6,000,000 check payable to the Internal Revenue Service, which was derived from specified unlawful activity, namely wire fraud, as alleged in Counts Two through Seven.

(18 U.S.C. §§ 1957, 2)

## Count Nine

68.     The allegations in paragraphs 54 through 65 of Counts Two through Seven are incorporated here.

69.     In or about December 2015, in the District of Vermont and elsewhere, defendant ARIEL QUIROS knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, namely a check on the account of GSI for $46,465.00 to purchase a Jeep Rubicon, which was derived from specified unlawful activity, namely wire fraud, as alleged in Counts Two through Seven.

(18 U.S.C. §§ 1957, 2)

## Count Ten

70.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

71.     Between in or about March 2014 and in or about April 2016, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER knowingly and willfully concealed and covered up by trick, scheme and device, a material fact in a matter within the jurisdiction of the Executive Branch of the United States, namely that QUIROS used approximately $21 million in AnC Vermont investor funds sent to JCM for purposes unrelated to the AnC Vermont project.

(18 U.S.C. §§ 1001, 2)

Count Eleven

72.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

73.     Defendants ARIEL QUIROS, WILLIAM KELLY, and JONG WEON CHOI, aka Alex Choi, represented AnC Korea as a principal support for the AnC Vermont project to investors, VRC, and CIS. These defendants concealed the truth about AnC Korea and CHOI.

74.     The defendants misrepresented the financial viability of AnC Korea. AnC Korea was a failed business. The marketing materials falsely stated that AnC Korea had the capacity to support the AnC Vermont project. QUIROS and CHOI knew that AnC Korea was desperate for operational funds, as it had no substantial revenue stream and substantial debts. Moreover, AnC Korea had made no progress in research and development for years.

75.     In early 2013, after CHOI was detained by Korean authorities, CHOI arranged to have AnC Vermont investor funds for AnC Korea sent to a new entity, AnC Biopharm, instead of AnC Bio, Inc. QUIROS and KELLY understood that AnC Biopharm was a company created and controlled by CHOI. CHOI had associates of AnC Korea appear to control AnC Biopharm when CHOI still controlled the company and the funds flowing to AnC Biopharm. In short, after CHOI was first arrested, QUIROS, KELLY, and CHOI sought to further conceal CHOI's participation in the project through the use of AnC Biopharm.

76.     As described above, beginning in 2009, AnC Bio Holdings owned AnC Bio Inc. CHOI was instrumental in the financial transactions establishing AnC Bio Holdings. In late 2013, VRC began raising concerns about AnC Korea and CHOI. VRC learned that AnC Bio Holdings was under investigation in Korea and asked about CHOI's relationship with AnC Bio

Holdings. QUIROS, KELLY, and CHOI presented false and misleading statements about CHOI's relationship with AnC Bio Holdings.

77.     VRC also asked whether CHOI was under investigation by Korean law enforcement. QUIROS and KELLY knew that CHOI had been detained as part of a criminal investigation in early 2013. Nevertheless, QUIROS, KELLY, and CHOI falsely stated that CHOI was not under investigation. CHOI was detained for part of 2013 and for most of 2014 as the criminal investigation against him proceeded. QUIROS, KELLY, and CHOI concealed this information from investors, VRC, and CIS.

78.     Between in or about October 2013 and in or about April 2015, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, and JONG WEON CHOI, aka Alex Choi, knowingly and willfully concealed and covered up by trick, scheme and device, a material fact in a matter within the jurisdiction of the Executive Branch of the United States, namely that CHOI was under investigation for financial crimes in Korea.

(18 U.S.C. §§ 1001, 2)

## Count Twelve

79.     The allegations in paragraphs 72 through 77 of Count Eleven are incorporated here.

80.     On or about May 20, 2014, in the District of Vermont and elsewhere, defendants ARIEL QUIROS, WILLIAM KELLY, and JONG WEON CHOI, aka Alex Choi, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the United States, namely that AnC Korea was not in financial distress.

(18 U.S.C. §§ 1001, 2)

## Count Thirteen

81.     The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

82.     On or about July 23, 2014, in the District of Vermont and elsewhere, defendant WILLIAM STENGER knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the United States, namely that he had stopped marketing the AnC Vermont project to prospective investors.

(18 U.S.C. §§ 1001, 2)

Count Fourteen

83.    The allegations in paragraphs 1 through 19 and 21 through 53 of Count One are incorporated here.

84.    On or about January 9, 2015, in the District of Vermont and elsewhere, defendant WILLIAM STENGER knowingly and willfully used and caused to be used a false writing and document, knowing the same to contain materially false, fictitious, and fraudulent statements and entries in a matter within the jurisdiction of the Executive Branch of the United States, namely a letter representing that a third party had analyzed the sales projections in the AnC Vermont business plan when the third party had not; and a timeline about product commercialization that omitted uncertainty about the FDA approval process.

(18 U.S.C. §§ 1001, 2)

Forfeiture Notice

1.      The allegations contained in Counts One through Seven of the Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

2.      Upon conviction of the offenses charged in Counts One through Seven, the defendants ARIEL QUIROS, WILLIAM KELLY, JONG WEON CHOI, aka Alex Choi, and WILLIAM STENGER shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as a result of such violations. The property to be forfeited includes, but is not limited to, the following:

      a.      United States funds in the amount of the gross proceeds obtained as a result of the violation, to be determined by the Court at sentencing.

3.      If any of the property described above, as a result of any act or omission of the defendants,

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

32

the United States of America shall be entitled to forfeiture of substitute property, pursuant to 21

U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

A TRUE

FOREPE

Christina E. Nolan (PJV/NPC)
United States Attorney
Burlington, Vermont
May 21, 2019

33