UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 JAN 28 PM 4:10

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:19-cr-76
)
ARIEL QUIROS, WILLIAM KELLY, JONG )
WEON CHOI, and WILLIAM STENGER, )
)
Defendants. )

**ORDER ON MOTION TO TRANSFER VENUE AND TO ADDRESS CONFLICT
ISSUES
(Doc. 71)**

The Grand Jury's May 2019 Indictment charges defendants Ariel Quiros, William Kelly,

Jong Weon Choi, and William Stenger with fourteen counts arising from an alleged scheme

between fall 2011 and April 2016 "to defraud investors in the AnC Vermont EB-5 project and to

obtain money from these investors by materially false and fraudulent pretenses, representations,

and promises . . . ." (Doc. 1 ¶ 20.) The case is currently scheduled for an October 2020 trial in

Rutland, Vermont with the jury to be drawn from the Southern Jury Division, which consists of

Vermont's six southernmost counties. (*See* Doc. 45 at 2.)

Currently pending is defendant Ariel Quiros's Motion to Transfer Venue and to Address

Conflict Issues. (Doc. 71.) He asserts that he cannot receive a fair trial in the District of

Vermont due to "inflammatory pretrial publicity." (Doc. 71-1 at 7.) He further argues that the

United States Attorneys involved in prosecuting this matter—former U.S. Attorney Eric Miller

and current U.S. Attorney Christina Nolan—"have conflicts of interest that require dismissal of

the Indictment or, at minimum, an evidentiary hearing." (*Id.* at 9.) Finally, Mr. Quiros contends

that the court should evaluate whether to recuse itself on grounds of relationships with state and

federal political leaders whom Mr. Quiros asserts are expected to be witnesses in the case. (*Id.* at 10.)

Defendants William Kelly and William Stenger have joined Mr. Quiros's motion. (*See* Docs. 73, 74, 75, 76.)[1] The Government opposes the motion (Doc. 78) and Mr. Quiros has filed a reply (Doc. 87). The court heard argument on the motion at a hearing on December 20, 2019, at which time the court took the motion under advisement. (*See* Doc. 98 (transcript).)

## Background

Defendants' Motion to Transfer rests on pretrial publicity in this case. Defendants have compiled a list of more than 1,300 print, television, radio, and internet stories that "relate to the Jay Peak and AnC Vermont Projects, or the civil and criminal cases relating thereto." (Doc. 71-2 ¶ 2; Doc. 71-3 (list of 1,343 media stories).) The Government argues that Defendants' list is overinclusive—the Government does not concede that all of the listed media stories are relevant to Defendants' motion. The court concludes that it is unnecessary to discuss each of the 1,343 media stories cited, and instead focuses its analysis on media coverage in general and a selection of media accounts, especially those that the parties have highlighted.

The portion of Defendants' motion seeking relief for allegedly conflicted prosecutors relies on "relationships" between Mr. Miller and Ms. Nolan and between "the key federal and state officials involved in the relevant events." (Doc. 71-1 at 72.) Defendants note that Vermont Senators Patrick Leahy and Bernie Sanders, Vermont Representative Peter Welch, and former Vermont Governors James Douglas and Peter Shumlin "participated in marketing and promotional events" and that "letters written by Senator Leahy and Governor Shumlin were

---

[1] For present purposes, the court refers here to the moving defendants—Mr. Quiros, Mr. Kelly, and Mr. Stenger—collectively as "Defendants."

included in the AnC Vermont Project offering materials." (*Id.* at 11.) Defendants also point out that Senator Leahy and Governors Douglas and Shumlin "made multiple foreign trips to solicit investors for the Jay Peak and AnC Vermont Projects." (*Id.*)

The Government agrees that "[s]tate and federal politicians supported Jay Peak's proclaimed success"; that they "posed in photographs so that Vermonters would link them to this good news"; and that Senator Leahy and Governor Shumlin "sign[ed] letters of support for the AnC Vermont project that the defendants included in the marketing materials." (Doc. 78 at 4–5.) The Government also does not dispute that some or all of these political figures are potential witnesses in this case.

Additional facts are set forth as necessary below.

<u>**Analysis**</u>

**I.     Venue: Whether a Presumption of Prejudice Arises from the Pretrial Publicity**

Under Rule 21 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). "Transfer is a limited exception to the constitutional rule that the trial of crimes 'shall be held in the State where the said Crimes shall have been committed.'" *United States v. Fell*, No. 5:01-cr-12-01, 2017 WL 10810028, at *2 (D. Vt. Jan. 3, 2017) (quoting U.S. Const. art. III, § 2, cl. 3). "Ordinarily, the key to determining the appropriateness of a change of venue is a searching voir dire." *United States v. Jacques*, No. 2:08-cr-117, 2011 WL 1706770, at *4 (D. Vt. May 4, 2011) (internal quotation marks omitted). "In rare cases, however, pretrial publicity may be so prejudicial and inflammatory as to give rise to a presumption of prejudice." *Id.*

Recognizing that this case has not yet reached the voir dire stage, Defendants urge the court to find a presumption of prejudice. (Doc. 71-1 at 47 & n.36.) "A presumption of prejudice 'applies when . . . the community has been so saturated with inflammatory pre-trial publicity that it pervades the proceedings and overrides notions of fairness in the determination of guilt or innocence.'" *Jacques*, 2011 WL 1706770, at *5 (omission in original) (quoting *United States v. Washington*, 813 F. Supp. 269, 271 (D. Vt. 1993)). Such a presumption "attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381 (2010).

The court considers multiple factors when evaluating a motion for change of venue. The relevant factors include: (a) "[r]ecent, widespread and highly damaging publicity"; (b) "[w]hether the prosecution has been responsible for the publicity"; (c) "inconvenience to the government and the administration of justice"; and (d) "whether a substantially better panel can be sworn at another time or place." *Fell*, 2017 WL 10810028, at *3; *see also* 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure, Fed. Rules of Crim. Proc.* § 343 (4th ed.). The court also considers:

> 1) the size and characteristics of the community in which the crime occurred; 2) the absence of a confession or other blatantly prejudicial information in the news coverage; 3) the passage of time between the crime and the trial; and 4) the jury's actual ability to acquit the defendant of some of the charges.

*Jacques*, 2011 WL 1706770, at *6 (citing *Skilling*, 561 U.S. at 381–84); *see also Fell*, 2017 WL 10810028, at *3 (discussing *Skilling*).[2] The defendant moving for a change of venue has the burden of proof on these issues. *Fell*, 2017 WL 10810028, at *3; *see also Washington*,

---

[2] The final factor—the jury's ability to acquit a defendant of some charges—obviously does not apply when the district court is evaluating a claim of presumed prejudice in advance of voir dire and trial. *See Fell*, 2017 WL 10810028, at *3; *Jacques*, 2011 WL 1706770, at *6 n.4.

813 F. Supp. at 275 ("The burden is on the defendant to make a satisfactory showing that a transfer is warranted.").

### A.    Timing, Saturation, and Nature of Publicity

Defendants note that the Jay Peak projects began to receive some adverse publicity in 2014. (*See* Doc. 71-1 at 22–23.) But the nature of the publicity changed when the United States Securities and Exchange Commission ("SEC") announced a civil suit against Mr. Quiros on April 14, 2016. (Doc. 71-76.) In that announcement, the SEC described its allegations as follows:

> The SEC alleges that Ariel Quiros of Miami, William Stenger of Newport, Vt., and their companies made false statements and omitted key information while raising more than $350 million from investors to construct ski resort facilities and a biomedical research facility in Vermont. Investors were told they were investing in one of several projects connected to Jay Peak Inc., a ski resort operated by Quiros and Stenger, and their money would only be used to finance that specific project. Instead, in a Ponzi-like fashion, money from investors in later projects was misappropriated to fund deficits in earlier projects. More than $200 million was allegedly used for other-than-stated purposes, including $50 million spent on Quiros's personal expenses and in other ways never disclosed to investors.

(*Id.* at 2.) Defendants characterize the SEC's announcement as "hyperbolic" and "inflammatory," and note that numerous subsequent news reports mentioned Mr. Quiros by name and referred to or adopted the SEC's "Ponzi" language. (Doc. 71-1 at 26, 49.)[3]

The State of Vermont brought its own enforcement action against Mr. Quiros and Mr. Stenger in state court on April 14, 2016. *See State v. Quiros*, 2019 VT 68, ¶ 7. Also on that date, Vermont Governor Peter Shumlin led a press conference announcing both the SEC and Vermont actions. At the press conference, Vermont Attorney General William Sorrell remarked

---

[3] A "Ponzi scheme" is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." Ponzi scheme, *Black's Law Dictionary* (11th ed. 2019).

that the State was alleging a "massive and complex fraudulent enterprise." VTDigger, *Officials: Quiros and Stenger Diverted $200 Million from EB-5 Investors*, YouTube (Apr. 14, 2016), https://www.youtube.com/watch?v=JXXrNtjq8Pc, at 21:59–22:03.[4]  Later at the press conference, Governor Shumlin stated: "We all feel betrayed" and that "It's a dark day for Vermont." (*Id.* at 38:22–25.)  Senator Leahy also issued a press release on April 14, 2016 stating: "I'm shocked and saddened by what state and federal investigators have found" and that "[f]raud and abuse cannot be tolerated." (Doc. 71-62 at 2–3.)

According to Defendants, the SEC's April 2016 announcement and the subsequent press conference resulted in a "media frenzy." (Doc. 71-1 at 27.)  And, Defendants contend, the publicity has continued through 2019. (*See id.* at 33–46.)  The Government concedes that "the press has reported on the significant developments in both the civil and criminal cases, and published some editorials or other commentary" but maintains that the media coverage does not "give rise to the sort of prejudicial pretrial publicity that Quiros is required to demonstrate." (Doc. 78 at 9.)

It is unnecessary to review all of the cited media stories here, but the court discusses a sample of the reports to help appreciate the nature of the publicity, focusing in particular on the media stories that Defendants have highlighted.  The court is simultaneously mindful of the Government's position that the "vast majority" of Defendants' exhibits are "factual in nature." (Doc. 78 at 9, 17.)  The court also includes some brief discussion regarding the media outlets referenced for context on the level of "saturation" of their stories in the community.[5]

---

[4] The court cites to several YouTube recordings herein.  No party has objected to the authenticity or propriety of the court's consideration of the cited recordings.

[5] The court's discussion below of media viewership and readership includes some distinctions between coverage in the areas of the state comprising the Southern Jury Division and elsewhere in Vermont.  The court is mindful that individuals with access to the internet are not

## 1. WCAX-TV and the "Kingdom Con" Tagline

Defendants assert that the most prejudicial phrase in the media reports is the "Kingdom Con" tagline used by WCAX-TV.[6] WCAX-TV apparently began using the "Kingdom Con" tagline in 2016. (*See* Doc. 71-95 at 2 (*Seven Days* editorial); *see also* Doc. 71-98 at 2.) The station used that moniker in numerous subsequent stories, including a May 2019 report on the filing of this criminal case. (*See, e.g.*, Docs. 71-164, 71-165, 71-166; *see generally* Doc. 71-3.) Although the parties have not presented quantitative viewership figures, the court notes that WCAX-TV has a very substantial presence in Vermont's broadcast television landscape, with over-the-air coverage extending to southern Vermont, including Rutland. *See* TV Station Profile, Contour Map, https://publicfiles.fcc.gov/tv-profile/wcax-tv/contour-maps/ (last visited Jan. 28, 2020).[7]

## 2. The *Times Argus* and the *Rutland Herald*

Defendants assert that the *Barre Montpelier Times Argus* and the *Rutland Herald* have both used "incendiary language" to refer to Mr. Quiros and the AnC Vermont project. (Doc. 71-1 at 55.) An August 23, 2017 editorial in the *Rutland Herald* entitled "The biggest fraud" begins by stating: "The biggest financial fraud in Vermont's history is grinding toward a conclusion

---

limited to the media that circulates in their local area. At the same time, the modern media landscape delivers such a quantity and diversity of information and entertainment that even the most studious consumer would be hard pressed to absorb and retain all of it.

[6] "Kingdom" refers to the area of Vermont known as the "Northeast Kingdom," which encompasses Jay Peak and Newport. "Con," of course, is shorthand for confidence, and refers to "[a] dishonest trick played on someone in order to cheat the person out of money." Confidence game, *Black's Law Dictionary* (11th ed. 2019).

[7] Some decades ago this court described WCAX-TV as enjoying a near monopoly at that time. *See Morrisseau v. Mt. Mansfield Television, Inc.*, 380 F. Supp. 512, 517 (D. Vt. 1974) ("WCAX-TV has more or less of a monopoly on commercial television broadcasting in Vermont . . . .").

with the abolition of a failed Vermont oversight agency and a decision by one of two accused masterminds not to contest charges by the Securities and Exchange Commission." (Doc. 71-125 at 2.) The editorial further states: "When a pot of money is made available, as it was by this program, shady operators always seem to find a way to get their hands on some of it." (*Id.* at 3.) The editorial concludes: "Making off with money from foreign investors is not the same as stealing from the people of Newport or Burke or Jay, but it is still stealing, and the alleged crime also entailed stealing the hopes of Vermonters who had seen glimmers of a renaissance for a region that could use it." (*Id.*)

Both the *Times Argus* and the *Rutland Herald* published an editorial entitled "Fatal taint" in May 2017. (Docs. 71-120, 71-129.) The editorial opens by stating: "The biggest financial scandal in Vermont history occurred when the owners of Jay Peak resort and other properties employed a federal visa-selling program to concoct a mammoth Ponzi scheme." (Doc. 71-120 at 2.) The editorial further states:

> Vermonters have felt the sting of EB-5 corruption. Empty building sites in downtown Newport are a reminder of the faith that local residents had placed in Stenger and the hopes that were dashed. Development at Burke Mountain and Jay Peak resumed after the projects were put in receivership, but many Vermonters have learned what it feels like to be played for chumps.

(*Id.*)

Defendants have not presented quantitative figures on readership for the *Times Argus* or the *Rutland Herald*. Defendants have supplied an exhibit listing the top ten Vermont newspapers by circulation as of August 2019, showing the *Rutland Herald* as sixth. (Doc. 71-93 at 2.) The *Times Argus*, based in Vermont's capital region, does not appear on that top-ten list. At the December 20, 2019 hearing, the Government presented a demonstrative exhibit indicating that the *Rutland Herald*'s average daily paid circulation is 27,263.

### 3. *VTDigger*

An August 2017 podcast stated that much of the success of online news outlet *VTDigger* since it was founded in 2009 "stemmed from its dogged investigation into Stenger, his Miami-based business partner Ariel Quiros and their project, Jay Peak ski resort." (Doc. 71-122 at 2.) The podcast states that *VTDigger* reported "dozens of stories" prior to the SEC's April 2016 announcement, chronicling "complaints that this development was starting to feel like a scam" and reporting on "the cozy relationship Stenger had with state oversight authorities." (*Id.*) The podcast quoted the SEC's description of the project as "Ponzi-like." (*Id.* at 3.)

On June 3, 2019, *VTDigger* issued a podcast entitled "The Deeper Dig: From biotech 'dream' to federal court." (Doc. 71-156.) *VTDigger* editor Anne Galloway stated that by May 2015 "it seemed pretty obvious from my research at that point that the project was completely fraudulent." (*Id.* at 4.) Later in the podcast she stated that "Quiros has been kind of blamed as the mastermind and you know, the real evil one, who was behind the scenes making all this happen." (*Id.* at 5.)

Defendants have not presented quantitative data on the listenership of either podcast. The Government notes that none of the stories related to EB-5 are listed on *VTDigger*'s 2018 list of top ten most read stories that year. (*See* Doc. 78-1.) Both parties refer to *VTDigger*'s media kit regarding that outlet's readership. Drawing from the monthly reader statistics, the Government calculates that *VTDigger* has approximately 24,770 monthly readers in the southern jury division, or 9.17% of the website's 270,000 total 2018 monthly readers. (Doc. 78 at 13–14.) Defendants agree that *VTDigger* had approximately 25,000 southern jury division monthly readers in June 2018. (*See* Doc. 87 at 10.) Defendants also suggest that *VTDigger* readership has increased in 2019. (*Id.* at 10–11.)

### 4. *Vermont Public Radio* and References to the "Hole" or the "Pit"

In July 2019, *Vermont Public Radio* ("VPR") aired a story entitled, "What's the Plan for the 'Pit' in the Middle of Newport?" (Doc. 71-159.) The VPR story described the "pit" as "a block of demolished buildings in the center of Newport's downtown district." (*Id.* at 2.) According to the VPR story: "The buildings here were razed in 2015 to make way for a mixed-use redevelopment project dubbed the Renaissance Block. The project was one of many ambitious developments in this region spearheaded by two men, Bill Stenger and Ariel Quiros." (*Id.*) The story goes on to note that the Renaissance Block was never built and that "this empty block in Newport has become both a character in the story, and a physical embodiment of it. Coverage of the case rarely fails to mention the 'giant hole,' or the 'massive hole,' or the 'gaping wound.'" (*Id.* at 3.) Indeed, Defendants cite to numerous other media accounts referring to "the hole" in Newport. (*See, e.g.*, Docs. 71-73, 71-79, 71-82, 71-111, 71-119.)

### 5. *Seven Days*

Defendants assert that *Seven Days* has published "multiple inflammatory editorials and op-eds opining both on the fact that a fraud occurred and on Mr. Quiros's guilt." (Doc. 71-1 at 54.) Defendants highlight a September 20, 2017 article entitled "EB-Fail: Jay Peak Is Part of a Troubling Pattern." (Doc. 71-126.) That article opens by stating: "Vermont's EB-5 scandal is generally seen as the biggest fraud scheme in state history and in the 25 years of the federal EB-5 program." (*Id.* at 2.) Defendants also point out that multiple articles in *Seven Days* refer to Mr. Quiros's conduct as a Ponzi or Ponzi-like scheme. (*See* Docs. 71-71 at 2; 71-86 at 2; 71-108 at 2; Doc. 71-113 at 2–3.)

Defendants contend that a cartoon published in a July 2019 edition of *Seven Days* is "perhaps the worst example of the media vilification of Mr. Quiros." (Doc. 71-1 at 54.) The

following cartoon by Tim Newcomb appeared in *Seven Days* approximately two months after the

May 2019 Indictment in this case:



(Doc. 71-160 at 2.)  The Government maintains that "[t]he purpose of such cartoons is obviously

to exaggerate for humor, as any reader would clearly realize."  (Doc. 78 at 18.)

Defendants have not presented quantitative figures on readership for *Seven Days*,

although they have supplied an exhibit listing the top ten Vermont newspapers by circulation as

of August 2019, showing *Seven Days* as first.  (Doc. 71-93 at 2.)  Relying on the publication's

media kit, the Government asserts that *Seven Days*'s "print circulation is only 36,000, only

10.47% of which is within the six relevant counties."  (Doc. 78 at 14.)  Defendants argue that the

Government understates the *Seven Days* readership statistics because the publication states that

each print copy is read by three people and because *Seven Days* also enjoys substantial online

readership.  (*See* Doc. 87 at 11.)

**6.    Statements by Political Leaders and Other Governmental Actors**

Defendants assert that "[f]ederal and state officials added to the prejudicial publicity by making repeated inflammatory statements, many of which condemned Mr. Quiros." (Doc. 71-1 at 37; *see also id.* at 67 (asserting that Vermont politicians "echo[ed] the media's unproven allegations against Mr. Quiros in order to score political points or to distance themselves from their own involvement in the Jay Peak and AnC Vermont Projects.").) In addition to the statements noted above, Defendants highlight the following.

In an April 2017 interview, Vermont Department of Financial Regulation ("DFR") Commissioner Michael Pieciak described a January 28, 2015 meeting with Mr. Quiros's attorneys that raised "red flags." (Doc. 71-117 at 4.) According to Commissioner Pieciak, when DFR officials asked Quiros's lawyers about how investors would be paid back, the lawyers "sort of had smiles on their faces," and one said that "Mr. Quiros is a man of untold wealth." (*Id.*) Commissioner Pieciak characterized that response as the sort that "somebody would have given if you were sort of a Bernie Madoff or someone else who has this perception of power and wealth." (*Id.*) Commissioner Pieciak stated that Mr. Quiros's lawyers had "bought into this perception that Quiros was this wealthy, successful businessperson, when in reality from day one, they diverted tens of millions of dollars to buy the resort and what that shows you is they didn't have the money . . . ." (*Id.*)

The parties in the federal case brought by the SEC reached a settlement in February 2018. The SEC issued a press release, the first paragraph of which stated: "The Securities and Exchange Commission today announced that the Miami-based businessman behind an alleged scheme involving investments in a Vermont-based ski resort has agreed to pay back more than $81 million of investor money that he used illegally." (Doc. 71-130 at 2.) The press release

contained quotations from several SEC officials, including the following statement from a Co-Director of the Enforcement Division: "The SEC's emergency action halted an alleged massive fraud that Jay Peak, Quiros, and Stenger perpetrated on more than 700 investors from at least 74 countries." (*Id.* at 2–3.) The penultimate paragraph of the press release states: "Quiros and Stenger agreed to their settlements without admitting or denying the allegations in the SEC's complaint." (*Id.* at 3.)

The parties in the Vermont state case reached an agreement to settle in July 2018. (*See* Doc. 71-140.) Vermont state officials held a press conference in Newport, Vermont on July 12, 2018 announcing the settlement. Vermont Attorney General T.J. Donovan stated that "[w]e're repairing the harm done to the City of Newport" and that obtaining some money in the settlement would help "restor[e] the harm done to so many community members and restor[e] the public trust in our state government." NewportDispatch, *Vermont Settles with Stenger and Quiros*, YouTube (July 12, 2018), https://www.youtube.com/watch?v=ClTMvTkU1-0, at 3:21–4:44. In his remarks, Governor Phil Scott stated that the funds recovered in the settlement would help "the Northeast Kingdom and impacted communities." *Id.* at 5:21–24. He also stated that "the dark cloud that has been hanging over us for the last few years is beginning to lift." *Id.* at 8:12–17.

### B. The Prosecution's Relation to the Publicity

Defendants contend that "[t]he Government and its investigative partners, including, but not limited to, the SEC, the Vermont Attorney General's Office, and the Vermont Department of Financial Regulation, bear significant responsibility for the prejudicial publicity in this case." (Doc. 71-1 at 59.) The Government does not dispute the propriety of considering publicity created by non-prosecution actors as part of a review of the "broader" pretrial publicity.

(Doc. 78 at 21.) But the Government argues that Defendants assert "no legal basis to impute responsibility to the prosecution team for the actions of actors whom it neither directed nor controlled." (*Id.*)

The court has reviewed the statements of officials other than the prosecutors, some of which are recounted above. The court focuses here on Defendants' particular challenge to the press conference led by U.S. Attorney Christina Nolan on May 22, 2019 announcing the charges in this criminal case, and on a press release issued on that day by the U.S. Attorney's office. The press release includes a quotation from an FBI agent who stated: "The defendants' broken business promises have left . . . a physical scar on the city of Newport . . . ." (Doc. 71-153 at 2–3.)

The press conference was held at the "Spates Block" in Newport, Vermont. Ms. Nolan fielded questions from reporters, one of which was: "Why are we in front of the hole?" (Doc. 99-1 at 7.) Ms. Nolan responded:

> Okay, so it's very important to me that the U.S. Attorney's Office have a presence outside of Chittenden County and make sure that all communities across the State know that we are here for them, and we are fighting for justice for them. We thought it was important to do this in the place in Vermont that was most shook, most rocked, most affected by this fraud. We wanted to—the easiest place to do it is a public place, but more than that, the Indictment—this piece of property actually is related to the allegations the grand jury has returned. Specifically, the grand jury indictment alleges that $250,000 of AnC investor funds paid in the form of administrative fees were used as an initial down payment on this property, the Spates Block, which was to be—which the defendants planned to use to construct a future EB-5 project. So part of their misuse of funds involved the purchase of— or at least the down payment improperly with AnC investor funds on this block.

(*Id.* at 7–8.) Later in the press conference, a reporter asked who currently owned the Spates Block property and who would be the owner at the conclusion of the criminal case. (*Id.* at 10.) Ms. Nolan stated: "Sir, I don't have that information for you at this time. I actually would have

to look into that, I don't have the answer. What I have for you is information about the criminal charges which is, which is not a little. It's a lengthy indictment." (*Id.*)

### C. Inconvenience to the Government and Administration of Justice

The parties have not addressed this factor in much detail; it appears to be largely neutral in this case.

### D. Whether a Better Panel Can Be Sworn

The court inquired at the December 20, 2019 hearing whether a statewide jury panel would be preferable to a panel drawn from the Southern Jury Division. Defendants' view is that doing so would offer no meaningful difference, although they would also not rule out considering a statewide pool. Defendants suggest that the alleged presumed prejudice is not present in the Southern and Eastern Districts of New York.

### E. Size and Characteristics of the Community

Defendants argue that Vermont's relatively small size increases the likelihood of prejudice. (Doc. 71-1 at 66.) Relying on U.S. Census data as of July 2018, Defendants calculate that the population of Vermont's Southern Jury Division is approximately 258,000 and that the number of persons older than age 18 in the Southern Jury Division is approximately 212,000. (*See* Doc. 71-158.) Defendants argue that this relatively small potential jury pool makes this case more like *Rideau v. Louisiana*, 373 U.S. 723 (1963) (murder committed in Calcasieu Parish, population of 150,000 residents), than like *Skilling*, 561 U.S. at 382 (jury pool for securities fraud trial in Houston contained more than 4.5 million eligible individuals; Supreme Court concluded that "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain"). The Government maintains that the population of Vermont's Southern Jury Division is larger than that of Calcasieu Parish. (Doc. 78 at 12.)

### F.   Confession or Blatantly Prejudicial Information

The Government asserts that the pretrial publicity in this case is like the publicity in the *Skilling* case, where the Supreme Court concluded that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Defendants apparently agree that none of the media reports contained a confession. *Cf. Rideau*, 373 U.S. at 726 (jury pool was "exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged"). But Defendants maintain that the media coverage has been inflammatory. For example, counsel for Mr. Quiros referred to the July 2019 cartoon in *Seven Days* and stated: "I can't un-ring this bell." (Doc. 98 at 39.)

### G.   Passage of Time

Defendants rely on what they characterize as a "media frenzy" shortly after the SEC's April 2016 announcement, but they also maintain that "[t]he Vermont media's intense public scrutiny of this case has not dissipated over time." (Doc. 71-1 at 52.) Defendants refer to Ms. Nolan's May 2019 press conference and multiple news stories that followed, some of which the court has described above. (*See id.*) The Government's position is that "the intensity of media coverage has waned in the year since April 2016. (Doc. 78 at 23.) The Government also suggests that media coverage will continue to wane between now and the October 2020 trial. (*Id.*)

### H.   Conclusion as to Presumption of Prejudice

Having carefully considered the factors listed above, the court concludes that this is not an "extreme" case and that Defendants have not met their burden of showing that transfer is

warranted. There was relatively intense Vermont media interest in the events underlying this case after the SEC's April 2016 announcement. And since that date, the media has continued to report on the various court proceedings (including this criminal case) and on related issues.

Like the media reports in *Skilling*, many of the stories and articles that Defendants have cited are "not kind" towards Defendants. *Skilling*, 561 U.S. at 382. Here, the Government concedes that the "Kingdom Con" tagline is "adverse." (Doc. 78 at 18.) The same is true of the references to "fraud" and to a Ponzi-like scheme. The July 2019 cartoon published in *Seven Days* is particularly uncharitable. And, as it did in *Jacques*, 2011 WL 1706770, at *6, the court acknowledges that Vermont is substantially smaller than Houston, and therefore the size and diversity of the relevant community in this case does not "dilute" the media impact as much as it did in *Skilling*, 561 U.S. at 384. But the population of the Southern Jury Division is more than 70% larger than the population of Calcasieu Parish in the *Rideau* case, so the calculus is different than that case as well.

As the *Skilling* Court noted, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Overall, the court concludes that the media coverage in this case does not present "the kind of vivid, unforgettable information" that the Supreme Court has recognized as "particularly likely to produce prejudice." *Id.* The court is not persuaded that the public statements of political and other officials should result in a contrary conclusion.

In terms of any Government responsibility for publicity, Defendants focus on the United States Attorney's statements at the May 2019 press conference at the "Spates Block" in Newport. According to Defendants, the location of the press conference and its content used the theme of the "pit" or the "hole" in Newport "to reinforce the mistaken notion that it was primarily the

people of Vermont who were 'betrayed' by the alleged conduct." (Doc. 71-1 at 64.) Defendants maintain that "not a single Vermonter, let alone any Newport resident, is alleged to be a victim of the alleged fraudulent scheme" and that "the Indictment contains no allegation about the dilapidated buildings formerly located at 'the hole' having been razed," which Defendants maintain has "nothing to do with the charges in this case." (*Id.* at 64–65.) The Government maintains that "[w]hile the investors are the alleged victims of the fraud in the legal sense as outlined in the Indictment, that fact does not preclude Vermonters from being 'victims' in the colloquial sense of others who are adversely affected by the alleged conduct." (Doc. 78 at 22 n.11.)

Initially, the court observes that the "Spates Block" is referenced in the Indictment, which includes the following allegation:

> The defendants also misused administrative fees paid by AnC Vermont investors. Contrary to the representations in the offering materials, the defendants used these funds for purposes unrelated to the AnC Vermont project. For example, in June 2013, STENGER, QUIROS, and KELLY used $250,000 of these funds as an initial payment for the purchase of a property known as the "Spates Block" in Newport, Vermont, where the defendants planned to construct a future EB-5 project.

(Doc. 1 ¶ 43.) It is true that the Indictment does not refer to the "Spates Block" as the "hole" and does not mention the demolition of the buildings or the reason for the demolition. But at least in the context of a press conference, it was within the realm of prosecutorial discretion to suggest a connection between the alleged conduct—misuse of administrative fees paid by AnC Vermont investors to purchase the "Spates Block"—and the fate of that property. In any case, in the court's view, the press conference and the resulting media attention do not themselves, or in combination with the other media reports, lead inevitably to an unfair trial.

## II.    Alleged Prosecutorial Conflicts

Defendants argue that "relationships between the two United States Attorneys who oversaw the investigation leading to the Indictment—Eric Miller and Christina Nolan—and the key federal and state officials involved in the relevant events, resulted in conflicts of interest that tainted this investigation and violated [Defendants'] rights." (Doc. 71-1 at 72.) Regarding former U.S. Attorney Miller, Defendants cite an April 2016 news article noting Senator Leahy recommended him for the post in 2015, that Mr. Miller's wife Liz Miller served as Governor Shumlin's chief of staff between 2013 and May 2015, and that Mr. and Mrs. Miller both contributed to Governor Shumlin's political campaign and to federal political campaigns, including Representative Welch's campaign. (*See* Doc. 71-86.) The article quotes Mr. Miller as stating: "Under clear Department of Justice ['DOJ'] rules, I have not and will not play any role in decisions that relate to the governor's administration—including decisions on the scope of the federal investigation as it could relate to state agency actions." (*Id.* at 3.)

Regarding current U.S. Attorney Nolan, Defendants note Senator Leahy's public support of her nomination to the post. (*See* Doc. 71-121.) Defendants posit that "the Government, first under Miller's lead, actively steered the case away from federal and State officials with whom he had close ties, and that Nolan, who had her own conflicts, followed the same course." (Doc. 71-1 at 78.) According to Defendants, there are "objective indications of the tainted nature of this investigation" because, Defendants contend, the Government failed to interview key political figures (including Senator Leahy and Governor Shumlin), failed to investigate other circumstances, and failed to preserve certain documents. (*Id.* at 78–83.) Defendants maintain that they have made a *prima facie* showing of a due process right to a disinterested prosecutor. (*Id.* at 74.)

### A.    Legal Standards

The parties have differing perspectives regarding the impartiality requirements that are imposed upon prosecutors. Regarding constitutional due process requirements, Defendants rely principally on *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), and *Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984). Reviewing statutory and ethical requirements, the Supreme Court in *Young* held that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." *Young*, 481 U.S. at 790. The Court in *Young* did not rely on due process for its holding. *Cf. id.* at 814–15 (Blackmun, J., concurring) ("I would go further, however, and hold that the practice—federal or state—of appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process."). Defendants nevertheless cite several of the *Young* Court's statements regarding the "requirement of a disinterested prosecutor." *Id.* at 807. In particular, Defendants highlight the *Young* Court's observation that "[i]t is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Id.* at 810.

Defendants also note that federal statutory law imposes its own disqualification requirements. (Doc. 71-1 at 74 n.68.) Section 528 of Title 28 provides in pertinent part:

> The Attorney General shall promulgate rules and regulations which require the disqualification of any officer or employee of the Department of Justice, including a United States attorney or a member of such attorney's staff, from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof.

Federal regulations implement that statutory command. *See* 28 C.F.R. § 45.2.

The Government concedes that prosecutors can "commit constitutionally recognized misconduct at charging in limited circumstances," such as where the prosecutor charges a defendant in retaliation for the defendant's exercise of constitutional or statutory rights, or based

on the defendant's race or religion, or where the prosecutor has a financial interest in the outcome. (Doc. 78 at 25–26.) But the Government maintains that due process protections do not reach situations of "purely personal bias" or, in particular, "purely personal bias not against the defendant but in favor a potential trial witness." (*Id.* at 26.) And the Government further contends that even if personal bias could give rise to a due process violation, Defendants have not made a showing sufficient to obtain discovery or dismissal of the Indictment. (*Id.* at 29.)

In light of the above, the court makes the following observations. First, due process does require a "disinterested" prosecutor, but the requirements for prosecutors are different than the requirements for judges and juries. *Wright*, 732 F.2d at 1056; *see also Young*, 481 U.S. at 810 ("[T]he standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers."). Second, as the *Wright* court recognized, the concept of a "disinterested" prosecutor "is not altogether easy to define." *Wright*, 732 F.2d at 1056; *see also id.* ("It is a bit easier to say what a disinterested prosecutor is not than what he is."); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250 (1980) ("In this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function . . . ."). Third, regarding the Defendants' burden, the required showing increases as the case progresses through different procedural stages. *Wright*, 732 F.2d at 1056 n.8.

Here, Defendants have filed a pretrial motion seeking an evidentiary hearing and requesting disqualification or dismissal of the Indictment if the evidence at such a hearing supports that relief. (Doc. 71-1 at 84.) In addition to their disagreements over the requirements imposed upon prosecutors by law, the parties disagree as to what Defendants are required to show to obtain discovery or an evidentiary hearing on the issue of prosecutorial bias. The Government suggests that the preliminary showing required to obtain such discovery or an

evidentiary hearing is "rigorous" and that Defendants must come forward with "some evidence tending to show the existence of the essential elements of the defense." *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). Defendants quote *Wright* for the proposition that they do not need to show actual prejudice but that instead, "the practical impossibility of establishing that the conflict has worked to defendant's disadvantage dictates the adoption of standards under which a reasonable potential for prejudice will suffice." *Wright*, 732 F.2d at 1056 (quoting *People v. Zimmer*, 414 N.E.2d 705, 707 (N.Y. 1980)).

The Government correctly points out that *Zimmer* involved a question of the prosecutor's financial interest in the outcome of a case that he presented to a grand jury—circumstances not present here. For their part, Defendants correctly observe that *Armstrong* concerned allegations of racially-motivated selective prosecution, a claim that Defendants have not raised in this case. The court concludes that it need not determine whether to distinguish *Armstrong* or *Wright* on the issue of Defendants' burden. For the reasons stated below, the court concludes that Defendants have failed to meet their burden under either standard, and that Defendants' requests for relief based on alleged prosecutorial bias should be denied without an evidentiary hearing.

### B. Former U.S. Attorney Miller

As discussed above, Mr. Miller's wife was Governor Shumlin's chief of staff between 2013 and May 2015. That relationship, presumably, led to Mr. Miller's announcement in the April 2016 news article that he would play no role "in decisions that relate to the governor's administration—including decisions on the scope of the federal investigation as it could relate to state agency actions." (Doc. 71-86 at 3.) According to Defendants, DOJ rules do not permit

"partial" recusals, and the "alleged recusal came too late, at least a year after the investigation began." (Doc. 71-1 at 73, 76.)

To the extent that Mr. Miller's announcement might have been seen as equivocal—i.e., recusing himself from the case as to "decisions that relate to the governor's administration" but not other matters—the Government represented in open court at the December 20, 2019 hearing that Mr. Miller was completely recused from the case as of April 2016. (Doc. 98 at 89.) The court is satisfied with that representation.

As to Defendants' contention that Mr. Miller should have recused himself earlier, the court concludes that there is no cause in this case to decide that question. The Indictment in this case was issued in May 2019—more than three years after Mr. Miller recused himself, and more than a year after Ms. Nolan assumed the office of U.S. Attorney in late 2017. Even assuming that Mr. Miller should have recused himself earlier than he did, new prosecutorial leadership in the case had ample time to independently assess the direction of the investigation and to arrive at a charging decision. Defendants question whether Ms. Nolan herself was sufficiently disinterested. The court discusses that issue next.

### C.    Current U.S. Attorney Nolan

Defendants' challenge to Ms. Nolan is their contention that she is "personally beholden to Senator Leahy because he was responsible for her appointment to the position of United States Attorney during the pendency of the investigation that led to Mr. Quiros's Indictment." (Doc. 87 at 30.)[8] There is no question that Senator Leahy publicly supported Ms. Nolan's nomination to

---

[8] Apart from any relationship to Senator Leahy, Defendants suggest that the Government has failed to offer evidence to establish that Ms. Nolan's independence was not compromised by her position as one of the prosecutors who reported to Mr. Miller while he was U.S. Attorney, both before and after Mr. Miller recused himself. (*See* Doc. 87 at 29.) But it is not the

succeed Mr. Miller as U.S. Attorney. (*E.g.*, Doc. 71-121.) And it is true that Senator Leahy was one of the political figures who initially promoted the AnC Vermont project, and then, after the SEC's announcement in April 2016, publicly expressed shock and sadness and opined that fraud and abuse would not be tolerated. The parties also agree that Senator Leahy is a potential witness in this case, but that federal investigators have not interviewed Senator Leahy.

The court concludes that Defendants' presentation of these facts is insufficient to warrant the relief that Defendants seek. Initially, it does not appear from the current record that Senator Leahy's public conduct and statements about the AnC Vermont project make him a central or "key" witness in this case. More importantly, the fact that Senator Leahy supported Ms. Nolan's nomination as U.S. Attorney does not, by itself, suggest that Ms. Nolan's decision-making in this case was compromised.

## III.    Judicial Recusal Issue

Defendants suggest that the court should conduct a judicial recusal evaluation based on "relationships between the Judges of this Court and certain Government and defense witnesses"—namely, Senators Leahy and Sanders and former Governors Shumlin and Douglas. (Doc. 71-1 at 85.) The court has considered the disqualification statute, 28 U.S.C. § 455(a), and the cases that Defendants have cited.

As I stated at the hearing on December 20, 2019, my relationship with Senator Leahy is cordial and respectful, but our meetings are infrequent and limited to events such as naturalization ceremonies. The relationship was closer during the selection and confirmation process, but that was almost six years ago. My relationship with Governor Shumlin is similar

---

Government's burden to submit such evidence. Defendants' speculation about imputing to Ms. Nolan any actual or apparent conflict on Mr. Miller's part is insufficient.

except that it was limited to an interview and a swearing-in event. It is natural and unsurprising that I feel gratitude to both Senator Leahy and Governor Shumlin for their support of my judicial candidacy. At the same time, I am acutely aware that both of these public figures are strong advocates for judicial independence, and either would be disappointed if they were treated by the court in some favorable manner different from other witnesses. I have considered the issue of recusal carefully and do not believe that my professional relationship with either potential witness rises to the level of disqualification.

## Conclusion

Defendant Ariel Quiros's Motion to Transfer Venue and to Address Conflict Issues (Doc. 71)—as joined by Defendants William Kelly and William Stenger—is DENIED.

Dated at Rutland, in the District of Vermont, this 23 day of January, 2020.

Geoffrey W. Crawford, Chief Judge
United States District Court