FD-302 (Rev. 5-8-10)

- 1 of 12 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry   10/01/2019

James Candido, former Director of the Vermont Regional Center was interviewed at the United States Attorney's Office, Burlington, Vermont by Assistant United States Attorneys Paul Van de Graaf and FBI Special Agent Jennie Emmons. Bill Griffin of the Vermont Attorney General's Office was also present as Raymond's legal counsel. After being advised of the identities of the interviewers and the nature of the interview, Raymond provided the following information:

(Note: the interview was conducted in person on September 9th, and follow-up interviews were conducted telephonically on the 10th and 13th [all interviews are contained in this report]).

Candido's parents were both psychologists. Candido attended Rice Memorial High School and then the University of Vermont. After college he worked full-time in the social work field as head of a group home. In 2004, Candido went to work on Jim Douglas's campaign for governor. After Douglas was elected, Candido got a state position working on an initiative to keep young adults in Vermont. He also worked with the legislature on various matters and filled in at various vacant state positions. Candido was planning to leave the state when the Vermont Regional Center director job opened up.

The Vermont Regional Center started in the 1990s, during Governor Dean's administration.

Candido started at the Regional Center in about 2006. He spent his first six months getting up to speed and trying to figure out how to run the regional center. He was at the regional center before the first Jay Peak EB-5 project, the Tram Haus Lodge, started up.

Candido worked to identify companies that might want to use the program—and part of Candido's job was to go out and talk to companies. Serious oversight was not part of the job. Every other regional center

| | |
|---|---|
| Investigation on 09/09/2019 at | Burlington, Vermont, United States (In Person) |
| File # 318B-AL-6464304 | Date drafted 09/09/2019 |
| by EMMONS JENNIE MCGLYNN | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido ,On 09/09/2019 ,Page 2 of 12

(beyond Vermont's) was operated by the project owner. Nothing had to be filed with USCIS and USCIS did not ask for anything from the regional center. At times Candido tried to get direction from USCIS and would be frustrated in these efforts.

Candido called the director of the EB-5 program at USCIS with questions about job counting, such as whether or not construction jobs could count. The director's attitude was extremely laissez faire.

When Candido started, USCIS had two adjudicator. When USCIS went to four, that was a big deal. The adjudicators had no financial experience. USCIS never asked for audited financial information nor did the regional center think to give that to USCIS.

The regional center's role was to make sure the project got built. Candido's view of the regional center's monitoring role changed over time. When he started, the EB-5 program was small. The regional center worked with a lot of immigration attorneys. "We thought we were covering everything from a legal point of view," Candido observed. However, based on the the SEC investigations happening elsewhere, they came to see that they were not covering everything. Yet, they got no guidance from the SEC.

In 2012, at the end of Candido's time at the regional center, he made some recommendations to Lawrence Miller and Brent Raymond. Candido recommended that the regional center approval process be streamlined. He wanted the Vermont Economic Progress Council (VEPC) to be involved in the approval process (Note: According to the state of Vermont website/Agency of Commerce and Community Development (ACCD) page, VEPC is: "an independent board of Vermont citizens, nine appointed by the governor and two appointed by the general assembly...VEPC serves as an approval and authorization body for the Vermont Employment Growth Incentive program and the Tax Increment Financing District program. VEPC uses a job creation model to evaluate whether companies qualify for state benefit programs.) Candido also suggested that the state get out of its EB-5 marketing role.

Candido felt strongly about the VEPC recommendation, but thought the marketing one was just a good idea. Candido suggested these thing verbally/informally around the time of his departure from the state. Candido believed there was a lot of confusion about the state's role. Further, a lot

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido, On 09/09/2019, Page 3 of 12

of people got upset when their projects were denied; hence, Candido felt VEPC would standardize and streamline the system.

Over time, it became clear that USCIS wanted more information from the regional center. During Candido's time, only a handful of regional centers that were not the actual developers were in existence.

Candido thought the regional center had to monitor job creation.

USCIS only mildly changed over time. Yearly "auditing" was a yearly review, though it seemed like an audit to Candido because the EB-5 program was not a project-centric application, it was an investor-centric application. It seemed USCIS was making the process more standardized for developers.

The Memorandum of Understanding (MOU) for the first EB-5 project was already in place by the time Candido came on. Candido saw Bill Stenger's offering materials for Tram Haus Lodge. Candido and Kevin Dorn set up a process of quarterly meeting, which were a flexible review. The quarterly meetings were added to the MOU to set up the expectation that the regional center would be involved in the process. There was a sense that the quarterly meetings should be a part of the monitoring.

Even if Candido had wanted to submit information related to the quarterly meetings to USCIS, there was no such process set up with USCIS to do so. If a problem had come to light, Candido would have gone to "BISHCA" (Note: BISHCA was the Vermont Department of Banking, Insurance & Health Care Administration, but is now known as the Vermont Department of Financial Regulation [DFR]). One could not even get an email back from USCIS. At the yearly audit Candido could have reported a problem. However, USCIS was not set up for such dialogue with the regional center. USCIS made it clear that they did not want to have such a set up.

What would be a material change (i.e., something reportable to USCIS) was not clear to Candido. Candido understood the monitoring role to involve the monitoring of job creation—and to make sure that the developer was building a project the size/value described in the Private Placement Memorandum (PPM). From Candido's perspective, every other regional center was owned by the developer and they were getting approvals from USCIS. The idea that regional centers had a big monitoring role was not the case. Candido thought

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido , On 09/09/2019 , Page 4 of 12

the Vermont Regional Center was going above and beyond the monitoring expected. The Vermont Regional Center had no financial relationship to the project, but did want the jobs to be created.

The Secretary of the ACCD was the ultimate decision-maker. Candido and Kessler were the state employees up to speed on matters. The regional center had a good relationship with Matt at Senator Leahy's office. Leahy, who was a champion of the EB-5 program, wanted to know what was going on with the program. Governor Douglas had been involved, but not heavily. Governor Douglas was cautious. Governor Shumlin was more eager about and interested in being a part of the EB-5 program.

Candido was not privy to conversations Stenger had with politicians. Candido got the impression that Stenger was incredibly on the "up and up." A lot of people believed in Stenger.

When Candido got calls from potential investors, he would not talk to them about the projects. He would provide them with a lists of available projects. He would not promote one project over another. The first time he created the list, he listed the projects alphabetically to avoid the appearance of any bias. Candido felt a lot of pressure to be neutral. He did not observe either ACCD secretary (Dorn or Miller) behave differently.

Candido also felt a lot of pressure "to get the message out" about the EB-5 program and to find companies to participate in it. There was a desire to make the regional center bigger. The program was evolving, and had become different than the statute outlined. They wanted "rural" to be part of it.

Several documents were presented to Candido: (1) a June 23, 2008 letter - Bates DIGGERPRA-ACCD0638; (2) a December 2, 2009 letter from Kevin Dorn to USCIS - Bates DIGGERPRA-ACCD0621; and (3) a January 2010 Vermont ACCD Development Report - Bates DIGGERPRA-ACCD0658.

Candido reviewed the above material. Candido observed that many things have been mis-characterized in regard to the state's monitoring role. Candido's understanding of "capital investment" was not about how much money went into the project, but rather how much money had come in from investors.

Candido is not sure if these three documents are related.

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido ,On 09/09/2019 ,Page 5 of 12

From Candido's perspective, during his time with the regional center, all Jay Peak projects were build to the specifications described in their PPMs. The waterpark was actually bigger than described. When the state was shown expeditures, they fit with what they were seeing.

Candido was shown drafts and edits of a letter from Ed Carroll (Bates MIG-R-DISC-00028321 and EJC-00018802). Candido noted that Carroll was one of the top attorneys in the marketplace. Carroll provided some guidance to the Vermont Regional Center and helped with process. Candido does not specifically recall these drafts.

AUSA Van de Graaf read Candido a description of the state monitoring in the December 2, 2009 letter. In response, Candido stated "that sounds accurate."

Candido noted that four models for job counts were approved by USCIS, which included models based on expeditures and models tied to hiring.

Candido was a part of the Asian trade mission (with the Vermont Chamber of Commerce and governor) in 2009 that included the trip to AnC Bio in Korea. The Chinese EB-5 market was starting to develop and Candido wanted to include the EB-5 program in the trip.

The talk of AnC Bio seemed benign at the time. Stenger talked about his partner having a connection to a company in Korea that made suitcase-sized dialysis machines. The Vermont delegation made a stop at AnC Bio in Korea.

Candido advised that the MOU process involved the receipt of an application. Candido would then bring the potential project to Kessler and review it with Dorn to see if it met the standards of job creation. If it did, they would approve it. A jobs report with jobs numbers and a PPM that had the same numbers were needed to get to an MOU.

Candido does not recall how the MOU signed in Korea in 2009 came about. Typically a jobs report would be a baseline requirement in the MOU process, but it is possible that requirement came about later. In regard to the plan for that MOU, Candido does not remember the MOU or talk about it. Candido had little to do with putting that trip together.

Candido recalls talk about AnC Bio being a part of a potential EB-5

project.

Candido found the AnC Bio Korea building to be very nice. At the time of his visit, Candido did not think AnC Bio would really be involved in an EB-5 project. The building was half empty. It looked exactly like what he expected to see for an operating medical technology company. Candido's group had dinner at the facility with the company employees.

After the trip, the idea of a project involving AnC Bio Korea died. Practically, Candido thought the idea was ridiculous—to just plop an extremely high tech company in Newport. Candido did not see how they would attract the right people to Newport. There was talk internally at the state about this particular challenge. When Stenger was asked about it, Stenger said there was a partnership with universities. Candido does not recall Stenger saying the Koreans were coming in to run the Vermont facility. When an AnC-related land purchase in Newport fell-through, Candido thought the project would not go forward.

Candido's mindset at the time was that USCIS was reviewing the same documents as the regional center. The MOU was telling companies that the regional center was going to be a part of the process; and there had been a clear history of Jay Peak getting all its applications approved and its projects built. The MOU was a part of the application. The review process was "very unofficial," which is why Candido wanted VEPCI to do it.

Candido was shown email related to Governor Shumlin and Senator Leahy (Bates DIGGERPRA-ACCD0058), in which Lawrence Miller stated more resources were needed for the regional center. Candido advised that he does not specifically recall the events in the email communication. At the time, it was just Candido at the regional center. Candido got help from Kessler and various immigration attorney in understanding the standards.

The regional center paid for Candido's EB-5-related travel until a change was instituted so that the developers paid for his travel. The projects wanted the regional center to be more of a partner and to be a part of their overseas presentations.

Candido was shown an email dated March 8, 2012 (Bates DIGGERPRA-ACCD0333) regarding Douglas Hulme. Candido advised that he was aware of the Hulme issue. Hulme was a difficult person. Candido was happy Hulme was leaving Jay

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido , On 09/09/2019 , Page 7 of 12

Peak. The state had concerns about Hulme acting as a broker/dealer. The state tried to get information from Hulme. Candido tried to get Hulme on the phone to talk about his concerns, but Hulme was silent.

The state went to Stenger to ask Stenger about Hulme's issues. Stenger explained that Hulme was upset because he was not getting the compensation he wanted. When Hulme to eventually responded to the state, he was vague about his issues.

Hulme was very brash and unstable during the time he was with Jay Peak. What Stenger said about Hulme was in line with Candido's experience with Hulme. And, since Hulme was not responsive, Stenger's version of events was taken as truth.

Though Stenger influenced Candido's impressions, Candido still took action in reporting concerns to BISHCA. The concerns included the broker dealer issue and a letter from Michael Gibson, whom Candido thought was a very weird person. Candido held on to the letter because he thought he might need it someday.

In an effort address concerns, Candido also met Jay Peak accountant Heather Whipkey. However, Candido did not know what he was looking for.

Candido was shown a blog post by John Roth, titled "Report from Jay Peak," (Bates 5138275), which contained a statement from Candido in it. In response, Candido stated there were no issues with Jay Peak when we reviewed their projects. Candido cannot recall specifically what he said to Roth, but what Roth wrote about was related to financial matters. Candido met with Roth in March at Jay Peak. Candido was at Jay Peak at the time to meet with Stenger—to figure out what was going on.

Candido observed that, to this day, regional centers are still granted to projects (i.e. regional centers tied to projects). The law pertaining to regional centers has not changed since the 1990s. The only way to know USCIS's expectations was from precedent. Now USCIS gives out blueprints about adjudication. Until after he left in 2012, the only way to understand oversight was by reviewing cases or through an RFE after a filing.

Candido understood the regional center's oversight to include overseeing indirect job creation—to understand how the money was spent was part of the

job creation. Candido's oversight involved quarterly meetings in which he would examine how many investors came into a project and how much money was spent. If money was not spend as it was supposed to be spend that would be important to Candido—because it would be important to job creation.

The regional center's oversight was more like tracking than auditing. If something important came to light, Candido would have been obligated to inform investors.

Candido always found USCIS's administration of the program to be confusing. Candido got confusing letters and questions from USCIS. USCIS asked things of the Vermont Regional Center that would not have been asked of other regional centers. Later, USCIS was critical of the Vermont Regional Center's quarterly meetings. Candido noted that other regional centers were operated by the project/developer and wondered how USCIS applied this same standard (i.e., How would such projects/developers have quarterly meeting with themselves?). Candido never got any information that the Vermont Regional Center was distinct from other regional centers.

In navigating what was expected of the Vermont Regional Center, Candido always followed the statute and precedent, and when he got letters from USCIS, he would make appropriate adjustments.

USCIS first had only two adjudicators in Texas. Eventually, multiple additional adjudicators (none of whom were business people or who had an eye for business matters) were added after an influx of an incredible amount of applications. USCIS was not using economists at this time.

Candido once sent in an application with a table. USCIS sent back an RFE asking for a table. Candido sent the application back, circling the table and, thereafter, the project got approved. Another time, Candido sent in two separate applications. A long period period passed and nothing was heard back about one of the applications. When Candido inquired about it, he learned USCIS had never looked at it because it was assumed to just be a duplicate of the other. USCIS seemed in over its head during this period.

For a time, USCIS only accepted communication through an email dropbox.

Candido, in comparison with higher level state employees (such as Miller) was more of an administrative person. He was not at a level where he would

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido , On 09/09/2019 , Page 9 of 12

have been given direction to do favors for persons such as Stenger. However, from what he observed of those on higher levels, everything was handled equitably. No one above Candido asked him to cut corners or give preference to someone.

Stenger was connected to politicians. Candido liked Stenger on a personal level. Candido did not interact much with Stenger and had less interactions with him than with other EB-5 project leaders, such as those of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

When he left the regional center, Candido realized the program had grown considerably. Despite his negative feelings toward Hulme, Candido grew concerned that the regional center was not doing enough, and that ACCD should not be alone in this work.

Candido talked to John Cronin at BISHCA. Candido thought BISHCA would talk to Gibson and Jay Peak, and that BISHCA would be concerned about what was said. Later, after Candido left ACCD, he was surprised to hear that BISHCA was not going to do anything.

After leaving ACCD, Candido worked for an private equity firm that had EB-5 business. Candido met up with Vermont Regional Center personnel at industry events. Candido kept close tabs on the regional center issues. Later, Candido read state correspondence published by Vermont Digger in which it was stated that BISHCA was not going to examine the issues. This reporting confirmed what Candido heard back at the time.

Candido clarified that he learned of the issues with Hulme through others in the industry (it was news in the industry because Jay Peak was so big and well-known) and not through a letter. Upon learning of the Hulme matter, Candido tried to talk with Stenger and Hulme, but could not get a response from Hulme for a long time. Stenger characterized the issue as a business dispute about the $50,000 administrative fee: Hulme broke ties when he did not see more money coming his way.

Hulme went to work for Mt. Snow's EB-5 program. Candido, Kessler and Miller thought that Hulme would have disclosed information if there was a really serious issue at hand.

In his meeting with Stenger (prior to his meeting with John Roth),

Candido asked Stenger what Stenger thought were Hulme's issues. Despite Stenger's explanation, Candido went over expenditures and took a tour with Stenger, during which Stenger showed Candido how money was spent on the project. From that level of monitoring, Candido did not see any issues.

The subject of co-mingling did not come up. Candido did not bring it up nor did Stenger. Candido knew co-mingling was not permissible because it would impact job creation.

Around that time, Candido spoke to Cronin. Candido is not sure if he spoke to Cronin at the same time he spoke to Roth.

AUSA Van de Graaf observed that Gibson had been communicating with Cronin regarding the broker-dealer issue; and at some point Gibson roped in Kessler to discuss these issues (and Candido was copied). In response, Candido advised that at that point he had had a long relationship with Gibson. Gibson was a registered broker-dealer who was trying to do a Moody's-type review for EB-5 projects. Candido found Gibson to be a very aggressive person. Gibson wanted the developers to pay have their projects in his booklet. Jay Peak would not participate so Gibson wanted the regional center to join, especially because it was one of the largest regional centers. Neither the regional center or Jay Peak ever paid to be in his booklet. The regional center had a lot of contact with Gibson, not all of which was pleasant. Gibson was angry at Hulme.

Candido did have direct conversations with Gibson in 2012, probably on the phone or at industry events, during which Gibson explained his concerns.

AUSA Van de Graaf asked if Gibson gave any critique or guidance on how a regional center should do its job. Candido advised that Gibson did ask about what the regional center did, but always in the context of marketing, and tied into the broker-dealer issue. Gibson was concerned with Hulme operating as a broker-dealer and marketing things that were not true, rather than state oversight. The concerns were always about Hulme's relationship to Jay Peak.

AUSA Van de Graaf asked Candido about his knowledge of and thinking about the finder's fee issue. Candido advised that in the beginning there was not a full understanding of how the projects worked in this way. Immigration attorneys did not know they could not take finder's fees. Candido knew the

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido , On 09/09/2019 , Page 11 of 12

practice happened but did not think it was rampant. Candido got the impression, from what he heard, that the immigration attorneys did not understand the problem because they were not securities attorneys.

The regional center did not have oversight over that matter. If Candido heard of it happening he would have gone to BISHCA. The matter was probably discussed with Stenger—because it became an industry topic (and eventually a really big topic and everyone knew it was a problem). Stenger always gave the impression that Jay Peak did not engage in the finder's fee practice.

AUSA Van de Graaf asked Candido about the May call with Hulme. Candido advised that he recalls the call clear. He recalls one call with Hulme. Candido left the regional center shortly after the call. On the call was Candido, Miller, Kessler, and Raymond (who was going to take over Candido's duties). Moulton, who was deputy secretary at that time, may have been involved, but Candido cannot recall.

Hulme and his lawyer were on the call. Hulme would not answer any questions—it was just his lawyer talking. The state learned nothing. The call was a complete waste of time. Candido cannot recall the rational for Hulme's silence, but it may have been due to a potential legal issue with Stenger. Candido thought Hulme was concerned about the legality of a marketing relationship with Stenger. Stenger and Hulme had collected a lot of money as marketers for Jay Peak and the SEC was getting more involved. It was possible that Hulme was unlicensed license broker-dealer and was getting out of the relationship to avoid trouble. By that time, it had taken a long time to talk to Hulme. From the state's perspective, it seemed more like a self-preservation situation than a whistleblower one (based on conversations that took place after the call).

Candido does not recall meeting George Guilsano. Candido went over expenditures with Stenger and Whipkey (Candido noted that he believes it was probably Whipkey, but it may have been another female at Jay Peak).

AUSA Van de Graaf asked Candido about his meeting with BISHCA. Candido advised that he met with Cronin, but cannot recall the date. The meeting was triggered by Gibson's email. Candido went over his concerns about Jay Peak in general. Candido was concerned that the issues were outside the regional center's jurisdiction; and Gibson did not know how to take a deeper look

5765980

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of James Candido , On 09/09/2019 , Page 12 of 12

into the issues. Candido told Gibson he would connect him with Cronin. Candido thinks his conversation with Cronin must have happened after the Hulme letter because the conversation included the overall concern about Jay Peak. The discussion about the general concerns with Jay Peak would have included the accounting problem raised by Hulme.

Candido would have had his recommendations (about getting out of the marketing role and bringing in VEPC) to Miller and Raymond even if the Hulme issues had not been raised. These were recommendations, or ideas to improve, and not a "manifesto." There now was knowledge that the projects involved securities and had to comply with rules. Candido concerns revolved around liablity. He felt the state should get out of marketing because they were taking on a lot of liability.

There was some talk about audits with Jay Peak. Candido had discussions with Raymond about this topic at industry events (after Candido left the state). Audits were a good idea, but if audits were done would be saying it was the state's role. Candido thought another part of the state government should do the audit. Reflecting back, using the term "audit" was a mistake. Candido would change that it he could go back. However, whenever he spoke he was clear about the state's role.

AUSA Van de Graaf asked about the Governor Shumlin video made for another project, which was put into a Jay Peak video. Candido advised that he put together a few videos and does not recall Jay Peak using the video. The word audit was used, but Candido believes it was used in reference to the job creation part of the project. Candido viewed it as a third party review of the aspect of the project that involved EB-5 (i.e., EB-5 part (involving job creation) as opposed to the investment part).

The regional center did not get any more help. The recession and budget deficit were factors. Candido went to the legislature to see if he could get a budget. Part of the reasoning for bringing in VEPC was to take work off the regional center's plate.