

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000285105 | **Location:** | U.S. Attorney's Office |
| **Investigation Name:** | ARIEL I QUIROS | | 500 S. Australian Ave. Ste. 400 |
| | | | West Palm Beach, Florida 33401 |

**Date:** January 24, 2020
**Time:** Approximately 9:01 a.m.
**Participant(s):** Susan Donegan, Witness
Anders J. Ostrum, Special Agent
Nicole Cate, Assistant U.S. Attorney
Jessee Alexander-Hoeppner, DOJ Trial Attorney, Fraud Section

On the above date and time, Susan L. Donegan (Donegan) was interviewed by Assistant United States Attorney (AUSA) Nicole Cate, Department of Justice Trial Attorney Jessee Alexander-Hoeppner, and IRS-CI Special Agent Anders Ostrum at the U.S. Attorney's Office in West Palm Beach, FL. After being advised of the identities of the interviewers and the nature of the interview, Donegan provided the following information:

1. Name:        Susan L. Donegan
   Employer:
   Work Address:

   Work Phone:
   Cell Phone:
   Email:



2. Donegan is currently the ████████████████████████████
████████████████████████████████████ Donegan oversees a variety of functions, including External and Government Affairs, Regulatory and Legislative Analysis, Residual Markets, Regulatory Business Management, and Regulatory Operations functions. ██

3. Donegan is the former Commissioner of the Vermont Department of Financial Regulation (DFR). During Donegan's tenure as commissioner, Michael S. Pieciak (Pieciak) served as the deputy commissioner of the DFR's Securities Division. Pieciak reported to Donegan.

4. Before 2014, Donegan didn't really know what the EB-5 Immigrant Investor Program was. At this time, EB-5 investments were not deemed a "security" and

because of this, DFR did not provide any regulation or monitoring of Vermont EB-5 investment projects. In approximately 2014, Donegan started to conduct her own research into the EB-5 Immigrant Investor Program. As Donegan became more familiar with EB-5, she believed the EB-5 program to be a "security."

5. Before DFR became involved, Vermont's EB-5 program was administered by Vermont's EB-5 Regional Center which was run by the State of Vermont's Agency of Commerce and Community Development (ACCD). In mid-2014, talk started brewing for the potential of DFR to assist ACCD with Vermont's EB-5 program, specifically the review of all EB-5 investment projects from a securities compliance standpoint. The DFR had more expansive authority than ACCD. Governor Shumlin asked DFR to aid ACCD in overseeing Vermont's EB-5 program. Informal communications were formalized when ACCD and DFR signed a Memorandum of Understanding (MOU) which allowed DFR to assist ACCD in EB-5 project oversight and laid out DFR's responsibilities. The MOU was negotiated between David Cassidy (General Counsel, DFR) and John Kessler (General Counsel, ACCD) and was signed by Donegan and Patricia Moulton (Secretary, ACCD).

6. Cassidy and Pieciak created two new positions to help in DFR's EB-5 regulation responsibilities. The positions were filled by Jim (last name unknown) and Chris Smith. Jim was an accountant and Chris Smith helped with registration and analysis. Chris Smith was a law graduate and now works as general counsel for the Cannabis Control Commission in Massachusetts. Donegan, Cassidy, Pieciak, Jim, and Chris Smith made up DFR's team in assisting with their EB-5 MOU responsibilities. DFR did not borrow anybody from ACCD as Donegan did not feel ACCD had the expertise Donegan's team needed to perform their regulatory and oversight functions. ACCD would provide DFR documents in connection with EB-5 projects.

7. In approximately January 2015, DFR was still performing oversight functions of Jay Peak and other EB-5 projects consistent with their standard regulation and monitoring activities – at this point the DFR did not view their work as an investigation. DFR was focused on working with the Jay Peak and AnC Bio Vermont EB-5 project Principals to clean up circulars and review financial statements and other relevant documents – unlike ACCD, it was DFR's job as regulators to do this. Donegan refers to Ariel Quiros (Quiros), Bill Stenger (Stenger), and Bill Kelly (Kelly) as "the Principals."

8. In early 2015, DFR was focused on obtaining an accurate and updated circular (also called a Private Placement Memorandum/PPM) for Jay Peak Biomedical Research Park L.P. (AnC Bio Vermont). At the end of approximately January 2015 there was a meeting between DFR and Primmer Piper Eggleston & Cramer PC (Primmer), the lawyer's representing the Principals of the Jay Peak and AnC Bio Vermont EB-5 projects. Donegan was not at this meeting but Pieciak was. Donegan recalls the attorney's present for Primmer to include Mark Scribner (Scribner) and Ralphine O'Rourke (O'Rourke). The meeting's purpose, among other things, was to go over questions posed by DFR concerning the AnC Bio Vermont EB-5 project. Pieciak and representatives from DFR were trying to help

the project Principals and their attorneys understand what DFR was looking for. DFR had found it very difficult to obtain answers to their questions and get financial supporting documentation needed to perform DFR's regulatory responsibilities. At this point, it was an active negotiation between DFR and Primmer about what was going to be included in the updated PPM and what wasn't. At the time DFR stepped in, there were a few iterations of the AnC Bio Vermont PPM. Primmer and the Principals wanted to use the latest iteration of the AnC Bio Vermont PPM, but DFR viewed this as outdated. DFR wanted a new PPM with updated and added disclosures which DFR felt were extremely important and material in nature.

9. By the end of January 2015 DFR was still in oversight mode, however, it seemed to be taking a very long time for the Principals and their attorneys to respond to questions and produce documents. Despite this, red flags hadn't yet appeared for Donegan.

10. Later on, Pieciak briefed Donegan telling her that DFR was not getting what they needed from the Jay Peak and AnC Bio Vermont project Principals, specifically the production of financial documents and answers to DFR questions pertinent to DFR's duty to regulate and oversee EB-5 projects. By this time, Donegan wanted to get more involved with the Principals. Donegan recalls sitting in a few meetings with attorneys from Primmer which included Scribner and O'Rourke. In later meetings, Primmer brought Gary Karnedy (Karnedy) to meetings. Karnedy told Donegan they would produce all the documents that DFR requested.

11. In approximately 2014, ACCD had instructed the Jay Peak Principals to suspend the AnC Bio Vermont project offering (marketing and new investment). AnC Bio Vermont needed DFR approval of an updated PPM before marketing and new investment could resume. Donegan recalls a few older versions of the AnC Bio Vermont PPM that DFR deemed insufficient. DFR eventually approved a revised version of AnC Bio Vermont's PPM allowing AnC Bio Vermont to go back into the marketplace. In reviewing AnC Bio Vermont's old and amended PPM, DFR's Chris Smith did a lot of the PPM analysis. It was DFR's focus that the project be adequately disclosed. DFR's Jim (last name unknown) focused more on the financials provided by the Jay Peak Principals.

12. As DFR started to perform their regulatory oversight of AnC Bio Vermont, it was Donegan's first impression that it was "messy," but as DFR learned more through correspondence and financial records it became to look "pretty funky." Sometime around February 2015, and accidentally via ACCD, DFR became aware the Securities and Exchange Commission (SEC) had taken testimony from Brett Raymond (Former Director, VT EB-5 Regional Center). Donegan recalls the SEC may have talked with John Kessler as well (General Counsel, ACCD). DFR learned of the Brett Raymond SEC testimony during the time period DFR was working with Primmer to update AnC Bio Vermont's PPR. When Donegan learned of the testimony, red flags went up. Donegan told Pieciak to call the SEC and get a copy of the deposition(s) and other relevant information. By this point Donegan was becoming increasingly skeptical that something else was going on with AnC Bio Vermont and its project Principals.

13. Through conversations with various people, including Alex McLean and folks in the governor's office, Donegan learned of displeasure being expressed by the Principals regarding DFR's ongoing EB-5 oversight.

14. As Donegan became increasingly involved in DFR's oversight of the Jay Peak and AnC Bio Vermont EB-5 projects she met with some of the Principals. Donegan met with Stenger early on and on multiple occasions. Stenger's pitch was always saving the "NEK" (Northeast Kingdom). Stenger always referred to Bill Kelly as "our lawyer, Bill Kelly." Donegan had Stenger and Kelly's personal cell phone numbers. Donegan would often deal with Stenger and Kelly concurrently. In the early stages, Donegan dealt more with Stenger than Kelly. At a later stage Stenger and Donegan's communication dropped off and at some point Donegan was only dealing with Bill Kelly. When DFR was attempting to get financial documents from Stenger, Stenger always promised Donegan he would get her what DFR was asking for. However, Stenger never delivered on his promises. At one point, Stenger showed up at Donegan's office with binders. Donegan assumed these were full of the financial documents DFR had requested from the Principals. In reviewing the binders and to Donegan's surprise, instead of the requested financial documents the binders contained numerous marketing materials. Donegan remembered thinking this was "ridiculous." The binders did not contain any projections or profit and loss statements. There were hardly any financials. Donegan provided the binders to DFR's accountant, Jim (last name unknown), and one of the Certified Public Accountants (CPA) in insurance. DFR's conclusion was these were not real EB-5 project financials. Sometime around the time the binders were reviewed by DFR, a DFR EB-5 team meeting was held to discuss how DFR was going to proceed. Conversations occurred entertaining the possibility that something else was going on, something different than what was being broadcasted by the Jay Peak and AnC Bio Vermont project Principals. Donegan felt that DFR was being stonewalled. Each time a request was made by DFR the Principals would promise documents but never produce those documents. Donegan thought there could be a second set of books. However, Donegan was always careful not to say the "F" word (fraud) until she had enough evidence that justified its use.

15. At or around the time the Letter Agreement was being negotiated, the DFR had started to suspect "monkey business" on the part of the Principals. Because of this, DFR wanted a full and accurate picture of the AnC Bio Vermont EB-5 project financials. DFR deployed a two-part strategy where on one hand they would try and negotiate a Letter Agreement with the Principals while also quietly launching an investigation which involved subpoenas and getting documents from third parties. The Letter Agreement was largely being negotiated between Donegan and Bill Kelly. Bill Kelly proposed changes to the Letter Agreement which Donegan rejected. Bill Kelly was always speaking for the Principals. The Letter Agreement specified terms and conditions between DFR and the AnC Bio Vermont project Principals. The Letter Agreement outlined the need for financial records, an escrow account for new investor funds, and an updated PPM with proper disclosure language. Donegan and the DFR wanted the Principals to provide all documents

necessary for DFR to perform a full financial review of the AnC Bio Vermont EB-5 project. This had to be done. It was the DFR's job to protect investors. It was Donegan's job. Although Donegan couldn't do anything about the investors that had already invested in projects being developed by the Principals, she could try her best to protect new investors. It was Donegan's idea to require new investments to be placed in an escrow account so the money could be protected. In the end, the Principals would never sign the Letter Agreement.

16. Bill Kelly always seemed to be on the road traveling. Donegan would frequently talk with Kelly over the phone. It was Donegan's impression Kelly's duties extended beyond his duties as a lawyer for Stenger and Quiros. It was Donegan's sense Kelly was pulling a lot of strings.

17. Donegan remembers Quiros introducing Bill Kelly as "my lawyer." At one point, Donegan had David Cassidy look into Bill Kelly to try and ascertain where Kelly went to law school and where he was licensed to practice law. Donegan nor Cassidy ever found out anything regarding Bill Kelly being a lawyer.

18. Donegan met Quiros for the first time at a meeting with the Governor at the end of March 2015. The second time Donegan met Quiros was when Quiros and Stenger came to the DFR. Donegan believes herself, Pat Moulton, Liz Miller, Sarah London, Stenger, and Quiros were in attendance for the meeting at DFR. The topic of the second meeting was Burke.

19. Before AnC Bio Vermont was allowed to go back into the market, Donegan went to the governor's office and told Shumlin she thought there was a problem. Donegan went through a presentation with the governor highlighting the various problems and potential violations. Donegan believes the governor, Sarah London, Liz Miller, Pat Moulton, and maybe Susan Allen were present.

20. In approximately April 2015 Donegan sent a resignation letter to the governor and Sarah London. Donegan felt that if she continued to remain Commissioner of the DFR she would be breaking the law if nothing was going to be done to protect new AnC Bio Vermont EB-5 investors. All Donegan wanted was to have an escrow option for new investor funds (AnC and Burke). Protecting investors was Donegan's main concern. Although Donegan did resign in 2016, she did not end up resigning in April 2015 as an escrow component was eventually agreed upon and implemented.

21. By the time the governor's meeting happened, the revised PPM was close but not yet satisfactory. The message coming from Governor Shumlin's office was for the DFR to find a compromise with the Principals. The Principals didn't want to disclose the SEC investigation. Chris Smith, David Cassidy, Pieciak, and Donegan were all involved in the review and approval of the revised PPM. The SEC investigation was reluctantly disclosed by the Principals. When it came to the PPM, Donegan was never judging the investment, she was simply ensuring it had adequate disclosures.

22. In addition to a revised and approved PPM, it was clear to Donegan that new investor funds had to go into an escrow account for investor protection. Once agreement for an escrow account was reached, investor money could be released from escrow two different ways. The first way funds could be released from escrow was through USCIS I-526 application approval. The second way funds could be released from escrow was through DFR approval. David Cassidy worked with Bill Griffin, Deputy Attorney General, to approve billables to contractors. At this point in time, USCIS had been slow in approving I-526 applications. Donegan understood this and felt that the provisions for release of escrow funds was sufficient to buy DFR time to continue their investigation into the Jay Peak and AnC Bio Vermont EB-5 projects. Although DFR's approval of the revised PPM for AnC Bio Vermont would allow the Principals to accept new investor funds, Donegan believed this to be okay because the presence of an escrow account would protect investor money.

23. Donegan considered shutting the AnC Bio Vermont EB-5 project down earlier and did suggest this to the DFR EB-5 team. The team contemplated whether this was a pull-the-plug moment. Donegan didn't use the "f" word but was thinking the project couldn't be saved. The team was unsure if the project could be fixed. Donegan's message to Governor Shumlin was that she didn't like the project but would move forward if there were protections for investors. Donegan fought and almost resigned to get new investor money into an escrow account.

24. Donegan recalls many meetings with Governor Shumlin, including some taking place prior to the March 27, 2015 governor meeting with the Principals. Among the meetings was one meeting where DFR told Governor Shumlin what they were seeing. Specifically, DFR told Governor Shumlin about irregularities in accounting, transactions that didn't make sense, and purchases of property and luxury items. They showed the governor an abbreviated "spaghetti" map which displayed the flow of investor funds. DFR highlighted how complicated the flow of funds was, the many banks, bank accounts, and entities involved. Donegan told the governor that the Principals were not being forthcoming with DFR's questions. Donegan didn't use the "fraud" word at this meeting.

25. Soon after the Vermont Attorney General's Office got involved, including William Sorrell and Susanne Young, Donegan went to the governor's staff and told them the AnC Bio Vermont project was a fraud.

26. Senator Patrick Leahy was a senator when EB-5 was created. Senator Leahy was very committed to the EB-5 program. Donegan spoke with Senator Leahy directly including his chief of staff at that time. On occasion, Senator Leahy's people would call Donegan. Donegan never told Senator Leahy or his people there was a fraud but she did tell them that it wasn't going so well. Donegan recalls Leahy saying do what you need to do. Donegan never heard, including after Governor Shumlin's meeting in March, Leahy say find a way forward – all Leahy said to Donegan was "do what you need to do." Donegan did not feel any pressure from Leahy.

27. Donegan never spoke with Senator Bernie Sanders.

28. Kelly was always lecturing Donegan on the law and explaining things to her at length. It was Donegan's impression Kelly thought he was the smartest guy in the room.

29. Donegan recalls Quiros saying this is his money and he'll do what he wishes.

30. Hindsight is 20/20; if Donegan could go back in time she would have tried to shut down the Jay Peak and AnC Bio Vermont EB-5 projects sooner.

I prepared this memorandum on January 28, 2020, after refreshing my memory from notes made during and immediately after the interview with Susan Donegan.

Anders J. Ostrum
Special Agent