FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry __10/08/2019__

Kevin Dorn, former Secretary of the Vermont Agency of Commerce and Community Development (ACCD), current city manager of South Burlington Vermont, was interviewed at the United States Attorney's Office, Burlington, Vermont, by Assistant United States Attorney (AUSA) Paul Van de Graaf and FBI Special Agent Jennie Emmons. Bill Griffin of the Vermont Attorney General's Office was also present as Dorn's legal counsel. After being advised of the identities of the interviewers and the nature of the interview, Dorn provided the following information:

Dorn grew up in Minnesota. In 1978, he moved to Washington, D.C., where he worked on Capital Hill. Dorn married and moved to Vermont in the 1980s. Dorn held a position with the Vermont Association of Realtors and later became an executive officer with the Home Builders and Remodelers Association of Northern Vermont.

Dorn was appointed secretary of ACCD by Governor Jim Douglas, a position Dorn held until he left state employment in January 2011. Dorn became friends with Governor Douglas and Douglas's chief of staff was a mentor to Dorn.

The roots of the EB-5 program went back to the Governor Dean administration. Not a whole lot had happened with the program before Dorn's time. During Dorn's first two years as secretary of ACCD, the EB-5 regional center did not come on his radar.

Jay Peak was on the path of using the program by the time Dorn came in. Bill Stenger was pushing to begin the funding of projects. Vermont was then the only state-hosted EB-5 center, which was unique at the time. The regional center's role was to promote EB-5 as a tool and to monitor the actual construction of projects on a quarterly basis.

Stenger was an advocate for the use of the program. Four or five other

| Investigation on | 09/03/2019 | at | Burlington, Vermont, United States (In Person) |
|---|---|---|---|

File # 318B-AL-6464304                                                      Date drafted  09/04/2019

by   EMMONS JENNIE MCGLYNN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5766808

companies were seeking to use it, such as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The first project was the Tram Haus Lodge. Dorn would go up to tour it with Stenger.

There was no staff for the regional center initially. Related legal questions went to John Kessler. A decision was made to create a position at the agency to promote work with Stenger (since the Northeast Kingdom was struggling economically). James Candido was the staff person brought on to administer the projects.

AUSA Van de Graaf asked Dorn if the state's monitoring was sufficient. Dorn advised that with "hindsight being 20/20," it was not that good. At the time, Dorn understood his job to be just about promotion and to ensure something was being built. He never thought to seek financial records.

EB-5 is a federal program and USCIS was approving projects. Dorn did not have the authority to compel the developers to produce financial records.

Dorn had regular contact with Stenger. Dorn had no suspicion that anything bad was going on. Dorn was pleased to see all the construction employment. He did not think his role involved the monitoring of financials.

AUSA Van de Graaf asked Dorn about developers using state monitoring as a way to gain investors' trust. In response, Dorn stated that he never once participated in such a discussion or ever saw Stenger make such a representation. Dorn did not see such a connection being made (i.e., the state is monitoring so one's investment is safe). Such representations were never made in Dorn's presence, though they could have been inferred or stated overseas.

Dorn knew Stenger before their EB-5 involvement. Stenger was "kinda a rockstar" and one of the "movers and shakers" in the Vermont business community. Stenger was the "go-to guy" for governors for training and employment issues. Stenger was active in the Chamber of Commerce and chaired a commission for the "next generation." Stenger was also on the Governor's Council of Economic Advisors.

AUSA Van de Graaf asked Dorn if trust in Stenger impacted his monitoring

of projects. Dorn did not think he was impacted in this way. Monitoring was done in the context of Dorn's understanding of his role. Dorn thought his role was to ensure the project was built. At the quarterly meetings, Dorn did not dig into facts. Dorn and Stenger did not spend a lot of time in Stenger's office. They would go through the bowels of the building and up to the roof to view the construction.

Dorn agreed with AUSA Van de Graaf observation that the regional center was the eyes for USCIS. Dorn felt that he was providing an appropriate level of oversight. The jobs-creation part was verified by an economist hired by Stenger to report to USCIS (Jeff Carr [phonetic] did that work).

Dorn trusted Stenger to be reporting the jobs created to USCIS (the 10 jobs for each $500,000 investment). Dorn did not see it as his job to count, but rather it was Stenger's and the economist's.

Four trips to China were arranged by the Chamber of Commerce. Chris Barbieri was the president and it was his view that Vermont should develop its trading relationship with China and Taiwan. A delegation of business people would go to China. In 2009, the EB-5 component was introduced to this effort.

About two to three weeks before the 2009 Asia trip, Stenger (who was also going) announced that the trip would include a visit to a Korean company that had a remarkable regenerative therapy. Initially, there was no talk about being a potential EB-5 project, but then Stenger talked about one with AnC Korea. Dorn did not know Quiros at this time.

Governor Douglas was on the 2009 trip (involving the stop in Korea), which was a part of an international trade mission. In Korea, Dorn and the Governor (and two members of his security team), were picked up by Stenger and Ariel Quiros. Stenger introduced Quiros as his partner. Dorn did not understand the relationship between Stenger and Quiros for a long time.

The next morning after arriving in Korea, Dorn rode from Seoul to the AnC facility in a van with Dr. Lee, who was the chief scientific officer for AnC Korea. Dorn was told that AnC Korea had a briefcase-sized dialysis machine, a heart pump, and a regenerative heart therapy that involved taking muscle tissue from the thigh and injecting it into the heart.

Dorn's impression was that AnC Korea needed a United States location to better interface with the FDA for the purpose of product approval. And, that the United States location could possibly be Newport. Dorn thought, "Wow, this operation could go into Newport! This facility is beautiful."

Later that night there was a reception at a hotel, and Dorn saw Quiros again at that event. Dorn may have seen Quiros once again at Jay Peak some months later.

A Memorandum of Understanding (MOU) was signed (Dorn thinks the Governor signed it). The MOU was "one of those things you do politically" to show the trip had meaning, without committing to much.

Dorn thought the AnC project was going to happen quickly. Dorn is an optimist.

The tour of AnC Korea was odd. There were very few people and no cars in the garage. The facility was brand new—one could "eat off the floor." They toured a clean room, which had some people in it, and had lunch in the cafeteria. Not much was going on inside the facility. The lack of activity did get Dorn's attention.

Everyone was excited about the prospect of biotechnology jobs. Dorn did not ask questions. At some point, Dorn raised the concern with Stenger about the Koreans feeling comfortable in Vermont—if the Korean company moved to Vermont.

Soon after the trip, Dorn talked to Stenger about further preparations. At some point, a site was chosen and Dorn made a visit to that site with Stenger. Dorn was excited. Stenger would say "it's going fine," and that they were trying to get FDA approval for the dialysis device. Things dragged on, but that did not seem out of the ordinary.

AUSA Van de Graaf referenced a July 2009 email from Stenger (before the Asia trip), in which it was stated that the Governor wanted the EB-5 program to expand beyond the ski industry. Dorn advised that Stenger was supportive of that goal.

Dorn's job was to promote the program. Dorn started going to other companies. Stenger was very generous in hosting (and paying for) receptions

5766808.04

and allowing others to set up a table for their projects. At least five companies had table-tops displaying their projects to lawyers and potential investors. The Chamber of Commerce and the state did not host these events, Stenger did.

Douglas Hulme was working with Stenger. Hulme had a lot of connections with immigration attorneys.

AUSA Van de Graaf asked Dorn if there were conversations with Stenger about the AnC EB-5 project being outside his areas of expertise. Dorn advised that he did have such conversations with Stenger. Dorn's recollection is that Quiros had that expertise. Quiros had a longtime business connection with AnC Korea.

Dorn met Alex Choi. Dorn understood that Choi and Quiros were going to facilitate the move to Newport. Dorn saw that AnC Vermont would involve Quiros, Alex Choi and Ike Lee, and a Korean senior management (which disappointed Dorn because he wanted more Vermont jobs). Dorn saw this project as a Korean company located in Vermont.

Dorn felt the project was an "odd duck." Newport is an odd place to put a cutting edge biotech company. However, the University of Vermont was excited about the project and Boston is not that far away. Dorn knew that getting the right people would be hard. That void would be filled by bringing in Koreans. Local people would get jobs in production.

AUSA Van de Graaf asked Dorn if he would have wanted to see a business plan in his oversight role—to approve the bona fides of the project. Dorn advised that he did not see that as a part of his role at the time. USCIS had that role. It was a new program. There were so many other things going on for Dorn in his job at ACCD.