FD-302 (Rev. 5-8-10)   - 1 of 9 -



# FEDERAL BUREAU OF INVESTIGATION

Date of entry   08/01/2018

John Kessler, General Counsel, Vermont Agency of Commerce and Community Development (ACCD), Montpelier, Vermont, was interviewed by at the United States Attorney's Office, District of Vermont, 11 Elmwood Avenue, Burlington, Vermont. Present for the interview with Kessler was Vermont Assistant Attorney General William Griffin. After being advised of the identities of the interviewers, which included Assistant United States Attorneys Paul Van de Graaf and Nicole Cate, and Special Agent Jennie Emmons (FBI), and the nature of the interview, Kessler provided the following information:

Kessler come on to ACCD as General Counsel in June 1997 under Vermont Attorney General Bill Sorrell, who was a friend of Kessler's. Kessler has held this position under several Governors' administrations, to include that of Governors Dean, Douglas, Shumlin, and now Scott. Prior to ACCD, Kessler worked in environmental enforcement at the state of Vermont.

ACCD has three major programs: Housing and Community Development, Economic Development, and Tourism/Marketing.

Kessler's predecessor was involved in the designation of the state of Vermont as a Regional Center. When Kessler first arrived at ACCD, the Regional Center did not have much going on.

Kessler was not involved in Governor Douglas's 2009 trip to Korea and the signing of the 2009 Memorandum of Understanding (MOU). Maury Beret (phonetic), who was the ACCD Deputy Administrator at that time, told Kessler that a MOU was required for EB-5 projects. While Kessler subsequently learned that MOUs were not actually required, they did become a practice at ACCD. The original template was obtained from Beret. Each time a new MOU was created it was improved upon with the addition of phasing and conditions. In 2009, James Candido was the director of the Regional Center. At that time, Kessler would go over the terms of the MOU with Candido.

The MOU is an agreement. In the MOU, USCIS/INS terms were used. There was a reference to immigration attorneys and verbiage about reporting, visits and monitoring.

| | |
|---|---|
| Investigation on 06/27/2018 at | Burlington, Vermont, United States (In Person) |
| File # 318B-AL-6464304 | Date drafted 07/05/2018 |
| by EMMONS JENNIE MCGLYNN | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5745337

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of John Kessler  , On  06/27/2018  , Page  2 of 9

AUSA Van de Graaf asked Kessler to describe the state of Vermont's role in the the revised MOU for AnC Bio Vermont. Kessler advised that the state's role evolved over time. In 2012, the AnC Bio Vermont MOU was updated. The MOU was updated purely because it was outdated. The project had not been marketed much based on the first MOU, and much had happened in the EB-5 world nationally. Securities were now a factor and the Chicago Convention Center case had happened. Further, Brent Raymond came on board at the state around that time, and he had securities licenses and experience. A compliance requirement (regarding compliance with all state and federal securities laws) was added to the MOU. AUSA Van de Graaf noted that monitoring information was added as well.

The Vermont Regional Center refused a EB-5 project for 

In 2012, an EB-5 investment package was called an "Offering Document" because, by that time, it was recognized as security. Before 2012, the EB-5 investments were not considered a security.

The state leadership and Raymond were concerned with the economic aspect of EB-5 projects. Kessler was concerned with conduct and determining if the project was a good fit for Vermont. Kessler was not vetting the projects from an economic development perspective. As a Regional Center, the state could say yes or no to a project. A potential project sponsor had no right to participate in the state's EB-5 program, and the state was not restricted in saying no. If the project was good, but the persons behind it were deemed unsuitable, the state could say no.

AUSA Van de Graaf asked Kessler about the time period after the second MOU, when AnC Bio Vermont came on Kessler's radar. AUSA Van de Graaf noted that Raymond was having quarterly meetings with Stenger and that Kessler was involved in some project-related visits. In response, Kessler noted that the monitoring and contact for AnC Bio Vermont was almost constant as it occurred by email and telephone as well as in person.

Kessler was shown an email communication (Bates 5153751 - 5217838), dated February 27, 2013, from Raymond to Stenger and Alex MacLean, with an attached article by Linda Peel about AnC Bio. In response, Kessler recalled that Peel was a nurse and that correspondence regarding this article had involved Senator Ann Cummings. Kessler advised that about this time, Raymond told Kessler that he had contacted someone in New York City involved in biotechnology investments. Kessler is not sure what prompted

5745338

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler ,On 06/27/2018 ,Page 3 of 9

Raymond to take this step. Raymond started doing some research on AnC Bio and his findings snowballed. Raymond wanted to talk to Kessler about the matter.

Kessler was shown email communication (Bates 2389395 - 0289421), dated October 10, 2013, from Stenger to Raymond, Lawrence Miller, and MacLean (copied), including several attached documents. The email states, in part, "attached are various documents and translations that demonstrate that Alex Choi is not the subject of any investigation." In response to seeing this document, Kessler advised that Raymond had learned about the problems with AnC Bio Korea. The information came to light through a Korean intern with the state of Vermont. The intern found an audit report about AnC Bio in Korea and had learned that Alex Choi had been arrested in Korea.

About this time, Kessler got more involved in digging into the issues. Kessler did not like what he was hearing. The audit report did not look good. Raymond directed the intern to do more research on AnC Bio Korea.

AUSA Van de Graaf referenced an email (Bates 5219411), dated October 22, 2013, from Stenger to Raymond in which Stenger states, in part, "Brent, working on the questions from the other day. No family connection with the issue discussed the other day. I'm working on the FDA timeline with Ike Lee and will have it soon..." AUSA Van de Graaf also noted the "Meet the CEO" document. In addition, AUSA Van de Graaf referenced a meeting mentioned in an email (Bates 5217842), dated October 15, 2013, from Stenger to Raymond. AUSA Van de Graaf asked Kessler what was discussed that day.

In response, Kessler advised that the state was inquiring if Ariel Quiros's wife was related to Alex Choi. AUSA Van de Graaf asked Kessler if the FDA timeline matter was followed up on. Kessler advised that he cannot recall the specifics of the meeting or talking about the FDA. The meeting included site visits to the Bogner property and a trip to Newport for the potential Renaissance Block and Marina projects. During the Bogner site visit, Kessler was thinking about permitting issues related to the site, due to his past work in environmental regulation.

AUSA Van de Graaf referenced a June 2014 meeting with Patricia Moulton, then Secretary of ACCD. AUSA Van de Graaf added that the revised AnC Bio Vermont offering document was approved in early 2015 and that the project was marketed again to investors again until the SEC closed it down. AUSA Van de Graaf asked Kessler if anyone thought the AnC Bio Vermont project was a crazy idea.

In response, Kessler stated that he had observed big projects go forward at Jay Peak, such as the water park, the ice rink, and the golf

5745339

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler ,On 06/27/2018 ,Page 4 of 9

course. The Jay Peak group was now going off-campus to Newport. From Kessler's perspective, it appeared the Jay Peak group was building on their success and being resourceful. What they wanted to do with clean rooms might be possible - leasing rather than buying was the new business model - and, they were proposing to connect the region's universities, the airport and the market. However, Kessler did not know the dark underbelly of the matter. Further, the Northeast Kingdom needed help. Stenger had been helping the economy up there for decades. And, AnC Bio Vermont seemed to fit in with Vermont ethos - being clean, knowledge-based and high tech. Kessler added that the Jay Peak water park brings more visitors to the resort than skiers. There was no state money in the Jay Peak projects, and no state money was involved in AnC Bio Vermont. Politically, the state was not exposed. The risk was taken under the auspices of the Vermont Regional Center.

AUSA Van de Graaf directed Kessler to the late 2013 - 2014 time period, during which USCIS was asking questions regarding AnC Bio Vermont, and Raymond was getting updates on the Requests for Evidence (RFE). In response, Kessler advised that he did not get involved in matters unless someone asked for his help. Kessler noted that the project itself does not notified about RFE questions from USCIS. AUSA Van de Graaf noted that in the case of AnC Bio Vermont, the project team got very involved in the RFEs, and Raymond had some involvement. In response, Kessler stated that he had minimal involvement in the RFEs, and does not recall anything specifically about AnC Bio Vermont in this regard.

AUSA Van de Graaf advised Kessler that Stenger received a complaint from an investor, and that Raymond learned of the complaint, as shown in the email communication (Bates 5290722 - 5290726), dated June 24, 2014. AUSA Van de Graaf also presented Kessler with an email communication (Bates 5265070 - 5265072), dated March 22 - 23, 2014, in which Raymond copied Lawrence Miller, Lucy Leriche and Kessler to a message to Stenger about investor concerns. In response, Kessler advised that Leriche was the Deputy Secretary to Lawrence Miller, who was then the Secretary of ACCD.

AUSA Van de Graaf asked if there was any meeting held in response to the investor concerns between March and June 2014. In response, Kessler advised that a lot happened during that period. A field visit in late 2013 /early 2014 took place, which resulted in red flags being raised. Kessler realized more needed to be understood about securities and integrity. Kessler quickly came to respect Raymond, who was smart and experienced, and who had an acuity for such matters. Raymond, however, was not a lawyer and legal expertise was needed. Kessler requested the assistance of the state of Vermont's bond counsel for the issues with AnC Bio Vermont. The feedback Kessler got from the bond counsel gave him confidence that AnC

5745340

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler , On 06/27/2018 , Page 5 of 9

Bio Vermont needed immediate attention - which in turn led to the aforementioned meeting. By June 2014, Kessler was more directly involved in AnC Bio Vermont's oversight.

AUSA Van de Graaf asked Kessler if Stenger ever gave the detailed response he said would be forthcoming in his March 23, 2014 email. In response, Kessler stated that the questions posed to Stenger were meant to be answered, but Kessler and Raymond did not wait around for a response. Kessler and Raymond starting making their own inquiries. The AnC Bio Vermont issues (such as the appraisal, values, and related transactions) led Kessler to seek help.

In May 2014, the state's Korean intern informed state officials that there was a court-ordered auction of the AnC Bio facility in Korea. This information was explosive at the state. It was a material fact that the investors should know about. Kessler went straight to Secretary Miller. A meeting was called with Stenger the same day.

AUSA Van de Graaf asked if the meeting was held May 16, 2014, the date referenced in Quiros's letter (Bates 0161128). Kessler stated that the meeting might have happened on that date. Kessler can picture the meeting in his mind as it was an extraordinary event. Stenger was asked to come for a meeting, but was not told what it was about. Kessler, who has known Stenger since 1997, saw Stenger turn "white as a ghost" and appear shaken, when he learned about the circumstances of the facility in Korea.

To Kessler, this was a watershed moment. It was an opportunity for Stenger to be genuine. However, Stenger started doing a song and dance, saying these circumstances are typical/traditional in Korea.

Secretary Miller, who knew Stenger well from the Vermont business world, "called Stenger to the carpet" about this matter. Stenger said he would get answers. After the meeting, Stenger sat in Secretary Miller's conference room on his phone, trying to get answers.

Kessler will look for any notes of the meeting with Stenger that he might have retained. Quiros never personally attended any meeting with the state, though he was sometimes present by phone. Kessler never met Quiros. Bill Kelly sometimes attended state meetings.

Lawrence Miller left the job of Secretary of ACCD for another position at the state, and was replaced by Patricia Moulton. When Secretary Moulton came on board, she had a lot of catching up to do. Kessler made a one or two page outline for her for the June meeting. The plan for the June meeting was to stop the projects until they came into full compliance with securities laws. The aforementioned bond counsel used by the state of

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of John Kessler  , On  06/27/2018  , Page  6 of 9

Vermont (which Kessler identified as the mega-firm Locke Lord) provided guidance on this matter. Kessler dealt with securities experts at this firm, whom Kessler identified as "Walter and Stan." Kessler had no doubt or fear going forward, based on the guidance they gave him, and that guidance was put into a letter.

Secretary Moulton told Kessler to send the letter. Usually an agency's General Counsel drafts letters for the agency head, but the agency head sends out the letter. In this case, Secretary Moulton had Kessler do it. The Jay Peak group was told to hit the breaks until matters could be cleaned up. They were also told to get a high caliber securities attorney.

AUSA Van de Graaf advised that the letter went out on June 9, 2014 and the meeting occurred on June 27, 2014, and that Jay Peak was given one month to comply. Kessler advised that one month was what the bond counsel said was reasonable.

Stenger and Kelly told Kessler that they had a securities expert working with them by the name of David Feldman, who was at the firm of Richardson & Patel. Kessler contacted Feldman and learned he was not doing any such work. Before December 2015, Kessler sent other letters to the Jay Peak group but they were "just blowing smoke" in response.

AUSA Van de Graaf noted that after the June 27, 2014 meeting, Stenger started producing weekly reports. Kessler responded, "Raymond put them on a tight leash."

AUSA Van de Graaf read an email message (Bates 0161135), dated July 31, 2014 to Kessler, regarding a July 25th report. In response, Kessler noted that the conversion of the Phase I investors' equity into unsecured promissory notes came to light in the spring of 2014. The actual change had taken place six months prior, but Stenger held back that information. The word got out only after Stenger came back from an overseas marketing trip. Kessler believes Stenger withheld the information deliberately, knowing the news would have spread like wildfire in China. If Stenger had announced the change in the fall of 2013, when it actually took place, the overseas trip would have been a disaster.

Kessler provided some background regarding Stenger and Jay Peak: Stenger had a long, moderately successful history at the Jay Peak resort. Each year Stenger was in charge the resort got better. The improvements were gradual and not extravagant. The resort had good customer service and was surviving in a shrinking industry. MSSI, the former owner, wanted to sell the resort. Stenger learned of the EB-5 program and located a patron (i.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler , On 06/27/2018 , Page 7 of 9

e., Quiros) to help him. Stenger had put his life into Jay Peak. He was also involved in the community, serving on school and hospital boards. He was a leader to a moderate degree. Stenger, Kessler opined, lost his way.

At the late June 2014 meeting, the Jay Peak group was told not to conduct any future marketing of AnC Bio Vermont until the project was in compliance with the state. Mark Scriber, a lawyer, was working on these matters for the Jay Peak group, but was struggling with getting timely answers to update the offering.

AUSA Van de Graaf read a December 2014 email (Bates 293956). Kessler noted that Scribner wanted to meet with Walter and Stan. AUSA Van de Graaf asked Kessler when he heard about the SEC investigation. Kessler advised that he heard at the end of 2014, and had no idea before. The SEC subpoena may have been the event triggering his knowledge or perhaps it was contact from Brian James or Trisha Sindler of the SEC. Kessler did not know about the SEC investigation before the June 2014 meeting.

The Vermont Department of Financial Regulation (DFR) was told about the SEC investigation. Walter and Stan at Locke Lord were told as well. Before this time, DFR was not involved in the EB-5 program. Kessler asked for help because he knew the program needed "guard rails" and ACCD was not suited in this role as a commerce and marketing agency. The Governor and his advisors decided put DFR in the compliance and regulatory role, and kept ACCD in the marketing role.

Attorney Griffin advised that the Governor wanted to separate promotion from regulation going forward. In the summer of 2015, after an extensive investigation, DFR contacted the Attorney General's office. A civil action was ready to be brought. Around July or August of that year, Mike Pieciak gave a Powerpoint presentation that included the "spaghetti chart."

Kessler noted that after December 30, 2014, DFR assumed the regulatory role, which included assessing offering documents. Although Stenger was still writing to Secretary Moulton, ACCD was forwarding his communication to DFR. Kessler was involved in getting information to DFR. Around March or April 2014, DFR allowed Jay Peak to resume marketing the AnC Bio Vermont project.

Kessler added that the purpose behind some of the correspondence to Secretary Moulton by Stenger was face-saving on the part of Stenger. Stenger and Moulton were acquainted with each other outside of the EB-5 world and Kessler believes Stenger sought to maintain a positive image with Moulton.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler , On 06/27/2018 , Page 8 of 9

In terms of who made the decision at the state to allow the Jay Peak group to go back to the investor market with AnC Bio Vermont, Kessler advised it was probably Susan Donegan and Pieciak. Attorney Griffin added, "It was a state government decision."

AUSA Van de Graaf asked Kessler about a meeting Quiros and Stenger had with the Governor. In response, Kessler advised that he did not get briefed on the meeting, but that there should be a public record about it. Attorney Griffin added that the developers were "pushing all the buttons" and the Burke project was the "practical pressure point." Kessler added, the contractors were "screaming."

AUSA Van de Graaf noted that by allowing the Jay Peak group to market the AnC Bio Vermont project again, the state was implying that the information contained in the offering was sufficient. However, AUSA Van de Graaf added, when the second offering is examined, there are inconsistencies - for example, the Frost and Sullivan data is inconsistent with the RFE job count data. In response, Kessler advised this would have been a DFR issue.

AUSA Cate asked Kessler if he knew how the decision was made to allow the offering to go forward. Kessler responded that he did not know.

AUSA Van de Graaf asked Kessler about a weekly report that went to Secretary Moulton, Kessler, Pieciak and others in April 2015. Kessler responded that by December 2014, such matters had been handed off to DFR.

AUSA Van de Graaf referenced a letter (Bates 0161131 - 0161134) from Kessler to Jay Peak people regarding AnC Bio and Burke regarding what they could not do. In response, Kessler noted that those things included no advertising, no marketing for new investors; that they needed to get high caliber securities counsel, and that they had until August to comply - before they could go to market again. The letter first went to Feldman, and then to Scriber. In subsequent letters there was more focus on AnC Bio Vermont than on Burke.

In regard to the allegation about a Vermont official being arrested in China for a sex related crime, Kessler has no additional information. Kessler is still waiting to hear from Attorney Russell Barr about who this person may be.

AUSA Van de Graaf asked Kessler about the Jay Peak marketing video in which Governor Shumlin misstated information. In response, Kessler advised that he learned of this statement (i.e., the Governor stated that EB-5 projects were audited by the state). Raymond probably brought it to

FD-302a (Rev. 05-08-10)

.318B-AL-6464304

Continuation of FD-302 of (U) Interview of John Kessler , On 06/27/2018 , Page 9 of 9

Kessler's attention. Kessler sent a demand that the video be taken off the Internet. He later got confirmation that it was taken down. Kessler does not know how that video got made. Raymond may know more information, such as whether or not the Governor made the statement specifically for the video or if the footage was captured an event.

Kessler's impression, when he saw the video, was that the Governor did not mean a real, CPA-type audit, but rather general oversight by the state. However, Kessler does not know what the Governor was thinking. When the video was made, only ACCD was involved in the EB-5 program (i.e., not DFR), and ACCD does not have auditors. ACCD was not involved in the making of the video, as far as Kessler knows, but he was not involved in marketing. Kessler would not have known what was going on at the Governor-level at the state. Kessler told state personnel not to be specific when marketing overseas, but to talk generally about the project being in Vermont.