FD-302 (Rev. 5-8-10)

- 1 of 7 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _02/21/2019_

Sarah London, Attorney (and former legal counsel to Governor Shumlin) Attorney General's Office, Montpelier, Vermont, ▉▉▉▉▉▉▉▉, ▉▉▉▉▉▉▉▉▉▉, was interviewed at the state office complex, 103 South Main Street, Waterbury, Vermont, by Assistant United States Attorneys Paul Van de Graaf and Nicole Cate and FBI Special Agent Jennie Emmons. Representing London at the interview was Deputy Attorney General (DAG) Bill Griffin of the Vermont Attorney General's Office.

At the outset of the interview, AUSA Van de Graaf advised that the focus of the interview would be the AnC Bio Vermont project, in which she, Liz Miller and Governor Shumlin were involved in various ways. After being advised of the the nature of the interview, London provided the information below.

Governor Shumlin was sworn in January 2011. London started as Governor Shumlin's legal counsel on the first day of the legislative session in December 2011 and held this job until the end of his administration. Beth Robinson was the Governor's counsel before London. As part of Shumlin's staff, London primarily worked on extraditions and pardons. Liz Miller, Governor Shumlin's Chief of Staff, was the lead for the EB-5 program. Both London and Miller were main points of contact for Susan Donegan, the Commission of the Vermont Department of Financial Regulation (DFR), and Pat Moulton, Secretary of the Agency of Commerce and Community Development (ACCD). AUSA Van de Graaf noted that Secretary Moulton began at ACCD in mid-2014, replacing Lawrence Miller.

London does not recall much about AnC Bio Vermont. Miller came in as Chief of Staff in January 2013 and served until May 2015 (London noted that the Chief of Staff changes about every two years). During Miller's time on the job, the Governor's office was more involved in the details of the EB-5 program. London recalls the main issues were with Burke and construction at Burke.

AUSA Van de Graaf asked London about Governor Shumlin's involvement in business development through the EB-5 program. In response, London advised that the Governor's role was to promote Vermont's Regional Center. The Governor traveled to China for this purpose. James Candido (the Director

Investigation on _01/11/2019_ at Waterbury, Vermont, United States (In Person)

File # 318B-AL-6464304                                    Date drafted _01/18/2019_

by EMMONS JENNIE MCGLYNN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5759561

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Sara London _____ , On 01/11/2019 , Page 2 of 7

of the Vermont Regional Center before Brent Raymond) sent draft letters
and talking points to the Governor's office. Later, London was in meetings
involving Governor Shumlin, Commissioner Donegan, and Secretary Moulton in
which DFR enforcement matters were discussed.

AUSA Van de Graaf provided London with a timeline of certain events: The
AnC Bio Vermont project was marketed at the end of 2012 until June 2014,
at which time the project was shut down by the state. A decision was made
by the state for DFR to handle compliance issues for the Regional Center –
and an MOU was created. In late January 2015, AnC Bio Vermont (and then
Burke) was allowed to be marketed again. In late March 2015, a meeting was
held with Governor Shumlin and in the fall of 2015, DFR came to the
Attorney General's office with big concerns about the projects, which
resulted in the state joining the SEC action. In April 2016, the SEC
action took place.

When asked about a promotional video that included statements made by
Governor Shumlin, London advised that she was involved in collecting
information about the video for a public records request to ACCD. London
became aware that Candido had sent talking points for the video. When the
Governor used the term "audit" in the video, it was because that was in
the script from Candido.

Brent Raymond expressed concern about the video to London and Sue Allen
(the press secretary who also filled in as Deputy Chief of Staff when
MacLean moved up). John Kessler (General Counsel for ACCD) also expressed
concern about the video.

London was presented with an email, from Raymond to Lawrence Miller,
London and Allen (Kessler copied), dated February 5, 2013 (Bates USAO-
EXEC00023813), about a trip to Miami, to which a Vermont Digger article
was attached. In the email, Raymond stated (in his recommendations for the
Governor in Miami) that statements suggesting that the state acts as an
"auditor" should be avoided. London advised that she believes the video
was filmed in 2012; and, any communications flowed related to it first
flowed through the Chief of Staff before they went to the Governor.

AUSA Van de Graaf observed that Governor Shumlin's 2013 State of the State
speech mentioned AnC Bio Vermont, and asked how that speech got drafted.
London advised that ACCD would have provided that information. The Chief
of Staff was tasked with drafting the speech. The Chief of Staff first
reaches out to Cabinet members to get input and then an outline of the
speech is created. Input is gathered from the various agencies under the
Cabinet members and text is complied and reviewed for the speech.

5759561.02

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Sara London                        , On  01/11/2019 , Page  3 of 7

London was not a part of the meeting in which the "Meet the CEO" topic was discussed. She was involved in meetings regarding enforcement action, but not in prior meetings.

AUSA Van de Graaf noted that around 2013 – 2014, Raymond was pushing for more vigilance and investigation. In response, London advised that she was aware of Raymond's concerns. Lawrence Miller was the ACCD Secretary at the time. ACCD was not getting the financial records they requested and did not have the authority to compel them. In 2012, London reached out to DFR's General Counsel, Dave Cassidy, for assistance but was told that it was not a DFR matter and that the state did not have jurisdiction. London is aware (though she never saw a legal memo about this contact) that Kessler reached out to James Cronin (phonetic) at DFR asking for help, but was told that since the matter was not securities-related, DFR could not get involved. London heard the SEC, at the time, was not consistently treating the EB-5 offerings as a security.

Miller had the idea to formalize the relationship between DFR and ACCD. London drafted an MOU for DFR and ACCD and tried to help the agencies work together until the kinks got worked out.

London described MacLean and Governor Shumlin as close and as having a smooth working relationship. MacLean was the primary person in terms of getting information to Governor Shumlin. This channel of communication caused tension between MacLean and Miller. After MacLean left her state job, Miller made it clear she (Miller) should be the chief point of contact for Governor Shumlin.

London is not aware of MacLean directly using her connection to Governor Shumlin in her work for Jay Peak. After leaving state employment, MacLean called for ethics guidance on how to structure her communications appropriately. London does not know if MacLean was talking directly to Governor Shumlin, but assumes that she was because Miller had to address that issue with MacLean.

AUSA Van de Graaf asked if Bill Stenger and MacLean put pressure on the Governor. In response, London stated that MacLean struggled to understand how the Vermont Regional Center would work with both a promotional and a regulatory role. Stenger, Kelly, Moulton, Donegan and Miller had a meeting about the new Regional Center format.

AUSA Van de Graaf asked London about Quiros's connection to Governor Shumlin. In response, London advised that she is not sure since she has

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Sara London _____ , On 01/11/2019 , Page 4 of 7

never met Quiros or observed Governor Shumlin and Quiros together. She did
not perceive them as close. Based on her review of government records,
there was not significant communication between them.

In the winter of 2013, Miller consulted with London about Governor
Shumlin's stay with his partner at Quiros's New York City condo (London
added that she is not sure the woman was the Governor's girlfriend or wife
at the time (the woman is now his wife). London does not know how many
times Shumlin and/or his partner stayed at Quiros's condo. London's
assessment of the matter was that it was not a problem because the
Governor was not on agency business or at a state function. London's
understanding was that the the condo was vacant at the time. London's
worried about the stay involving taxpayer's dollars. The state of Vermont
does not have a statute regarding gifts or a requirement for such
disclosures. There is an executive code of ethics, but that is for cabinet
members and is enforced by the Governor's office. The code usually does
not apply to the Governor. London's take is that the condo stay was not
illegal.

London described Stenger's clout with the state of Vermont as
"extraordinary." The EB-5 program was referenced in everything. Stenger
was perceived as a hero and the driver of economic development for the
Northeast Kingdom. There was nothing but a positive opinion about Stenger.

AUSA Cate noted that Raymond and others were looking into AnC Bio Korea
and Korean interns were finding problems; and, that MacLean and Stenger
were asked to come into for a meeting with the state. In response, London
advised that she was not aware those events. Such information would have
flowed up to a designated person on the Governor's senior staff (for the
relevant agency). Miller would go through weekly reports and give
information to the relevant senior staff member.

AUSA Van de Graaf observed that in June 2014, a meeting occurred in which
AnC Bio Vermont and Burke were shut down and then the ACCD-DFR MOU was
created (with Miller being the person driving that). London added that the
trigger for the MOU was ACCD not getting timely financial information and
needing the expertise of DFR.

London observed that there was not a good working relationship between the
ACCD and DFR lawyers. The transition into the new roles did not go well.
ACCD did not want it to look like the problems were their fault.

AUSA Van de Graaf noted that the MOU was signed and thereafter Mike
Pieciak became the front line person for the compliance/oversight.
Pressure was put on the state to allow the projects to go back in the
market. A meeting happened in late March involving Miller, MacLean,

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of ___(U) Interview of Sara London_____ , On __01/11/2019__ , Page __5 of 7__

Stenger, Bill Kelly and Quiros. In response, London advised that she was
not at this meeting. Miller attended and Allen might have been there.
London recalled it being called a "breaking the log jam" meeting.

AUSA Van de Graaf observed that the Governor was put under pressure
because of the construction workers impacted, especially those on the
Burke project (there was no construction at AnC Bio Vermont); and that AnC
Bio Vermont and Burke were both topics at that meeting.

In response, London advised that the projects were separate in her mind.
She was aware of the pressure. Attorney Sandy Fead, who represented some
contractors, was putting pressure on the Governor, the Lieutenant
Governor, ACCD, and legislators. The issues were not really about the AnC
project. The Governor's office tried to work with Commissioner Donegan and
Secretary Moulton regarding the logistics of getting Burke back on track,
but also protecting the investors' money. Secretary Moulton hired a
company called White and Burke to make sure every dollar spent for Burke
really went toward Burke. London was involved in figuring out the
logistics of how White and Burke would get paid.

AUSAs Van de Graaf and Cate explained that an agreement between
Commissioner Donegan's office and the developer was drafted in the spring
of 2015, after the state allowed the developer to go back to the market.
In response, London stated, "We spent a lot of time waiting for the SEC to
file." Donegan kept waiting, but the SEC kept pushing it off. No one at
the Governor's office was directly in touch with the SEC.

London advised that the Governor has waived executive privilege in regard
to the Jay Peak/EB-5 matter.

London was shown an email communication, involving Kessler and
London,  about an assessment of the scope of the state's liability for the
time between the marketing hold and the ACCD/DFR MOU creation. In
response, London advised that she does not recall this specific
conversation with with Kessler. She told Kessler to work directly with the
Attorney General's office. Kessler was raising a lot of concerns at the
time. She was trying to get Kessler and Dave Cassidy to work together. She
was aware that Locke Lord (the law firm) was in the mix.

An email, dated in February 2015, was presented to London, in which
Kessler was reaching out to DFR and telling DFR not to approve the
developer to go back into the market, but to wait for Locke Lord to weigh
in. In response, London advised this was after the MOU. There was never a
smooth working relationship between DFR and ACCD. DFR was not great at
sharing information, which frustrated Kessler. ACCD personnel seemed on
high alert, particularly Raymond. A story ran about email correspondence

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Sara London , On 01/11/2019 , Page 6 of 7

wherein Raymond said to Stenger, "I still think you're a great man." Raymond was upset about a Vermont Digger article following that story. After that story there was an uptick of that sort of correspondence (the one presented to London).

In regard to the handling of public records requests, London advised that DFR was getting a large volume of requests from Vermont Digger. London was trying to make sure ACCD was coordinating with Mark Scribner regarding the requests. London spent time making sure a process was followed at DFR, prior to the litigation.

London was asked why no politicians attended the May 2015 groundbreaking at the AnC Bio Vermont site. London advised that Miller was the principle person who would advise the Governor what event to attend - or not to attend.

The problems related to the Jay Peak/EB-5 projects were the most complicated issues faced by the Governor's office. There were not great working relationships on a number of fronts. London is grateful for Miller's idea to have both DFR and ACCD involved in the Regional Center. Vermont was the only state to have a Regional Center, which perhaps, looking back now, was not a great idea. London added that "Vermont always wants to be first."

The various personal agendas were a part of the state's internal issues. Commissioner Donegan and Secretary Moulton got along, but the lawyers in the respective agencies did not. Commissioner Donegan was not pleased about the appointment of Piechek as her successor. She did not fully trust him when he worked under her. Piechek, who had been Bill Sorrell's campaign manager, was having direct contact with the Attorney General's Office about this matter, which caused friction between Commissioner Donegan and Piechek.

Further, Raymond's departure from the Regional Center was rocky. Raymond felt he was treated unfairly by the administration. Secretary Moulton was not aware, when he left, that he was going to work for Mt. Snow (another Vermont EB-5 project). Secretary Moulton was concerned about correspondence Raymond had had with this project while he was in the position of Director of the Regional Center. However, no inappropriate dealings were found. Raymond was very upset at the time he left. After he left, some of his emails seemed to be missing. A "To be deleted" email folder was found on his computer, which was empty. Further, the expected volume of emails not found. After Raymond's departure, Becky Fu (Note: also a Vermont Regional Center employee) left for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The circumstances of these departures made for difficult time at the state.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Sara London                    , On  01/11/2019  , Page  7 of 7

The following Bates-numbered documents were presented or referenced in
the interview

USAO-EXEC00024346

USAO-EXEC00025555

USAO-EXEC00025122

USAO-EXEC00023813

USAO-EXEC00005752

5759561.07