FD-302 (Rev. 5-8-10)

- 1 of 9 -

 OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry  12/27/2018

Patricia Moulton, President, Vermont Technical College, former Secretary of the Vermont Agency of Commerce and Community Development (ACCD), was interviewed at the United States Attorney's Office, District of Vermont, 11 Elmwood Avenue, Burlington, Vermon,t by Assistant United States Attorneys Paul Van de Graaf and Nicole Cate and FBI Special Agent Jennie Emmons. Representing Moulton at the interview was Deputy Attorney General (DAG) Bill Griffin of the Vermont Attorney General's Office. After being advised of the identities of the interviewers and the nature of the interview, Moulton provided the information below.

Moulton (like her father before her) has focused her career on economic development in Vermont. Under Governor Dean, she became the Commissioner of Economic Development. Under Governor Douglas, she held various state positions. In January 2011, she started as the Deputy Secretary of ACCD for Governor Shumlin.

As the Deputy Secretary of ACCD, she had little to do with the EB-5 program. After about two to three years, she left state employment to move closer to her (now ex) husband in southern Vermont.

After about year, around June 2014, Moulton returned to state government, after being asked by Governor Shumlin to serve as the Secretary of ACCD.

Moulton explained that ACCD deals with the income side of state government, to include economic development and tourism. The Vermont Regional Center was its own entity within the economic development department.

When Moulton came on as Secretary, she was aware ACCD had some issues with Douglas Hulme. On her second day on the job, Brent Raymond and John Kessler told her there were problems with the AnC Bio Vermont project, to include issues with marketing, and lack of sales of the AnC Bio products. ACCD had a Korean intern that helping the agency with research related to AnC Bio Korea.

| | | |
|---|---|---|
| Investigation on | 12/07/2018 at | Burlington, Vermont, United States (In Person) |
| File # | 318B-AL-6464304 | Date drafted  12/12/2018 |
| by | EMMONS JENNIE MCGLYNN | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5759560

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton     , On  12/07/2018  , Page  2 of 9

AUSA Van de Graaf reviewed Moulton's notes from a June 27, 2014 meeting with Moulton. Moulton advised that the meeting was the first time she talked to Quiros, and probably the first with Bill Kelly. Quiros was on the phone and Kelly, Bill Stenger, Raymond and Kessler were present in person.

Moulton has known Stenger for years. She first met Stenger when she was ten years old, by way of her father. She did not socialize with Stenger, but the relationship was such that she was comfortable asking him for favors, such as using a Jay Peak condo for the cleaning cost.

Over the years, Moulton worked quite a bit with Stenger. Stenger seemed to share her passion for workforce/economic development in Vermont. Moulton had a favorable opinion about Stenger's political views and vision regarding such development. She had tears in her eyes when she read a report on this topic authored by Stenger. He was "spot-on" as far as she was concerned. Moulton was "pumped up" about the Northeast Kingdom development occurring through the EB-5 program.

At Jay Peak, Stenger knew everyone, which impressed Moulton. She got to know his assistant, Lizzy Button, and the assistant before Button. However, Moulton was not familiar with Stenger's business practices. She assumed Stenger was a good guy because she had had no negative experiences with him, and others had a high opinion of him.

Moulton now knows Stenger "lied to her face" throughout the process of dealing with the EB-5 issues. Stenger played on his relationship with her.

AUSA Van de Graaf asked Moulton if she was concerned about more money going into Jay Peak than would realistically come of out it. In response, Moulton stated that she did recognize this issue. However, in her career experience - in the renovation of older buildings, for example - more money goes in than will ever come out. In those circumstance, grant money is sought for the cost. AUSA Van de Graaf noted that Jay Peak's situation was different from a grant scenario in that there were investors (with stake in the project). Moulton added that she did not have a feel for ski and resort development. Further, Raymond had told her that the green card was the most relevant part to the investment to the investors.

ACCD was involved in promoting economic development, and monitoring to make sure the EB-5 projects got built. ACCD was not in the role of financial oversight. Though ACCD did ask financial questions, it was not the agency's job to do an audit. ACCD was supposed to make sure the job

5759560.02

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton , On 12/07/2018 , Page 3 of 9

numbers made sense. At one point a concern was raised that job numbers were being double counted. ACCD hired someone to look into this issue and it turned out not to be the case.

When Moulton came back as the Secretary of ACCD, she had a conversation with Don Wells of DEW Construction (she added that the conversation happened well into her time on this job). Wells told her, in regard to the Burke project, that what Jerry Davis was building for $50 million could be built for $32 million. He mentioned Davis's Lamborghinis and condos in Florida and added, "We didn't have this conversation."

According to Moulton's June 27, 2014 meeting notes, AUSA Van de Graaf observed that the first topic appears to be the SEC matter. Moulton was asked what she knew about the SEC. In response, Moulton stated that ACCD had been contacted by the SEC before the date of the meeting, hence, the state was asking questions. Moulton, however, cannot not recall details. She thinks Quiros's response was that the SEC had investigated for one and a half years and came up with nothing. Quiros put forth that Jay Peak Phase I was completed and "brilliantly" run. There was a question about USCIS and the SEC and any collaboration between the agencies. Moulton observed that USCIS was very loose in its format whereas the SEC seemed to "wake up" and realize a lot of money was involved.

AUSA Van de Graaf noted that according to a Memorandum of Understanding (MOU), the state had a role in regulating the EB-5 program. The state had responsibilities as an agent for USCIS. In response, Moulton agreed that the state had a role, but noted that to characterize that role as regulatory or ACCD as an "agent" would be too strong. Moulton noted one could not get a human on the phone at USCIS. One time, with the help of Senator Leahy, they got a person on the phone. USCIS was unsatisfactory in terms of accessibility. Moulton wondered, "Who the hell put this program together?" There was an expectation for the state to perform a role, but a vacuum in terms of support form USCIS. Raymond brought important experience in fulfilling this role. In completing the 829s and 526s, it was clear the state had responsibility to USCIS. AUSA Van de Graaf observed that Kessler had obtained help from securities lawyers prior to her arrival at ACCD as Secretary.

AUSA Van de Graaf reviewed portions of Moulton's notes showing what Kelly was saying in the meeting. In response, Moulton stated that Kelly was referring to the Offering Memorandum (OM) and that Kelly had said that they (i.e., the Jay Peak team) had gone to a different firm to make sure the OM met SEC standards.

Moulton added that Raymond kept saying there was a need to disclose – in regard to the issue of the sale or auction of the AnC corporate

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton , On 12/07/2018 , Page 4 of 9

headquarters in Korea. The meeting's agenda had a bunch of items to be addressed. AUSA Van de Graaf observed that Kessler was saying that the state wanted to be sure the Jay Peak team had good security counsel and a biotech industry expert. In regard to the latter, Moulton stated that Ike Lee was presented as that person.

In the meeting, the state was pushing for third party verification that a market exists for the products. Moulton added that she does not always take such detailed notes, but felt it was important in this meeting. The "*" in Moulton's notes mean she intended to go back and check on that topic.

Moulton recalled that Kelly, in response to state inquiries, was giving favorable information about the projects and, in general, telling the state, "you guys don't know what you're doing." During the meeting, Kelly kept referring to her as "Madame Secretary." Quiros called Raymond, trying, in an odd conversation, to provide reassurances, but not answer the state's questions. AUSA Van de Graaf observed that by this time Raymond was dealing with investor complaints and the Phase I investor issue had come up.

Moulton stated that Stenger told the state that Hulme was upset that the Jay Peak team was cutting ties with him right at the time he stood to make a lot of money for a little work. The state had its own issues with Hulme. Hulme had been marketing his business with the appearance it was connected to the state. Further, Moulton trusted Stenger more than Hulme. She had known Stenger longer and they had had a good relationship.

AUSA Van de Graaf asked Moulton about Kelly's statements about Bioheart in the meeting (according to her notes). In response, Moulton stated that her notes reflect what Kelly said in the meeting. The question was asked "where are you on all this" because there was concern about there being no FDA approval. Moulton had once been involved in a project concerning dialysis equipment, which never got off the ground. When Kelly stated that the C-Pak is close to approval, she thought that meant FDA approval.

AUSA Van de Graaf noted that the Jay Peak team would say over and over again that a big market existed. In response, Moulton noted that the window company and biotech business was a departure from the hotel and resort format. Moulton's initial reaction to AnC Bio Vermont was "Really, a biotech facility in Newport, Vermont?" But Stenger explained that Newport was within a "research triangle" and that the business would be different from a pharmaceutical company because it would not take royalties, meaning researchers would not be bound by royalites - they

5759560.04

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton , On 12/07/2018 , Page 5 of 9

could maintain ownership of their research and conduct research on their own. Moulton wondered who would pay for this research, but never dove into the question.

Moulton also noted that Stenger would always overstate how fast things would get completed. Kelly said he was not sure a market study could be completed in 30 days.

AUSA Van de Graaf showed Moulton an email message from Stenger to Kelly, John Kessler, Quiros (Mouton, Raymond, and Becky Fu were copied), dated June 28, 2014 (Bates ACCD00009417), which was the Saturday after the aforementioned meeting. According to Stenger's message, he appears to interpret the state's rules to mean that no money can be taken - in summary, the Jay Peak team agreed to revise the offering and not take money, but did not agree not to market. In response, Moulton stated that she got the impression that Stenger was being pushed by Quiros and Kelly not to agree to the state controls. When asked if ACCD had the authority to stop them, Moulton stated that it did.

AUSA Van de Graaf showed Moulton Kessler's July 9, 2014 letter (Bates ACCD00005379) (which Moulton noted was the first in a series of letters) and Stenger's response, dated July 25, 2014 (Bates VT-DFR00058242). In the July 9, 2014 letter, Kessler outlined the issues and stated that he is pleased they have agreed to state supervision. In response, Moulton noted that the issues were important. ACCD, however, got partial answers to its questions.

Moulton cannot recall when she talked to DFR about getting help. Raymond, and possibly Kessler, had also tried to get help from the Vermont Attorney General's office. DFR's first response was that they were exempted or precluded from getting involved. However, Governor Shumlin later directed DFR to get involved.

Moulton explained further that, upon her return to ACCD, she had a conversation with Susan Donegan. Donegan told her DFR could not get involved because the EB-5 program was a federal program outside DFR's jurisdiction. Later, Donegan said that upon further review, DFR could get involved because "fraud is fraud." Moulton's reaction was "Good! We are in over our head." In December 2014, Governor Shumlin wrote a letter to codify that DFR and ACCD were working together. Moulton and Kessler were still trying to gather information in this time period, but knew that DFR was coming on board. Stenger was positive about DFR's involvement at first. He liked the additional level of oversight in that "it put more of a stamp on the Vermont Regional Center being a good thing."

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton, On 12/07/2018, Page 6 of 9

AUSA Van de Graaf presented Moulton with a letter to Kessler from David Gordon, dated November 24, 2014 (Bates ACCD0005433). In response, Moulton noted that when she met Gordon, he made the state officials feel like ignorant "country bumpkins."

AUSA Van de Graaf referenced three letters from Stenger to Moulton: one dated December 23, 2014 (Bates ACCD00005462; one dated January 8, 2015 (Bates 5649210); and another dated January 28, 2015 (Bates ACCD00005173), and asked why Stenger was writing to her. In response, Moulton stated that the MOU was with ACCD and ACCD was the entity asking question. The January 8th letter contained issues important to ACCD. The letter asked for them to "please answer the questions."

AUSA Van de Graaf asked if Stenger was using his connection with Moulton. In response, Moulton stated that did feel Stenger took advantage the relationship. He knew that she was an committed economic development professional and played on her emotions. For instance, on one specific occasion during this time, he pled to her, with tears in his eyes, "You can't shut this down, Pat. 350 will be out of a job." This plea pulled on her heartstrings. Stenger and Moulton's father had known each other. Stenger was an inch from bringing up Moulton's father. Moulton now realizes Stenger knew what was going on but pretended there were no issues.

AUSA Van de Graaf observed that the January 8, 2014 letter contains a draft Frost and Sullivan letter and report, which contained general positive information about stem cells and dialysis, and a claim that the financial projections about the products appear reasonable. In response, Moulton stated that, at this point, she thought ACCD and DFR would come to a decision together about whether or not the Jay Peak projects could go back to market. At ACCD, they wanted to nail down the market issue and thought they would opine on the economic development issues. She thought there would be discourse and balance between the agencies, but as time went on it became clear the problem was "DFR's baby," due to all the dirty laundry coming to light.

AUSA Van de Graaf referred to a January 29, 2015 email (Bates ACCD013389) from Kessler regarding a DFR meeting with Jay Peak representatives. In response, Moulton noted that Kessler was anxious about not being in the loop. The DFR/ACCD partnership was still being formed and there were ownership/turf issues. In addition, David Cassidy and Kessler were like oil and water. However, it became clear that DFR would be in charge of diving in and doing the forensics. Moulton had to tell Kessler to let go. Kessler's concern is also shown in a July 16, 2015 email communication (Bates ACCD00007031).

5759560.06

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton ,On 12/07/2018 ,Page 7 of 9

Moulton advised that she met Kelly about five or six times. There was a DFR meeting that included Moulton, Donegan, Liz Miller, Kelly and Stenger – before or after the Governor got involved in the matter. AUSA Van de Graaf noted that Stenger's December 23, 2014 letter references a meeting that occurred on Friday, December 19th.

Moulton advised that Quiros was pestering the Governor about a meeting. She does not have her notebooks to review (they have been given to DAG Griffin). DAG Griffin will review them to see if they contain notes for the December 19th meeting.

AUSA Van de Graaf observed that the disclosures in the offering were at issue and the Jay Peak team was pushing the state agencies to sign off on the offering. In response, Moulton noted that there was at least one meeting with Mark Scriber and his team about what needed to go into the offering, and at least one meeting with Gordon. Gordon was physically present at one meeting.

For follow-up, AUSA Van de Graaf asked Moulton to make an effort to identify dates of meetings and any notes from those meetings that included Stenger, Kelly, Quiros and/or Scribner from June 2014 to the end of December/beginning of January (when ACCD's involvement dropped off).

In regard to the meeting with Governor Shumlin, Moulton advised that she and Donegan were on the same page that there was a big problem. This was the time before DFR dived into all the money tracing. The Governor was under pressure because of all the jobs at stake. Moulton and Donegan did not have all the evidence yet regarding the problems. Moulton and Donegan had some uncomfortable conversations with the Governor. AUSA Van de Graaf noted that AnC Bio Vermont and Burke had different issues, but got lumped together, and that Moulton and Donegan did not seem convinced that Burke did not have big issues.

Moulton advised that the Governor wanted to get everyone together. There was concern about the AnC Bio Vermont, such as the $10 million for the technology and the land deal. The state was on Burke "like glue" and that was probably why Burke was not a part of the SEC's initial case. AnC Bio Vermont was the cash pipeline for Burke. They were trying to raise the red flag with the Governor. The Governor wanted to be the peace maker, bringing everyone into the room to work things out.

Moulton advised that other projects, such as the Spates Block, the Marina, and the Airport, never got to the MOU stage. Moulton never got a reason why these projects were dropped. She recalled that the demolition

5759560.07

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton , On 12/07/2018 , Page 8 of 9

of the Spates Block occurred because it was reportedly a good time for it. Stenger was probably wanted to show program. Stenger was like a saint in the Northeast Kingdom.

The meeting with the Governor took place around late March 2015. Present were Stenger, Quiros and Kelly (maybe) and Moulton, Donegan, Alex MacLean and Liz Miller. Moulton thinks the Governor took notes. The Governor told the Jay Peak team that they were not being cooperative with the state people, which in turn was raising red flags.

Quiros came to the meeting with a manila folder filled with papers. Quiros said he was going to file a lawsuit after the meeting. After the meeting, Quiros hung back to talk to the Governor. Moulton later learned that the file contained pictures Quiros wanted to show to the Governor rather than the lawsuit (as had been implied). The Governor felt that the Jay Peak team was not being forthright and that Stenger was "blowing smoke."

The state officials were pushing the Governor to shut down the projects, but the Governor said no - they would wait for SEC to take action (which happened in April 2016).

AUSA Van de Graaf observed that an outcome of the meeting was that DFR would do an audit of the money, and funds would be escrowed. After this agreement was structured, the Jay Peak team went back to the market with the project.

In the meantime, Moulton noted, Mike Pieciak created the spaghetti chart and they waited for the SEC to file its action in April 2016. Moulton never felt that they got the money they needed to complete the audit. With the AnC Bio Vermont project, they still had a lot of unanswered questions, but the money was protected.

Moulton got called into a meeting to go over the "spaghetti chart." She remembers the blood draining from her face. The Governor had the same reaction. Finally, they had all the evidence.

The May 1, 2015 weekly report (Bates 0490438) from Stenger to Moulton, which references to the "AnC Bio Groundbreaking" was shown to Moulton. In response, Moulton stated, "The sun always shines in Bill Stenger's world." AUSA Van de Graaf added that Stenger stated in the report that the AnC Bio website "will be up and running by the end of May" with "400 plus job openings..."

In response, Moulton stated that there were also AnC Bio Vermont workforce-related meetings with Stenger - before Moulton realized how bad

5759560.08

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Patricia Moulton ,On 12/07/2018 ,Page 9 of 9

things were. Moulton could never get anyone to describe the skills needed for the AnC Bio jobs. After the spaghetti chart, she realized things were bad. She completely lost faith in Stenger. Upon reflection, Moulton added that she may have lost faith in him earlier, possibly when he made his tearful plea. She was now convinced that AnC Bio Vermont was not going to happen. Subcontractors got screwed. It was a heartbreaking time.

Moulton and Donegan were upset with the Governor for not pulling the plug. Donegan considered quitting. However, the Governor was right to wait for the SEC to take action. The state did not have the resources of the SEC, such as a Receiver.

The following Bates-numbered documents were referenced above:

ACCD00009417

ACCD00005379

VT-DFR00058242

ACCD00005433

ACCD00005462

5649210

ACCD00005173

ACCD00005189

ACCD013389

ACCD00007031

0490438

5759560.09