FD-302 (Rev. 5-8-10)                              - 1 of 5 -                               OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   11/28/2018

    Michael Pieciak, Commissioner, Department of Financial Regulation, State of Vermont, 89 Main Street Montpelier, Vermont, telephone ████████, was interviewed at the United States Attorney's Office, District of Vermont, 11 Elmwood Avenue, Burlington, Vermont, by Assistant United States Attorney (AUSA) Paul Van de Graaf and FBI Special Agent Jennie Emmons. Also present for the interview, representing Pieciak, was Deputy Attorney General Bill Griffin of the Vermont Attorney General's Office. After being advised of the identities of the interviewers and the nature of the interview, Pieciak provided the following information:

    Pieciak started working at the Vermont Department of Financial Regulation (DFR) in February 2014. His team was not aware of the SEC investigation of Jay Peak at that time. In January 2015, Brent Raymond was deposed by the SEC. After Raymond's deposition, DFR got a copy of the deposition.

    On January 28, 2015, DFR met with attorneys from a law firm representing the Jay Peak developer (hereafter referred to as the Developer, meaning Ariel Quiros, Bill Stenger and Bill Kelly). In attendance at the meeting were three lawyers from law firm Primmer, Piper, Eggleston and Kramer, to include Gary Karnedy and Mark Scribner, and three lawyers from the state of Vermont, to include Pieciak, David Cassidy and Chris Smith. Neither Quiros, Stenger or Kelly attended.

    Prior to the meeting, a Jay Peak investor by the name of ████████ had sent the Vermont Agency of Commerce and Community Development (ACCD) three pages of Raymond James documents showing the existence of margin loans. In the meeting, DFR asked the Developer's attorneys about the margin loans. The response was that Quiros was a man of extraordinary wealth. Later, a letter was received by the state from Quiros's attorney, David Gordon, providing a rationale for the margin loans: it was saavy business decision on the part of Quiros because interest was being earned and Raymond James provided FDIC protection for the investments. These answers were red flags to DFR.

    When DFR asked in the meeting if there was an SEC investigation, they were told that the SEC had just asked for documents. DFR called the SEC

---

Investigation on  11/19/2018  at  Burlington, Vermont, United States (In Person)

File #  318B-AL-6464304                                        Date drafted  11/23/2018

by  EMMONS JENNIE MCGLYNN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5756878

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Michael Pieciak ,On 11/19/2018 ,Page 2 of 5

the next day and learned that the SEC had serious concerns about the AnC Bio Vermont project, in particular. The SEC further advised that they were engaged in conversations with the Developer.

The Developer's lawyers seemed pleased that DFR was involved because DFR understood financial matters, securities, and offering documents. They seemed to appreciate the oversight and regulation by DFR. DFR had about 17 issues on a list to address, about 10 of which were knocked out in the meeting. Among the follow-up items for the Developer's team was an explanation of the margin loans and financial information about the spending on the AnC Bio Vermont project.

DFR's involvement in the EB-5 program came about when the relationship between the Developer and ACCD broke down. Governor Shumlin's office was receiving complaints and got a sense of the mounting frustrations. A decision was made by the Governor's office for the joint administration of the EB-5 program. DFR became the regulatory agency and ACCD stayed in its promotional role. ACCD did not have experience with investigations or subpoena power; hence, this decision made sense.

Pieciak focused on the investigation. John Kessler (the General Counsel for ACCD) sent Pieciak the offering memorandums for Burke and AnC Bio Vermont along with correspondence involving David Gordon, for Pieciak's review.

AUSA Van de Graaf observed that communications around this time indicate there was a fight about what the Developers had to disclose. In response, Pieciak noted that DFR became resigned, but negotiated the point that material issues had to be disclosed in the offering documents. AUSA Van de Graaf asked what changes were made under DFR's oversight, noting that in the first section of the revised offering more information was added about risks, the Korean entities, and the lack of FDA approval. Pieciak stated that all 500 pages of the offering - in other words, the whole investment package - had to be honest and include full disclosures.

Ralphine O'Rourke, another lawyer with the Primmer law firm, provided DFR a document, by way of email, which contained an accounting of all the AnC Bio Vermont spending (a copy of this document was shown to Pieciak) along with a copy of the revised offering memorandum.

In regard to the Bogner land deal, Pieciak could not recall when he uncovered all the relevant facts. Pieciak believes he pushed for a disclosure about Quiros's conflict of interest in the land transaction, but does not recall what details went into the offering memorandum. AUSA Van de Graaf noted that ACCD had asked for an appraisal for the land and Stenger obtained what appeared to be an bogus appraisal. Pieciak noted

5756879

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Michael Pieciak    , On  11/19/2018  , Page  3 of 5

that DFR considered "disclosure" over "merit" as the most appropriate method of regulation.

DFR realized there was a problem, but building the whole financial picture from the a beginning was taking a long time. DFR did not want to tip off the Developers that there was an investigation. At some point, the decision to let the Developers go back to the market with AnC Bio Vermont was "academic" because DFR knew they would never be able to spend new money. The Burke project, however, was fundamentally different. The investigation showed that the Burke project did not have the massive co-mingling and redirection of funds as was the case in AnC Bio Vermont.

DFR investigated the $500,000 transaction involving an invoice from PeakCM for the purpose of refunding an investor. The Developer had to pull the money out of a project for the refund and came up with a bogus excuse. At the time, the state allowed the Developer to spend money only four different ways and refunds were not one of them. Pieciak became concerned that PeakCM had nefarious involvement.

Pieciak was shown an email communication (Bates USAO-DFR00102016 - Bates USAO-DFR00102018), beginning February 20, 2015, in which Pieciak communicated to Scribner that the financial information provided by the Developer showed that AnC Bio Vermont had $25,000,000 remaining (i.e., not spent) which could be used for construction costs until "successful completion of the audit." Pieciak later learned that money was not actually available. The fact that money was diverted to something else was a material fact - the money was not in the bank as the Developers claimed it was.

The Letter Agreement (Bates USAO-DRF00006709 - USAO-DRF00006711) looks to Pieciak like something created by DFR.

The SEC investigation was not disclosed in the revised offering memorandum because the SEC did not call it an investigation - although Pieciak knew it was - and because the SEC did not want the investigation disclosed.

In regard to questions about the intellectual property that was purchased for $10,000,000 (a January 23, 2015 letter [Bates ACCD0005173 - ACCD0005189] from Bill Stenger to Pat Moulton of ACCD was referenced in the interview, in which questions were addressed), Pieciak stated that the Raymond James-related materials promised on page 4 were never provided to the state.

Around January 20, 2015, Moulton received the aforementioned materials from the Phase I investor, ▮▮▮▮▮▮▮▮▮▮ related to the margin loans. DFR

5756880

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak , On 11/19/2018 , Page 4 of 5

then got the letter from Gordon explaining Quiros's use of the margin loans. Thereafter, DFR realized it needed to go directly to the source. DFR then contacted Raymond James and requested information on all the accounts associated with the Jay Peak entities.
With reference to the Developer's justification of the $41,500,000 spent on AnC Bio Vermont, AUSA Van de Graaf noted that DFR's investigation showed that $10,000,000 (for the intellectual property) was not paid and the $14,000,000 was not paid in full. AUSA Van de Graaf added that the SEC learned of the Declarations (i.e., the declarations by AnC Biopharms officials) after Quiros's deposition. In response, Pieciak stated that the SEC told DFR about the Declarations around April 2016. Initially, the SEC was leery about sharing information with DFR about their investigation. DFR later learned that Quiros paid off the margin loan with AnC Bio Vermont money. In March 2015, Pieciak knew an audit needed to be done, but also understood that it would never get done.

Governor Shumlin was not briefed on DFR's investigation until 2015. A meeting with Governor Shumlin, which included Liz Miller and Susan Donegan, occurred around late March 2015. On April 1, 2015, the escrowed funds were released so the meeting probably happened a week prior (an email was referenced in the interview [Bates USAO-DFR00102319], subject "DFRs response to today's meeting for AnC Bio and QBurke), dated March 27, 2015, from Susan Donegan to Kelly).

Pieciak observed that forces were colliding. DFR received 2,000 pages of Raymond James documents and was only 2% into its investigation. From the Governor's perspective, the SEC had been investigating for two years, but had never stopped the Developers from fundraising. ACCD was frustrated, and ACCD did not know all that DFR knew. DFR sensed that the $25 million the Developers claimed to have on hand was not really there; hence DFR felt it was okay to say "go ahead and use it." DFR knew that the agreement with the state would prevent new money from being misused.

Governor Shumlin and his staff had direct contact with the Developers. The Developers exerted political influence. The Developers had brought $300,000,000 worth of development to the Northeast Kingdom - or at least that was the belief at the time. Further, there was a sense that the state was slowing down the development.

According to securities law, if a deal changed materially, the offering memorandum had to be revised. Pieciak recalled talk about anticipating refunds for initial investors who might pull out when the offering was reissued. The Developer claimed to have a $10,000,000 reserve on hand to deal with such refunds.

5756881

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak , On 11/19/2018 , Page 5 of 5

When the Developer argued that an audit was too expensive, DFR hired a company called CohnResnik to conduct the audit and analyze the Raymond James records. CohnResnik submitted document requests, but Kelly was not responding to them. The audit never even got close to completion. Then the case against the Developers was filed.

During the investigation, from about April to July 2015, Pieciak was thinking there must be an explanation, that they would find the missing funds in some account. It took a long time to figure out that there was no explanation and that the funds had been misused. ACCD and the Governor's office were then brought into the picture. By June or July 2015, concerns about the Burke project were resolved, while Phases One through Seven were a "disaster." Pieciak was letting more and more people outside DFR know about the problems with the projects. By September 2015, DFR was 75% of the way through its investigation.

AUSA Paul Van de Graaf advised that a follow-up interview with Pieciak was desired after Pieciak had a chance to review documents and refresh his recollection.