*DISCOVERY 9.30.19*



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000285105 | **Location:** | VT Dept. of Financial Regulation |
| **Investigation Name:** | ARIEL I QUIROS | | 89 Main St., Montpelier, VT 05602 |
| **Date:** | July 24, 2019 | | |
| **Time:** | Approximately 9:45 a.m. – 11:15 a.m. | | |
| **Participant(s):** | | | |

Anders J. Ostrum, Special Agent, IRS Criminal Investigation
Paul Van de Graff, Assistant U.S. Attorney, U.S. Attorney's Office
Michael S. Pieciak, Commissioner, VT Dept. of Financial Regulation
Gavin Boyles, General Counsel, VT Dept. of Financial Regulation
Bill Griffin, Deputy Attorney General, Office of the Attorney General

On the above date and time, Commissioner Michael S. Pieciak (Pieciak) from the State of Vermont, Department of Financial Regulation was interviewed by Assistant United States Attorney (AUSA) Paul Van de Graaf and IRS-CI Special Agent Anders Ostrum. Also present for the interview, representing Pieciak, was Deputy Attorney General Bill Griffin of the Vermont Attorney General's Office and Gavin Boyles, General Counsel of the Vermont Department of Financial Regulation. After being advised of the identities of the interviewers and the nature of the interview, Pieciak provided the following information:

1.  Pieciak showed AUSA Van de Graaf and SA Ostrum various Excel workbooks, including two titled "Global Funds Analysis" and "Net Flow to Ultimate Beneficiaries," which were compiled and used by Vermont Department of Financial Regulation (DFR) in their investigation of the Jay Peak and AnC Bio EB-5 projects. Excel workbooks were prepared for each of the entities and eight project phases showing the sources and uses of investor funds. Each workbook contained separate tabs which contained bank spreads of individual bank accounts of the entity or EB-5 project. Excel pivot tables and filters were then used to summarize the data for enhanced analysis. The Excel workbooks were prepared by the DFR during the approximate time period of April 2015 to April 2016, before a receiver was appointed. When the receiver hired Kapila Mukamal (Kapila), Kapila would have received anything it requested from the DFR. The Excel workbooks were likely provided and used by Kapila in their financial analysis of the Jay Peak EB-5 projects. Pieciak is unsure if the United States Attorney's Office received the Excel workbooks pursuant to their grand jury subpoena.

2.  AUSA Van de Graaf showed Pieciak a document labeled "Meeting Between the Department of Financial Regulation and Primmer Piper Eggleston & Cramer PC, January 28, 2015, RED: Primmer comments from meeting." The document was subtitled "AnC Bio Transaction Questions and Comments." Pieciak confirmed that he prepared the questions outlined in this document - Chris Smith from the DFR

5763222

may have also helped with the questions.  Pieciak confirmed that the responses below each question were input by DFR based on comments provided in the meeting by the developers' attorneys, Primmer Piper Eggleston & Cramer PC (Primmer).    The purpose of the January 28th meeting was to go over questions and answers involving Jay Peak Biomedical Research Park L.P.'s private placement memorandum.  Primmer attorneys were representing the developers to the AnC Bio project to include Ariel Quiros (Quiros), Bill Stenger, and Bill Kelly.

    a.  AUSA Van de Graaf asked Pieciak about question one, specifically what the state's primary concern was regarding the details of the land transaction involving Jay Peak Biomedical Research Park L.P. (purchaser) and GSI of Dade County, Inc (seller).  DFR's standpoint was that there was a conflict of interest between the ownership of the transacting entities, and as such, the Private Placement Memorandum (PPM) needed to be revised by adding a disclosure regarding the identity and ownership of the seller.  The DFR was focused on the presence and accuracy of the disclosure in the PPM and not as concerned with how much the seller was profiting from the sale of the land.  DFR's responsibility for Jay Peak Biomedical Research Park, L.P.'s revised PPM was that it contained accurate and full disclosures of material items and nothing misleading.  DFR's approval of the revised PPM was purely for regional center purposes, not for regulatory purposes of security law.

    b.  AUSA Van de Graaf asked Pieciak about question two.
       i.  There is a January 8th letter referenced in question two; this is not a typo.
      ii.  At the time of the January 28, 2015 meeting the DFR assumed the $10M valuation in distribution rights was negotiated between independent parties.

    c.  AUSA Van de Graaf asked Pieciak about question five, specifically the answer provided by Primmer as it relates to the rational for the 80/20 ownership split between AnC Bio VT, LLC. and Jay Peak Biomedical Research Park L.P. pursuant to the Joint Venture Agreement.  Pieciak said Primmer was referring to the Investment Company Act of 1940 which regulates mutual funds.  Pieciak believes Primmer was saying the ownership split was designed to exempt the company from the act's coverage.

    d.  AUSA Van de Graaf asked Pieciak about question six.  Quiros and his attorneys are claiming the entire SEC filing was a mistake.

    e.  AUSA Van de Graaf asked Pieciak about question eight, specifically Ike Lee's resume.  It was noted that the Ike Lee resume submitted to the DFR did not contain Ike Lee's position with StemCutis, LLC.

3.  Prior to January 28, 2015, Pieciak became aware of the existence of a Raymond James margin loan.  Pieciak had received approximately four pages of a Raymond James account statement from ████████ an early EB-5 investor.  The Raymond

5763223

James statements contained limited information which showed the existence of a margin loan. In addition to the information received from ▇▇▇▇▇▇ Pieciak had limited conversations with Pat Moulton, Secretary of the Vermont Agency of Commerce and Community Development, where he also learned of the existence of the margin loan. Prior to January 28, 2015, Pieciak understood little as to the purpose of the Raymond James margin loan.

4. Present at the January 28, 2015 meeting between DFR and Primmer were three lawyers from Primmer to include Mark Scribner, Ralphine O'Rourke, and Gary Karnedy. Three representatives from the DFR were present including Pieciak, Chris Smith.and David Cassidy. The meeting was held at DFR's office. The following conversations triggered several red flags for Pieciak during the meeting:

   a. When Primmer's lawyers were questioned about the Raymond James margin loan, Mark Scribner told Pieciak this was a smart move by Quiros. Scribner described the margin loan as a smart move because although the margin loan had an interest rate of approximately 2% the treasury bills yielded approximately 4%. Pieciak remembers Scribner's face as he made this statement. DFR asked for additional information on the margin loan, specifically detailed summary of accounts.

   b. The meeting involved discussion surrounding a $10M reserve fund for investors who do not re-subscribe. Mark Scribner told Pieciak that Quiros was a man of untold wealth and could come up with the $10M if needed.

   c. Through their attorneys, the developers misled the DFR when questioned about the SEC's level of interaction and interest in the AnC Bio project. Specifically, the developers led the DFR to believe the SEC's interest in the AnC Bio project was consistent to the SEC's general interests with other EB-5 projects. In addition, the developers led the DFR to believe there was limited interaction with the SEC. Subsequent to the January 28, 2015 meeting with Primmer, Pieciak called the SEC on approximately January 29, 2015 and spoke with Brian James and Trisha Sindler-Fuchs. Pieciak was told the SEC had concerns with the AnC Bio project, but the SEC would not elaborate much further at that time.

5. On approximately February 27, 2019, Pieciak received a letter from David Gordon, attorney for the developers, which described the purpose of the margin loan at Raymond James. A detailed summary of accounts did not accompany this letter.

6. AUSA Van de Graaf showed Pieciak a document labeled "INDEX OF DOCUMENTS FOR JANUARY 28, 2015 MEETING WITH DFR." Pieciak confirmed the index was prepared by Primmer. Before the January 28, 2015 meeting, Pieciak reviewed many of the items referenced in the "INDEX."

5763224

AUSA Paul Van de Graaf advised that a follow-up interview with Pieciak was desired after Pieciak had a chance to review documents and refresh his recollection.

I prepared this memorandum on August 9, 2019, after refreshing my memory from notes made during and immediately after the interview with Michael S. Pieciak. I also made a follow-up telephone call on August 9, 2019 to Michael S. Pieciak to clarify a few statements made by Pieciak in the July 24, 2019 meeting.

Anders J. Ostrum
Special Agent

5763225