UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA              )
                                      )
        v.                            )        No. 5:19-cr-76
                                      )
ARIEL QUIROS,                         )
WILLIAM KELLY, and                    )
WILLIAM STENGER,                      )
        Defendants.                   )

JOINT NOTICE OF CORRECTION TO UNSEALED
FBI REPORT OF INTERVIEW

On January 16, 2022, the Court ruled that various law enforcement reports[1] of

interviews with former state employees would be unsealed after the parties had an

opportunity to review the reports for potential redactions. During this review, the United

States discovered that the FBI report of an interview with Brent Raymond in January of

2019 contained mistakes that should be clarified at the time of the report's public release.

The report, in describing Mr. Raymond's statements about certain events, mistakenly

refers to "Liz Miller" on page one, "Miller . . . she" on page two, and "Miller . . . her" on

page seven.  When discussing these events, Mr. Raymond was not speaking about Liz

Miller but rather Lawrence Miller, who between 2011 and mid-2014 was the Secretary of

the Agency for Commerce and Commercial Development, which had responsibility for the

Vermont Regional Center. In 2012, Liz Miller served as Commissioner of the Vermont

Department of Public Service, which had no EB-5 role. Ms. Miller did not become

---

[1] As the Court is well aware and as the government has noted previously, the reports are law enforcement
agents' written summaries of interviews; they are not verbatim transcripts. Indeed, it is likely that these reports
contain other minor errors in capturing what the interviewee said. Thus, this correction should not be read as
confirming the accuracy of other aspects of the reports.

Governor Shumlin's Chief of Staff until early 2013. The only reference to "Miller" in the report where Mr. Raymond identified Liz Miller not Lawrence Miller is on page nine, where Mr. Raymond discussed DFR starting its EB-5 oversight role. The FBI report of the second interview with Mr. Raymond, as well as the reports of interviews with Ms. Miller and Mr. Miller, also released by the Court, corroborate the accuracy of this correction.

Counsel for Mr. Stenger has reviewed this joint filing and agrees to this correction to the public record.

Dated at Burlington, in the District of Vermont, this 28th day of January, 2022.

Respectfully submitted,

UNITED STATE OF AMERICA

NIKOLAS P. KEREST
United States Attorney

By:     *Nicole P. Cate*
        Nicole P. Cate
        Paul J. Van de Graaf
        Assistant U.S. Attorneys
        P.O. Box 570
        Burlington, VT 05402
        (802) 951-6725

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/04/2019

Brent Raymond, former Director of the Vermont Regional Center (part of the Vermont Agency of Commerce and Community Development [ACCD]), was interviewed at the United States Attorney's Office, District of Vermont, 11 Elmwood Avenue, Burlington, Vermont, by Assistant United States Attorneys Paul Van de Graaf and Nicole Cate and FBI Special Agent Jennie Emmons. Representing Raymond at the interview was Deputy Attorney General (DAG) Bill Griffin of the Vermont Attorney General's Office. After being advised of the identities of the interviewers and the nature of the interview, Raymond provided the information below.

Raymond's background is in banking and securities and he has certifications in that field. In 2011, Raymond started his state employment as the state's trade director. Soon after he started, the situation with Douglas Hulme unfolded. In May 2012, Raymond sat in on a meeting regarding Hulme. After the meeting, Liz Miller asked for recommendations and Raymond provided some, such as self-compliance with securities laws (federal and state) and forensic audits.

When James Candido resigned, Raymond was asked to take over the EB-5 program. In June or July of 2011, he took over as the state EB-5 director, but also kept his job as the trade director. The key state players at the time were Miller and Pat Moulton, both of whom Raymond reported to, and John Kessler, who relied on Raymond (because Raymond would listen to him).

The EB-5 industry was like the "Wild West." Raymond was stunned by the lack of checks and balances. The general partners had so much power. However, when Raymond left the state, he did not foresee the problems would be so big.

The state's audit request was made verbally. Raymond heard that the Jay Peak/Quiros group said it as too expensive. Miller talked about it to Stenger directly. Stenger responded, "Yes, of course," but then later called and said it was too expensive. Raymond was not present for that conversation, it was between Miller and Stenger.

Investigation on  01/08/2019  at  Burlington, Vermont, United States (In Person)

File #  318B-AL-6464304                                      Date drafted  01/18/2019

by  EMMONS JENNIE MCGLYNN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of __(U) Interview of Brent Raymond__ , On __01/08/2019__ , Page __2__ of __12__

The audit matter was presented when Raymond was in the new position for a couple of weeks. The way it was presented was that Jay Peak would have to pay, not the state of Vermont. At first Raymond did not realize it was not going to happen. He asked Miller about the status of the audit process. Miller said she decided they did not have to do the audit – because they said it was too expensive. Raymond tried to impress the risks to the state (by not demanding an audit). Candido (who stayed in touch) told Miller that it was like a federal land lease. Raymond would drop articles on Miller's desk about liability related to the EB-5 program.

When Miller told Raymond there would be no audits, because they were too expensive, he had to focus to keep his jaw from dropping. Everyone seemed to think the audits were a "no brainer." However, since no one else in the industry was doing them, there was concern at the state that they could be faulted for demanding something above and beyond the norm.

AUSA Van de Graaf asked about the fall 2012 revised AnC Bio Memorandum of Understanding (MOU). Raymond advised that he worked on several iterations of it. The first one had been signed by Kevin Dorn. AUSA Van de Graaf noted that one was dated in 2009. Raymond added that Miller said that "we could put everything in (i.e. covenants) retroactively several years later."

AUSA Van de Graaf noted that the Offering Memorandum (also known as the Private Placement Memorandum [PPM]) got drafted and was released into the market in November 2011. Raymond advised that the Agency of Commerce and Community Development (ACCD) had no involvement with the PPM until they got approval to look into them in 2014. There had been no supervision of the PPM. In fact, Raymond had to ask Stenger for a copy of the PPM because there was not a copy in the files at his workplace at the state. When Raymond read the PPM, he became concerned.

AUSA Van de Graaf asked about what happened during the quarterly reviews – between the early phase and fall 2013. Raymond advised that state personnel would get together with Stenger and go to Jay Peak and view the construction. The SEC had asked the state how they confirmed the proforma construction of properties per the PPM. The state did not "confirm," but rather just checked to see that the construction was ongoing.

During these contacts, Stenger would have a stack of documents. Kessler did not want them because they would be subject to public records request (and, Raymond would have spent all his time responding to those requests). Instead, the quarterly checks served the purpose of maintaining regular communications – most directly with Stenger and sometimes with Alex

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Brent Raymond                    , On  01/08/2019  , Page  3 of 12

MacLean (with Stenger copied). Raymond had no involvement with Quiros other than one time when Quiros tried to "spin" the SEC investigation. Whenever Raymond directed questions to Quiros, Quiros would not respond directly.

AUSA Van de Graaf showed Raymond an email Raymond had sent in February 2013, which forwarded a report by Diane Peel. AUSA Van de Graaf also presented Stenger's and Quiro's responses to this email. Raymond advised that when he saw the report he spoke to Miller and Kessler about it. Stenger talked to Raymond about the report. Stenger made it sound like Peel was a "kook" and a "nut job." Stenger was on the board of the hospital where Peel worked. After Quiros gave his response about it, there was no aggressive follow-up, though Raymond talked about his concerns internally at the state.

Raymond had three different male Korean interns at the state. Raymond brought them in because of the concerns about AnC Bio Korea. The initial thought was that the interns would help review documents, but they also ending up helping with work related to state global trade work. Raymond was constantly trying to research the Korean company, but it was hard. A Korean auditor's document, when translated, revealed that AnC Bio Korea had financial issues.

In October 2013, Raymond sent an email about possible familial connections. Raymond kept digging even though the state got documents certifying that there were no such relations. Those documents did not satisfy Raymond.

Raymond and Becky Fu (who reported to Raymond) worked together on the Vermont Global Trade Partnership (which had several federal grants) and the Regional Center.

In September 2013, Raymond and Fu went on a trip to China with Governor Shumlin. The purpose of the trip was to promote projects that were recruiting investors, which involved connecting with agents (for investors) in China. Jay Peak personnel were traveling with the state officials to meet with the agents and potential investors.

Raymond made a lot of foreign trips to attend conferences (where booths were set up) and other events for the purpose of connecting with agents and investors.

At such events, the state personnel would talk about the Vermont Regional Center and what made it different from other Regional Centers -- such as the Vermont Regional Center being not for profit, about how economic development was the fundamental goal, and how there was no reason

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond _____ , On 01/08/2019 , Page 4 of 12

to approve illegitimate projects. They would explain that the Vermont Regional Center had closed down projects after they were approved, despite push back from important state people. They would never say "invest in Jay Peak," but would talk about why the Vermont Regional Center was different.

There came a point when Raymond asked not to go on any more overseas marketing trips. Raymond ended up having to go on a trip involving Senator Leahy, despite his efforts to avoid it. Raymond was involved in discussions about potentially excluding Senator Leahy from the trip due to the SEC investigation. Raymond was told that the SEC investigation was confidential.

Raymond learned about the SEC investigation when Fu told him that the SEC called for him about AnC Bio. He got the call about a month before the subpoena arrived. Raymond was relieved that the SEC was involved. Raymond told Miller and Kessler, and scheduled a call with Brian James and Trisha Sindler, the investigators with the SEC. He told and gave them "everything."

Raymond forwarded information to "BISHCA" (now known as the Vermont Department of Financial Regulation [DFR]), but there was no interest. While the SEC was investigating, Jay Peak lawyers were making threats.

AUSA Van de Graaf noted that in October an intern found an article about a search of AnC Bio Korea and that Raymond sent an email (with an attachment), asking Stenger about the search. A package of information was sent back to the attention of Raymond, Miller, and MacLean with attachments, purporting to show that Alex Choi and AnC Bio Korea were not in any trouble. Raymond advised that this material did not alleviate his concerns.

AUSA Van de Graaf showed Raymond a series of email. In one, Raymond asks for a document to be forwarded and referenced a trip he and Kessler took to the AnC Bio Vermont site. Stenger responded with the requested document and added that the project would change the character of the Northeast Kingdom. Two days later, an email was sent responding to Raymond's "additional request" about Quiros's ties and the debt of AnC Bio Korea. AUSA Van de Graaf asked Raymond to provide additional context for this period in October 2013.

Raymond advised that he did not know about the SEC investigation at this time. Raymond was growing more and more frustrated. Miller asked him what more did he want. The interns discovered that AnC Bio Korea was in trouble and the company was in default. An intern was typing up information and Raymond was asking questions. ACCD and Raymond cared about Alex Choi's bona fides. Raymond cared not only as a representatives of the

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond ,On 01/08/2019 ,Page 5 of 12

state of Vermont but also as a person. Raymond did not want people to get hurt because the project was not real. His whole career was about protecting people in the financial industry. AnC Bio Korea was what the whole project was built upon. AnC Bio Korean was to receive $10 million in distribution rights.

Raymond was shown an email from Stenger to Raymond, stating there were no family connections and work was being done on the FDA timeline. In response, Raymond advised that Stenger would show up at his office and drop things off. Eventually, Raymond received some certification that there were no family connection. What was said about the FDA was eventually determined to be untrue. AUSA Van de Graaf asked if Stenger ever got back to Raymond about the FDA matter. Raymond advised that Stenger came by a couple times to drop off materials, but did not respond via email. Stenger may have provided a response to questions, but Raymond is not sure. AUSA Van de Graaf noted that in March 2014, Raymond asked questions again.

AUSA Van de Graaf presented an email, dated February 7, 2014, regarding all "material information," which was provided in response to several of Raymond's questions.

AUSA Van de Graaf asked if Raymond heard about the USCIS Request for Information (RFE). Raymond advised that Jay Peak did not like to pay attorneys. One of Jay Peak's long time attorneys would communicate frequently with Raymond. This attorney "slipped" and mentioned the RFE, and then followed up by telling Raymond not to mention it.

While in Shanghai, China, Raymond was approached by several investors with concerns about AnC Bio Vermont, and who wanted their money back. After leaving China, Raymond stayed in touch with the investors through "WeChat." The investors, who had not received refunds, showed Raymond emails wherein Stenger said they would get their money back. Raymond told Miller they had to deal with this issue. He told the investors they would get their money back, and they eventually did. Then an investor named ███████ ████████ sent a letter in which it was clear he was building a case.

AUSA Van de Graaf presented an email communication from around this same time (February 2014), in which an investor known as "Susie" was calling Jay Peak people cheaters and Stenger was trying to deal with her concerns. In response, Raymond advised that Susie was incredibly angry and aggressive.

AUSA Van de Graaf noted that Raymond asked questions about the RFE, which Stenger answered. Notably, Raymond asked if there were material issues of which of the Regional Center should be aware. An answer came

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Brent Raymond _____ , On  01/08/2019 , Page  6 of 12

from MacLean with a link to the RFE response via Sharefile. AUSA Van de
Graaf added that in March 2014, a Korean intern got more information and
on March 23, 2014, Raymond emailed a list of the investors' concerns, to
include their concern about the land purchase.

In response, Raymond advised that he been concerned about the land
purchase for a long time. The land was eventually appraised by a local
appraiser and Raymond was concerned about the the appraisal's reliability.
Raymond added that there was no land appraisal in the original PPM and
that one Quiros entity was selling to another Quiros entity. When the
investors raised this concern it gave Raymond license to put these
concerns in an email. Now it was not just Raymond raising issues, others
shared his concerns. Stenger was a very influential and connected person
in the state so Raymond had to be cautious. Miller's take was that there
was no serious concern because it was a PPM, and that was how those deals
work.

Raymond brought the land issue up several times, to include at one
meeting with Miller and Lucy Lariche, who was the Deputy Secretary at at
the time. Raymond found the land transaction disconcerting because of what
the investors paid for the land and because the transaction was not arm's
length. Raymond did not know what was paid initially. He later found out,
but does remember how. There is an email from 2012 in which Raymond asked
Stenger about the land.

MacLean told Raymond it was not professional to ask Quiros about
familial relationships. She was sensitive about that question and yelled
about it over the phone. MacLean said she was going to go to the Governor
and Miller about it. Raymond felt he needed to be careful. He was not the
ultimate decision maker. When investors came to him, it empowered him to
ask for more detail. Eventually, he realized he could not make a
difference on the inside, so he left his job with the state.

AUSA Van de Graaf read Raymond an email related to questions raised,
dated March 23, 2014, wherein Stenger wrote to Raymond that he "will get
to this by Monday." A response to some of the questions came in a letter
from Stenger, dated March 27, 2014. Raymond advised that he remembers this
letter.

AUSA Van de Graaf observed that other events happened around this time:
Raymond learned about the auction of the AnC Bio Korean facility, there
was a meeting in May about the auction, and Raymond reached out to a law
firm in Boston about investment regulatory issues. In response, Raymond
advised that an intern discovered the auction. Raymond asked Miller if
their law firm could review the second RFE. Miller approved this step and
Stenger agreed. However, Stenger then claimed the RFE was sent out before

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond _____ , On 01/08/2019 , Page 7 of 12

the state could see it. AUSA Cate noted that in a May 13, 2014 communication Raymond asked for the RFE and expressed gratitude for the delay its submission to USCIS so the state could review it.

Raymond noted that what is not shown in the record is that the Jay Peak /Quiros group was double counting jobs. Raymond showed the materials to someone else and they agreed. Raymond was trying to get enough information together to convince the powers to lock down the project.

At a short May 2014 meeting was Miller, Fu, Kessler, Raymond, MacLean and Stenger. Stenger and MacLean were confronted with the fact that the AnC Bio Korea facility was auctioned off. Stenger appeared to be genuinely shocked and was tearful. Stenger stated that this was new information to him and that he would seek answers. The whole clean room space at the AnC Bio Vermont facility was dependant on AnC Bio Korea.

AUSA Van de Graaf noted that on May 20th, after the meeting, a fax was received at the state from a Korean lawyer, Kan Jae Jin, which contained an explanation of the auction of the AnC Bio Korea facility. AUSA Van de Graaf noted another letter was sent to the state about Quiros having provided consulting services to the Korean business (Bates 0161125). AUSA Van de Graaf asked Raymond if Quiros having a stake in the Korean company — in any way — would have been material to the deal. Raymond advised it would have been material.

Raymond wondered where the AnC Bio Vermont money was going, particularly the $10 million for the distribution rights. Raymond did not see AnC Bio Korea making money in Korea on the products.

Though Miller was at the May meeting, her focus at the time was more on state-related health care matters. Lariche was trying to fill in. There were issues with other projects as well at that time. There were "daily fire drills."

At secretary level at the state there was a vacuum in leadership, which caused some delays. Pat Moulton came on at ACCD and was "amazing," but was being pulled in different directions. Raymond tried to get Miller to come to Friday meetings, which was not easy. In May 2014 it was hard to bring in Miller.

An email was presented to Raymond, dated June 17, 2014, from Kessler to Stenger (Raymond copied), in regard to setting up a meeting with Quiros and Stenger. In response, Raymond advised "we were already communicating with the SEC at this point." AUSA Van de Graaf observed that the meeting took place on or about June 27, 2014.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Raymond first met Bill Kelly at an EB-5 conference in Florida. Jay Peak always had one or two of the biggest exhibits at the conference. Raymond found Kelly to be "slick" and "slimy" and could not figure him out. Kelly would fly in for bigger events. Raymond would "ping" Kelly to see how he responded to questions.

Stenger lied to Raymond a lot. Stenger was "nuanced" and "grandfatherly" in his lying. Kelly was more like a used car salesman. Stenger was the "official responder" on day to day matters. Kelly answered on the more serious topics on Quiros's behalf. Kelly stated that he was Quiros's counsel.

Earlier in Raymond's career, when he was in banking, he dealt with Stenger about a VEDA loan. Stenger was very disorganized and a "real pain" to work with. Stenger treated Raymond like a "peon." Stenger never surrounded himself with detail-oriented and organized people. Raymond now sees Stenger's true dishonesty whereas earlier he had thought he was just disorganized. Stenger made statements that turned out to be absolutely false. Raymond felt Kelly could not be trusted whatsoever.

In the meeting, Kelly said that the SEC had approved their project. Raymond's response was "Ok, get me the documents." Kelly then said he could not find them. Kelly "bullshitted" the whole way through the meeting. Raymond believes he (Raymond) withheld the fact that the state was in contact with the SEC. Kelly was "spinning stuff," to include a statement that the SEC had approved the PPM, which Raymond knew was "so far-fetched."

AUSA Van de Graaf noted that AnC Bio Vermont got suspended and, thereafter, it was mostly lawyers talking to lawyers. AUSA Van de Graaf asked if there were meetings during the six month period between the June 2014 meeting and DFR taking over.

Raymond advised he was present at a meeting that included Kelly, Kessler, David Gordon and Mark Scribner at the Primer Piper law office, which was brought on board for the new PPM. The Jay Peak/Quiros team was refusing to provide records to the state of Vermont, claiming they were proprietary.

Raymond recalled a meeting at the University of Vermont where Stenger begged (and was crying) state personnel to allow the Burke project to go forward.

Raymond researched the portable dialysis machines. He called a friend in the biotech industry, who told him that it was impossible with today's technology to have portable dialysis. He also told Raymond to "stay away –

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Brent Raymond _____ , On  01/08/2019 , Page  9 of 12

as far as you can – from Bioheart." Raymond was scared by the fact that
his friend immediately knew about Bioheart.

AUSA Van de Graaf observed that the JayPeak/Quiros team was told they
could not market or take in money, but Stenger continued to market. In
response, Raymond advised that a Vietnam agent told Raymond Stenger was
still marketing. Raymond confronted Stenger, and got the "typical" Stenger
response: they did not realize they were marketing AnC Bio Vermont, it
must have been a mistake. Raymond had Stenger take down a big pop-up
display with incorrect marketing information. Raymond tried to catch
Stenger marketing during the ban, but it was hard because Stenger was
"global." When Raymond did catch Stenger in the act, he called him out.

AUSA Cate asked why would Stenger be at the conferences if they were
not allowed to market. In response, Raymond advised that, at first, only
AnC Bio Vermont was frozen from marketing – until a new PPM was approved.
Then Burke's money was frozen, followed by a ban on Burke's marketing.

Raymond eventually left his job at the state when he found out, through
the media, that the projects were allowed to go back to the market.

AUSA Van de Graaf asked Raymond about other Jay Peak projects. Raymond
advised that Kevin Dorn had signed approvals for the West Bowl project.
Raymond eventually got that project locked down. Nothing was ever
submitted to the state for the for the airport project, though the Jay Peak
/Quiros team did a public roll-out about it. Erie Pomerleau backed out of
a deal for the purchase of land by Lake Memphremagog.

DFR started its oversight role after Miller found out about the SEC
investigation. Miller thought it was a good idea to break out the
responsibilities of the agencies (ACCD and DFR). A letter from the
Governor was drafted about this reorganization in December 2014. In
January 2015, DFR began its monitoring role. Raymond initially was
forwarding relevant emails to DFR, but eventually DFR wanted Raymond to
stop his communications.

Raymond heard that Gordon was first hired for the PPM revision. Raymond
did not want the new PPM to be written by Scribner. Scribner's work was
"horrible." Raymond wanted the Jay Peak/Quiros team to get real securities
counsel. In the meeting at the law firm in Burlington was Scribner, Gary
Carnidy, and a young attorney. Kelly and Stenger were not present. An
argument with Scribner ensued about what the Regional Center had a right
to see. Raymond is not sure if he saw a final version of the PPM. He
certainly did not approve it.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond _____ , On 01/08/2019 , Page 10 of 12

AUSA Van de Graaf showed Raymond letters sent to Moulton in late 2014 and early 2015 (to include the dates of December 23, 2014 and January 8, 2015). In one of the letters, Stenger referred to a meeting with Moulton. In response, Raymond advised that the letters were directed to Moulton because the Jay Peak/Quiros team thought she would be more reasonable and sensitive to their needs. Stenger, who was on state economic councils, was trying to leverage his relationship with Moulton. His efforts, however, did not work. Moulton was on board to lock down the projects, though she was influenced by someone else to try other remedies. Moulton was present at the aforementioned meeting with Stenger at UVM. He is not sure if she was at the December meeting.

In regard to the January 8, 2015 letter, Raymond advised that the letter was addressed to Moulton, but it was a follow up to questions posed by Kessler to the attorneys. The Jay Peak/Quiros team was trying to draw Moulton into responding.

AUSA Van de Graaf asked if Raymond's group was still investigating at this time. Raymond advised that in December 2014, they were still involved in the weekly reports and following up on information the Jay Peak /Quiros's team was supposed to provide. Once DFR took over, Raymond and Kessler were in the dark about DRF's work. However, Raymond's group was still get weekly reports and communicating with the SEC. Raymond traveled to Korea and reported to DFR what he saw. By March, DFR was in charge.

AUSA Van de Graaf asked Kessler who was reviewing the answers provided in these letters. Raymond advised that if he was involved there would have been communications with Moulton and Kessler, and he would have forwarded them to DFR. Raymond added that it was "way past the time at this point" where anything they would say could convince him it was a good project. He recalled seeing the Frost and Sullivan report. Months would go by in which they were asking for the same things over and over again.

In June 2015, while Raymond was in Korea for another project, he carved out time to go to the AnC Bio Korea office in Gangnam. Raymond was advised through a translator that it no longer existed. He learned the office was located in a suburb about two hours away. Though a Korean AnC representative called back and invited him to visit, he never made it to the other location. Raymond sent an email to DFR personnel to advise them of this information.

Raymond felt the SEC investigation should be disclosed in the PPM. Their attorney in Boston advised it should be disclosed since it was a

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Brent Raymond                          , On  01/08/2019 , Page  11 of 12

material fact. AUSA Van de Graaf asked if Raymond got push-back. Raymond
advised that the Jay Peak/Quiros team pushed back about anything impacting
marketing.

Raymond did not hear about the March meeting with the Governor until
after it happened. He was annoyed with DFR and wondered why DFR did not
share the information about his trip to Korea with the SEC. He was stunned
when the projects were allowed to go back to the market. He decided to
resign and gave three months notice.

Raymond had worked with the ▓▓▓▓▓▓▓project while he was the Regional
Center Director. Mt. Snow was working with Hulme, an unregistered broker
dealer that ▓▓▓▓now held in high regard. Raymond had an opportunity to go
work for▓▓▓▓w and he took it.

Raymond was shown a Vermont Digger article (Bates 533874) in which the
suspension was described as voluntary. Raymond advised that his concern
was for the investors. He would have loved to have made a public statement
but had to be careful not to harm the investors, and he probably would not
have gotten approval to make statements. At the time, there was talk about
coordinating with the SEC. State personnel were very sensitive and serious
about what was written with the knowledge it would likely become a public
record.

In regard to the audit mandate by DFR, Raymond advised that "anyone
with common sense would want an audit." Raymond, Kessler and Moulton were
concerned about the what happened to the money. Raymond added, "It was sad
what happened."

In regard to his overseas travel for the EB-5 program, Raymond advised
that at first the state paid for his travel, but then it was decided that
Jay Peak had to pay. Raymond always flew economy and was "conservative"
about where he stayed. The Jay Peak people and the Governor flew business
class.

Raymond was often offered "comp stays" at Jay Peak. Raymond said no a
number or times. On one occasion, Stenger found out Raymond and his son
were coming to Jay Peak. Raymond was not billed for the stay despite his
efforts to get a bill. Raymond feels violated by this experience.

AUSA Van de Graaf observed that Raymond made two previous statements on
record: a deposition with the SEC and another civil case deposition.
Raymond advised there is another hour left on the latter, but nothing has
been scheduled yet.

The following Bates-numbered documents were referenced above:

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of __(U) Interview of Brent Raymond__ , On __01/08/2019__ , Page __12 of 12__

5251629

5219411

ACCD00006964

0289395

5217842

5217835

5153751

5153804

ACCD00005218

0161125

ACCD00007008

5265070

5289118

ACCD00005462

5649210

ACCD00005173

533874