FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    09/19/2019

Brent Raymond, former Director of the Vermont Regional Center was interviewed at the United States Attorney's Office, Burlington, Vermont by Assistant United States Attorneys Paul Van de Graaf and Nicole Cate and FBI Special Agent Jennie Emmons. Bill Griffin of the Vermont Attorney General's Office was also present as Raymond's legal counsel. After being advised of the identities of the interviewers and the nature of the interview, Raymond provided the following information:

In December 2011, Raymond left a job on Congressman Welch's staff to become a trade director with the state of Vermont.

In May 2012, before he started as the Vermont Regional Center director, he participated in a conference call with Douglas Hulme and Hulme's lawyers. Others on the call included Lawrence Miller, James Candido, John Kessler, and Kristin (LNU). Patricia Moulton came in at the end of the call. The purpose of the call was to try to understand Hulmes's concerns.

In June 2012, Raymond took over the Regional Center from Candido.

AUSA Van de Graaf listed events: in October 2012, a new AnC Bio Vermont MOU was signed; in February 2013 Diane Peel's report came out; around September 2013 a trip to China occurred (Raymond advised that he did not go on that trip); in October 2013 documents were provided by Quiros to the state about the status of matters in Korea; and, in October 2014 Chinese investor issues percolated.

Raymond advised that he believes the Chinese investor problems came to light in early 2014. Raymond was at a conference in Shanghai and was seated with an economist. A woman rushed in and asked for him. Raymond was startled and concerned something had gone wrong at home. He left the conference and found Chuck Leamy on a conference floor with six to eight Chinese persons screaming at him. Leamy did not seem to know how to talk to them. Raymond

| Investigation on | 09/03/2019 | at | Burlington, Vermont, United States (In Person) |
|---|---|---|---|
| File # | 318B-AL-6464304 | | Date drafted  09/04/2019 |
| by | EMMONS JENNIE MCGLYNN | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

5766790

FD-302a (Rev. 5-8-10)

318B-AL-6464304 Serial 310

318B-AL-6464304

Continuation of FD-302 of  (U) Interview of Brent Raymond , On 09/03/2019 , Page 2 of 7

directed them to a private area. They presented Raymond with emails in which they have been promised a return of their invested money. Raymond, after this event, worked to get them their money back.

Raymond had discussions with Lawrence Miller before the meeting with Stenger and MacLean in Montpelier.

AUSA Van de Graaf noted other events: Moulton instituted a marketing hold on June 27, 2014; Raymond did a recorded interview with the SEC in January 2015; and, DFR started its work January 2015.

Raymond gave three months notice in July 2017, but ended up leaving earlier because the state was concerned about the optics of Raymond going to work at Mount Snow on EB-5 matters. Raymond still got paid by the state (without insurance) for the three months.

Becky Fu███████████████████████████████████████. She left the state before Raymond. There was also concern about a conflict of interest in her situation (due to the Trapp EB-5 projects).

Fu participated in the meeting on the 6th floor at ACCD, involving Michael Scribner and a New York City attorney David Gordon. Raymond asked Fu to keep notes (and did a quick review of those notes). There was also a working document about obtaining facts about Korea.

It took forever for the projects to get "frozen" by the state. Moulton would seem to agree with them (Raymond and others at ACCD who had concerns), then she would want to try "this or that" rather than freeze the projects.

The state worked with a Boston (securities) firm as soon as the SEC was involved. Raymond had been asking for outside security counsel, but the state had been slow to agree with him—until the SEC came in.

The first SEC/ACCD interaction was probably around the time Raymond got a subpoena for his SEC deposition. ACCD personnel talked to SEC Miami a couple times a week. ACCD asked for their documents to be subpoenaed. ACCD wanted to "share everything," and there was frequent communication. ACCD was open with the SEC that they had been concerned for a long time. Raymond finally "felt sane."

Raymond decided to leave the state when he heard that the projects could

5766790.02

FD-302a (Rev. 5-8-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond , On 09/03/2019 , Page 3 of 7

go back to the market. "I was done," Raymond noted, "something was wrong here." Raymond decided to find another job and resign.

Betweem the time the SEC got the subpoenaed documents to his deposition, there was a lot of friendly communication with the SEC. Those at ACCD joked with the SEC about asking Bill Kelly for stuff and not getting it.

At the June meeting with the state, Kelly said he could produce a document stating that the SEC "blessed" them. Raymond said, "Ok, let's see it." Kelly then went through the motions of looking for it on his computer, but did not find anything.

Raymond had been around Kelly before but only in meetings.

Raymond saw a Raymond James statement related to Phase I. Tony Sutton, and investor, had emailed the statement to Moulton and copied Raymond. In the statement, Raymond observed that project monies had been co-mingled, money was flowing in and out, and the existance of a margin loan. Raymond was taken aback when he saw the margin loan. Gordon had said that investor money had been invested in treasury bonds for safety reasons, but this was the first time Raymond saw a margin loan was involved. Raymond had previously worked as a wealth manager and understood margin loans.

Raymond went to Moulton and Kessler with this information. Moulton may have reached out to Sutton. The concern was forwarded to the SEC. DFR also picked up on the margin loan issue.

AUSA Van de Graaf observed that an explanation was given in around January/February that margin loans were used for liquidity purposes (so money would be available for payments). Raymond advised that the Raymond James account statement (and he saw just one at that time) was for the first or second project, which were already completed (hence, the liquidity would not have been needed).

Raymond was asked to speak about Vermont exports at an event at the University of Vermont (UVM), which had a lot of dignitaries from Canada. Stenger, who was also at the event, wanted to talk to Raymond and Moulton. During their talk, Stenger broke down and cried and pleaded with them to let the projects go forward.

5766790.03

Raymond asked Kelly and Quiros for Raymond James statements. Kelly left a Raymond voicemail saying that they were getting them together, but also asked Raymond where Raymond had seen a statement before.

After the meeting in which Raymond asked to see Raymond James statements, Raymond emailed Quiros and Kelly to follow up about getting the statements. Kelly promised to get them, but never did.

AUSA Van de Graaf noted that Stenger sent three letters to Moulton: one on December 23rd, one on January 8th and one on January 23rd; and noted that Stenger referenced a December 19th meeting with Moulton. Raymond stated that there was one meeting with Governor Shumlin. AUSA Van de Graaf noted that that meeting happened later, after the Department of Financial Regulation had done some work.

Raymond began to do a lot of EB-5 travel (for AILA and IIUSA events and trade shows, for example). The travel included foreign events, such as those put together by IIUSA and a immigration entity in the host country. Fu would occasionally travel with Raymond. Lawrence Miller once went on an EB-5 trip to San Francisco. Kessler would sometimes go for the purpose of gaining knowledge of the program. At first, the state of Vermont paid for Raymond's EB-5-related travel.

The foreign events were primarily in China, Taiwan, and Vietnam, but also in UAE and Kuwait. About 80-85% of EB-5 investors were from China, hence they wanted to develop a relationship with agents in China.

Raymond flew economy class on EB-5 trips. He would submit a budget to the state for his travel and state the purpose of the trip. He was sensitive to being a state employee on a state budget. He did not have overly elaborate meals, unless the meal involved impressing an agent. However, such meals were infrequent.

At events, Jay Peak had the biggest exhibits. Stenger flew first class for his travel.

Raymond begged not to go on the trip that involved Senator Leahy. Raymond is aware that Leahy was a big supporter of the EB-5 program. The SEC inquiry had started, and Raymond and Kessler brought that fact up the chain to Miller. Raymond heard that Leahy's office was going to be notified.

FD-302a (Rev. 5-8-10)

318B-AL-6464304 Serial 310

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond ,On 09/03/2019 ,Page 5 of 7

Leahy was traveling to Vietnam for a matter related to left-over munitions and had coordinated with Stenger to attend EB-5 events in China.

Raymond knew there was something seriously wrong. He took down all the Jay Peak references on the state's website. Miller told Raymond he had to go on the trip. The trip, which involved Leahy and Congressman Welch, included travel to Shanghai, Ho Chi Minh City and Hanoi, and possibly another city in Vietnam. When speaking to investors, Raymond said over and over that their investment would be at risk. Raymond tried to make sure that Leahy and Welch did not say anything wrong. Leahy probably spoke highly of Stenger. Though Leahy was supportive of the EB-5 program in general, he did not say investors "should" invest. The Chinese love bureaucrats so attendence by Leahy and Welch was significant. The trip was geared more to agents than investors.

Raymond tried to avoid Governor Shumlin. Shumlin strayed from talking points and was not "manageable." Raymond never went on a trip with Shumlin or even to state events with him.

Raymond attended the September 2012 Northeast Kingdom initiative event. Raymond was concerned that there were no Memorandum of Understandings (MOUs) for some of the projects being proposed.

Raymond did not attend the AnC Bio Vermont groundbreaking. He planned not to go.

Raymond attended an event in Newport with Stenger related to economic development. This event did not involve investors. He sat next to Stenger and answered questions. The mayor of Newport, who was also there, criticized Raymond for being too conservative.

Raymond had to be conscientiously balanced in being skeptical and marketing the projects.

Raymond assumed responsibility for the Regional Center's website. He would make edits and changes. Raymond changed a lot of information available on the website. At a certain point he could make edits himself and did so.

Raymond is aware that the Jay Peak team was marketing projects after marketing was shut down by the state. At a Washington, D.C., event, Raymond

5766790.05

observed that they were marketing (after marketing had been frozen). The language they were using was not appropriate and Raymond told Stenger to remove it. Stenger was almost always as these events, though he missed some when his wife was sick.

AUSA Van de Graaf asked if the Regional Center's support of Jay Peak changed after AnC Bio Vermont was shut down in June 2014. Raymond advised that he removed all the Jay Peak projects from the list of projects on the website. Further, the Regional Center did not participate in Jay Peak's booth at events and did not list Jay Peak's projects at their (the Regional Center's) booth.

Part of the reason Raymond joined ACCD was Miller. Raymond saw that Miller, who had a background in private industry, was coming up with solutions. Raymond was impressed.

Raymond suggested changes to the MOU. Miller was concerned that the changes would cost the developer more money. Raymond now thinks about what he could have done to push for more, such as audits. The projects' Private Placement Memorandums (PPMs) did not have the kind of substance (detail and covenants) Raymond was used to seeing.

After the audit question was raised, there was a decision that audits would not happen. Miller told Raymond that James Candido had done some kind of financial review of the projects (when he was in Raymond's position). Raymond also read this in a Seven Days article within a couple weeks of the Douglas Hulme email going out to immigration attorneys. However, Raymond considered a financial review by Candido to be ridiculous. Candido did not have the background to do a financial review.

Raymond would calculate the jobs created based on USCIS approvals.

There was a lack of communication with USCIS. In terms of reporting concerns to USCIS, Raymond did not see the situation as clear cut because he did not have enough information. People like Scribner advised him to be careful—Raymond could negatively impact investors and put the state at risk.

Sutton and other investors sent Raymond emails. In one, Raymond got a link to a video in which Governor Shumlin stated that audits were conducted by the state. Raymond's reaction was "Holy Shit!" One of the state's talking

FD-302a (Rev. 5-8-10)

318B-AL-6464304 Serial 310

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Brent Raymond , On 09/03/2019 , Page 7 of 7

point was that financial audits are not conducted. Raymond had never seen the video before. The video was a product of Jay Peak's marketing and was a part of Jay Peak's EB-5 website.

AUSA Van de Graaf noted that in an earlier interview a friend of Raymond's told Raymond not to go near ▓▓▓▓. Raymond advised that he did not follow up on this information. He knew he would not get an honest answer. He knew Quiros had been on the board of ▓▓▓▓ and had been removed. He wondered how Stenger could be competent on matters related to biotechnology and clean rooms. ACCD was using an intern to gather information. Raymond learned that the UVM medical program wrote a letter of support and gave an "AnC Bio guy" a room at UVM—and that person wrote a letter on UVM medical center letterhead.

Raymond worked a lot with David Pendle of Leahy's office. Raymond and Pendle had ongoing conversations about EB-5 in general. Raymond gave Pendle ideas for legislation for integrity measures.

In August 2014 (probably), during a break when staffers were in Vermont, Raymond and others (to include either Lucy Leriche or Moulton) went to Leahy's office. The meeting included Leahy staffers Pendle, John Tracy and Chris Saunders. Raymond got the impression that they did not know what to make of him (Raymond) or even of the SEC investigation (since there had been another SEC investigation of ▓▓▓▓▓▓▓▓.

Raymond had another meeting in Washington with a Leahy staffer over beers. Raymond got the impression she feeling him out. She told Raymond everything was going to be fine and that Stenger is "a good guy."

Stenger did not have a close connection with Senator Sanders or Welch.

Raymond was asked to try to recall the name of the Leahy staffer he met in Washington; and to see if he still has the voicemail from Kelly.

5766790.07